## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JOHN DOE (said name being fictitious),<br><br>                    Plaintiff,<br><br>v.<br><br>DELAWARE VALLEY REGIONAL HIGH SCHOOL BOARD OF EDUCATION, SCOTT MCKINNEY, individually and in his official capacity as Superintendent of Schools, ASHLEY MIRANDA, individually and in her official capacity as school counselor, MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey, ANGELICA ALLEN-McMILLAN, in her official capacity as Acting Commissioner of the New Jersey Department of Education, and JOHN ROES 1-10 (said names being fictitious), individually and in their official capacities,<br><br>                    Defendants. | Civil Action No. |

---

**BRIEF IN SUPPORT OF ORDER TO SHOW CAUSE SEEKING TEMPORARY RETRAINTS AND A PRELIMINARY INJUNCTION.**

---

MURRAY-NOLAN BERUTTI LLC
136 Central Avenue, 2nd Floor
Clark, New Jersey 07066
908-588-2111
ron@murray-nolanberutti.com
Attorneys for Plaintiff John Doe

On the Brief:
Ronald A. Berutti - 023361992

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT ....................................................................... 1

STATEMENT OF FACTS .............................................................................. 3

LEGAL ARGUMENT .................................................................................... 8

POINT I: THE PLAINTIFFS HAVE SATISFIED ALL CRITERIA FOR A
PRELIMINARY INJUCTION  ........................................................................ 8

A. Likelihood of Success ............................................................................. 8

B. Irreparable Damage ................................................................................ 11

C. Harm to Defendants ............................................................................... 12

D. Public Interest ........................................................................................ 12

POINT II: THE PLAINTIFF IS ENTITLED THE
EQUITABLE REMEDY OF HAVING A MONITOR
APPOINTED TO PROTECT HIS FUNDAMENTAL RIGHTS
UPON HIS DAUGHER'S RETURN TO THE CLASSROOM ............................. 12

CONCLUSION ............................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Bill Blass, Ltd. v. Saz Corp.*, 751 F.2d 152, 154
(3d Cir. 1984)............................................................................ 8

*Chadda v. Bd. of Elections*, 222 F. App'x 147, 149
(3rd Cir. 2007) ......................................................................... 8

*ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226
(3d Cir. 1987) ........................................................................... 8

*Elrod v. Burns*, 427 U.S. 347, 356-57 (1976)  ...........................9,11

*Groman v. Township of Manalapan*, 47 F.3d 628, 633
(3d Cir. 1995) ........................................................................... 9

*Hodgson v. Minnesota*, 497 U.S. 417 (1990).............................10

*L.W. v. Skrmetti*, 83 F.4th 460, 486 (6th Cir. 2023) ................ 11

*McCurdy v. Dodd*, 352 F.3d 820, 827 (3d Cir. 2003) ............... 10

*Meyer v. Nebraska*, 262 U.S. 390, 400 (1923) ..................... 1,10

*Monroe v. Pape*, 365 U.S. 167, 172 (1961)................................9

*Moore v. East Cleveland*, 431 U.S. 494, 503-504 (1977) ....................... 10

*National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988)............ 9

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 587 U.S. 1 (2023)....................................10

*Opticians Ass'n of Am, supra* 920 F.2d at 191-92: ..................... 8

*Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925)..............................10

*Tillery v. Owens*, 907 F.2d 418, 429 (3d Cir 1990) ................................ 12

*Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) ............................................... 1,2,10,

*Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ............................................ 9

*Tillery v. Owens*, 907 F.2d 418, 429 (3d Cir 1990) ........................................... 12

**Constitution/Statutes**                                                    **Page**

*N.J.S.A.* 10:5-1 *et seq.* .............................................................................. 2,4

*U.S. Const. Art. VI, Cl.2* ........................................................................ 3

U.S. Const. amend. XIV, § 1 ..................................................................... 9

20 *U.S.C.* §3401(3) .................................................................................. 2, 11

28 *U.S.C.* § 2201. ................................................................................... 8

## PRELIMINARY STATEMENT

At issue before this Court are pure questions of constitutional law which are very basic concepts that have been recognized by the United States Supreme Court as being fundamental rights which compel strict scrutiny review: (1) "the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (plurality); and (2) parents have the right "to teach and ... to engage ... so to instruct their children ..." *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923).

Delaware Valley Regional High School ("DVRHS"), by and through its Board of Education ("Board"), Superintendent Scott McKinney ("McKinney"), school counsellor Ashley Miranda ("Miranda"), and perhaps others who are identified as John Roes 1-10 (together the "Board Defendants"), have turned these basic constitutional principles on their head and have chosen to willfully and contumaciously violate the parental rights of the plaintiff John Doe. Mr. Doe has recently learned that the Board Defendants have been socially transitioning his daughter, Jane Doe ("Jane"), so that she is treated as a male. The Board Defendants have purposely acted to conceal such fact from Mr. Doe, who has worked with licensed medical professionals to provide his daughter with therapy over the past several years due to her prior trauma. The Board Defendants never cared to investigate Jane's mental health history, medical diagnoses, or ongoing treatment, and never learned that Jane had experienced trauma as a young child when her biological mother passed away. Instead, they recklessly moved to violate Mr. Doe's parental rights.

When Mr. Doe learned of the Board Defendants' action to socially transition Jane, he demanded that the Board Defendants cease and desist since his fundamental parental rights were being violated, which the Board Defendants have refused to do. Now the Board Defendants insist

1

that Jane, who presently is receiving approved at-home instruction since Mr. Doe asserted his objections, cannot return to school unless social transitioning continues without Mr. Doe's consent, despite Mr. Doe's demands that the defendants cease and desist, in violation of his constitutional rights.

The Board Defendants have asserted that federal and state anti-discrimination laws compel them to act in such manner. However, Mr. Doe, though his attorneys, have provided the Board Defendants with citation to *Troxell* and otherwise have advised that the Board Defendants are violating Mr. Doe's fundamental constitutional rights. Yet without any analysis or examination, the Board Defendants have continued to rely on unspecified federal and state law for their unconstitutional actions. Thus, Mr. Doe has joined the Attorney General of New Jersey ("AG") and the Assistant Commissioner of Education for the New Jersey Board of Education ("NJBOE") as defendants to enjoin them from seeking to enforce laws and policies that violate the fundamental rights of parents in the manner that is taking place at DVRHS. It is a matter of public record that the AG has taken the legal position that schools may not refuse to socially transition students since to do so allegedly would be discriminatory under the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5-1 *et seq*. Further, the NJBOE has promulgated Policy 5756, which guides school districts to provide so-called "gender affirming care" to students in the manner in which the Board Defendants are doing. The Board has enacted Board Policy 5756 in keeping with such guidance and compels such "gender affirming care" at DVRHS. Thus, such laws and policies are unconstitutional to the extent that they violate the fundamental rights of parents such as Mr. Doe, as described above.

Moreover, by their actions, the Board Defendants are violating federal law as well. The Board receives federal funding such that it is subject to 20 *U.S.C.* §3401(3), which is the supreme

2

law of the land, and provides, in pertinent part, that "parents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role." To the extent that the NJLAD, Policy 5756, or any other state law has school districts receive federal funding while engaging in social transitioning minor children without their parents' fully informed knowledge and consent, such laws and policies are unconstitutional under the Supremacy Clause of the Constitution, *U.S. Const.* Art. VI, Cl. 2.

The Board Defendants utterly refuse to honor Mr. Doe's constitutional rights and will only educate Jane if he yields such actions by the Board Defendants. Thus, immediate relief is necessary to protect Mr. Doe's rights under the circumstances, and the additional remedy of appointment of a monitor should be granted as well, to ensure that the Board Defendants will protect Mr. Doe's rights, in light of the Board Defendants' contumacious conduct to date.

## **STATEMENT OF FACTS**

Jane is a minor child who has a documented diagnosis of Attention-Deficit/Hyperactivity Disorder ("ADHD") and Unspecified Mental Disorder ("UMD"), who also endured the childhood trauma of the death of her mother. Jane has been under the care of a therapist for depression, anxiety, and gender confusion since April 21, 2022. Mr. Doe and mental health professionals have agreed to take a cautious approach to Jane's gender confusion given her underlying trauma and psychiatric co-morbidities. (VC¶¶ 1-2)[1]

The Board has a policy titled "5756 - Transgender Students," ("Board Policy 5756"), which provides, in part:

> The school district shall accept a student's asserted gender identity; parental consent is not required. A student need not meet any threshold diagnosis or

---

[1] "VC" refers to the Verified Complaint; "Berutti Dec." refers to the Declaration of Ronald A. Berutti, dated January 5, 2024.

treatment requirements to have his or her gender identity recognized and respected by the school district, school, or school staff members. In addition, a legal or court-ordered name change is not required. There is no affirmative duty for any school district staff member to notify a student's parent of the student's gender identity or expression. (VC ¶3, Ex. A)

The NJDOE published guidance to New Jersey encourages public schools to take a "student-centered approach" to students who believe themselves to be transgender, which declares, "school district personnel should have an open, but confidential discussion with the student to ascertain the student's preference on matters such as chosen name, chosen pronoun use, and parental communications." (VC ¶4, Ex. B) Further, the AG is actively litigating the legal position that although such policy is merely guidance, school districts must follow it since to do otherwise would violate the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5-1 *et seq.*, and perhaps other New Jersey Laws, which provide certain anti-discrimination provisions with respect to gender identity. (VC ¶5)

When a student's name and pronouns are changed by a school so that the student can live as the opposite sex while at school and/or elsewhere, the school is initiating a social transition. Social transition is a psychotherapeutic intervention and is not a neutral act. Cass, H., *Independent review of gender identity services for children and young people: Interim report* (2022). (VC ¶6) Gender dysphoria is a serious mental-health condition that requires professional help. "Since it is impossible to definitively delineate the contribution of various factors contributing to gender identity development for any given young person, a comprehensive clinical approach is important and necessary" *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8,* WPATH, International J. Trans. Health 2022, Vol. 23, No. S1-S258 (2022) ("WPATH"). (VC ¶7) Parents must be permitted to seek a mental health evaluation prior to any psychological intervention. Mental health providers "should provide guidance to

4

parents/caregivers and supports to a child when a social gender transition is being considered" so that the parents can succeed in "making informed decisions about the advisability and/or parameters of a social transition for their child." WPATH at S78  (VC ¶8)

As a freshman at DVRHS, Jane participated in an extracurricular club known as Students Advocating for Equality ("SAFE"), which exists to "promote open discussion and awareness about modern cultures and topics surrounding intersectionality while aiming to make positive contributions to our community and school." (VC ¶9) Miranda is the staff advisor of SAFE and is neither a state licensed medical doctor nor psychologist. (VC ¶10) Jane attended a SAFE meeting and expressed to defendant Miranda that she would like to undergo a social transition from female to male in school. Miranda immediately affirmed Jane's expressed identity and began to facilitate Jane's social transition. (VC ¶11) Miranda did not ask Jane about her mental health history, her history of trauma, or whether Jane was currently under the care of a mental health professional, but rather asked Jane if she would like to change her name and pronouns and be known only as a male at school, to which Jane agreed. (VC ¶¶12-13)

Thereafter, Miranda sent a communication to the entire staff of DVRHS other than two teachers who had contact with members of Mr. Doe's household, who were excluded so that Mr. Doe would not learn of the social transition. (VC ¶¶14-15) In such communication, Miranda informed staff of Jane's name change and advised that all such staff was thereafter required to utilize the alternate male name by which Jane desired to be called. (VC ¶¶14-15) Staff were also informed that Mr. Doe was not to be informed about Jane's social transition. (VC ¶¶14-15) Thereafter, and before Mr. Doe eventually learned of the social transition of his daughter at DVRHS, when communicating with Mr. Doe about his daughter, the school always uses Jane's given female name, which was done for the purpose of concealing Jane's social transition at

DVRHS. (VC ¶16)

    In December 2024, months after the commencement of Jane's purposely secretive social transition, Mr. Doe learned of Jane's social transition at school when another parent called Jane by a boy's name in his presence. After Mr. Doe inquired of the parent why the parent was calling Jane by a boy's name, the parent explained to Mr. Doe that Jane was being called by such name at school since she was being socially transitioned. (VC ¶17) Upon learning that Jane had been provided with a separate identity at school and that DVRHS and its staff was intentionally hiding such fact from him, and due to his daughter's distress at living a second life, Mr. Doe placed Jane on home instruction until he could share Jane's personal and therapeutic history with McKinney, Ashley, and the Board (the "Board Defendants"). (VC ¶18)

    On December 8, 2023, Mr. Doe met with DVRHS administration as well as Miranda, who indicated that she was not aware of Jane's ADHD and UMD diagnoses or her past trauma when she facilitated Jane's social transition. (VC ¶19) Miranda also advised that she was unaware that Jane was under the care of a therapist at Mr. Doe's parental direction and with his consent. (VC ¶19) Mr. Doe informed the Board Defendants that he and Jane's therapist were not in agreement with Jane's social transition and expressly denied his consent to the continuance of Jane's social transition at school, but was advised that Jane would continue being socially transitioned, such that the Board Defendants specifically and deliberately aimed at interfering with protected aspects of Mr. Doe's parent-child relationship. (VC ¶¶20-21) Following the meeting, a Cease and Desist letter was served on the Board Defendants, which asserted, among other things, that Mr. Doe's parental rights were being violated. (VC ¶22, Ex. C)

    Thereafter on December 8, 2023, a letter was forwarded to the Board Defendants which confirmed the critical events of the meeting that had occurred, reiterated that a Cease and Desist

6

was served, and renewed the demand that the Board Defendants cease and desist from socially transitioning Jane against Mr. Doe's parental judgment as to Jane's best interests. (VC ¶23, Ex. D) On December 22, 2023, the Board Defendants responded by advising that Jane would be approved for home instruction, but "that the District will continue to abide by federal and state law as well as the Department of Education guidance regarding transgender students to ensure that the District is not discriminating against a student based on gender identity or expression." (VC¶24, Ex. E) Consequently, the Board Defendants again specifically and deliberately interfered with constitutionally and statutorily protected aspects of Mr. Doe's parent-child relationship and expressed deliberate indifference to Mr. Doe's fundamental parental rights and further interfered with such constitutional and statutory rights by establishing a policy that only way that Jane could return to the classroom is if Mr. Doe chose to waive his constitutional and statutory rights and to abide by the Board Defendants' violations thereof, based on the Board Defendants' interpretation of law and public policy. (VC ¶25)

On January 2, 2024, counsel for the Board Defendants further noted in an email to Mr. Doe's attorney that the school district had a goal to implement "home instruction" for Jane in a public library, but that "to ensure there is no misunderstanding," Mr. Doe should "know that during home instruction the teachers will comply with district policy, NJDOE guidance, and federal and state laws regarding A.H.'s name preference." (VC ¶26; Berutti Dec. Ex. A) Thus, the Board Defendants again specifically and deliberately interfered with constitutionally and statutorily protected aspects of Mr. Doe's parent-child relationship, expressed deliberate indifference to Mr. Doe's fundamental parental rights, and further interfered with such constitutional and statutory rights by establishing a policy that made it impossible for Jane to receive a public education unless Mr. Doe yielded his constitutional and statutory parental rights. (VC ¶27)

## LEGAL ARGUMENT

### POINT I

## THE PLAINTIFF HAS SATISFIED ALL CRITERIA FOR A PRELIMINARY INJUNCTION.

Mr. Doe has brought claims seeking injunctions prohibiting defendants from the continued enforcement of laws and policies which violate parental rights in the manner in which Mr. Doe's rights are being violated. An urgent need for immediate relief has been demonstrated since despite Mr. Doe's demands to the contrary, the Board Defendants are relying on state laws and policies to claim that they will continue to socially transition Jane without his consent in violation of Mr. Doe's parental rights.

"[A] TRO or preliminary injunction will issue only when the movant produces evidence sufficient to convince the court that all factors favor preliminary relief. *Chadda v. Bd. of Elections*, 222 F. App'x 147, 149 (3d Cir. 2007). Such factors are found in *Opticians Ass'n of Am, supra*, 920 F.2d at 191-92:

> When ruling on such a motion, the district court must consider four factors: "[A] the likelihood that the applicant will prevail on the merits at final hearing; [B] the extent to which the plaintiffs are being irreparably harmed by the conduct complained of; [C] the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; and [D] the public interest." *Bill Blass, Ltd. v. Saz Corp.*, 751 F.2d 152, 154 (3d Cir. 1984). Only if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief should the injunction issue. *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987).

The plaintiffs meet all four criteria and, thus, is entitled to a temporary restraining order and preliminary injunction.

### A. Likelihood of Success.

Mr. Doe brings claims under the federal Declaratory Judgment Act, 28 *U.S.C.* § 2201, and pursuant to Section 1983 claim. All such claims allege violations of Mr. Doe's constitutional

rights, and the Declaratory Judgment Count exclusively seeks declarations of law and injunctions as substantive relief.

*Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995), provides that "[a] prima facie case under §1983 requires a plaintiff to demonstrate: (1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." Liability under Section 1983 "attaches only to those wrongdoers 'who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it.'" *National Collegiate Athletic Ass'n v. Tarkanian*, 488 *U.S.* 179, 191 (1988) (*quoting Monroe v. Pape*, 365 *U.S.* 167, 172 (1961)). Injunctions are particularly appropriate in cases involving deprivations of First Amendment rights. *See Elrod v. Burns,* 427 U.S. 347, 356-57 (1976) (affirming an injunction under § 1983 where First Amendment rights had *been violated).*

In the instant matter, defendants are state actors who are violating Mr. Doe's fundamental constitutional parenting rights. *U.S. Const.* amend. XIV, § 1 provides that "No State shall ... deprive any person of life, liberty, or property, without due process of law." The Fourteenth Amendment's Due Process Clause "includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Troxel, supra*, 530 U.S. at 65 (*quoting " Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). "Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition ... and implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed ..." *Glucksberg, supra*, 521 U.S. at 720-721 (cleaned up). "[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history

and tradition." *Moore v. East Cleveland*, 431 U.S. 494, 503-504 (1977) (plurality). "It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural." *Id.* at 504. There is an absolute liberty interest of parents and guardians to direct the upbringing and education of children under their control, *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-535 (1925), for which strict scrutiny should be applied. *Troxel, supra*, 530 U.S. at 80 (Thomas, J., concurring). Strict scrutiny compels the state to "prove that the law is narrowly tailored achieve a compelling governmental interest." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 18-19 (2023). "The established doctrine is that this liberty may not be interfered with, under the guise of protecting the public interest ..." *Meyer, supra*, 262 U.S. at 399-400. The Third Circuit has "recognized a cognizable liberty interest in preserving the life and physical safety of a minor child. . . a right that logically extends from a parent's recognized liberty interest in the custody of his children and the maintenance and integrity of the family." *McCurdy v. Dodd*, 352 F.3d 820, 827 (3d Cir. 2003) (quotation omitted and cleaned up). "A natural parent who has demonstrated sufficient commitment to his or her children is thereafter entitled to raise the children free from undue state interference." *Hodgson v. Minnesota*, 497 U.S. 417, 447 (1990).

"The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted." *Meyer, supra*, 262 U.S. at 400. "Corresponding to the right of control, it is the natural duty of the parent to give his children education suitable to their station in life ..." *Ibid.* Similarly, as in *Troxell*, "[t]he liberty interest at issue in this case--the interest of parents in the care, custody, and control of their children--is perhaps the oldest of the fundamental liberty interests recognized by ... [the United States Supreme] Court." *Id.* at 65.

Conversely, "[t]he Supreme Court has not recognized any new constitutionally protected classes

in over four decades, and instead has repeatedly declined to do so." *L.W. v. Skrmetti*, 83 F.4th 460, 486 (6th Cir. 2023) (quotation omitted). The Supreme Court has not recognized transgender status as a suspect class. *Id.*

Moreover, 20 *U.S.C.* §3401(3) is the supreme law of the land and provides "parents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role." The Board Defendants actions violate such law as do the Attorney General, the Acting Commissioner of the NJBOE, and the Board to the extent that they seek to enforce laws and policies which interfere with such statutory rights.

By their actions in demanding that Mr. Doe accept the Board Defendants' insistent requirement that they socially transition Jane without his authority, the Board Defendants are directly interfering with Mr. Doe's family and his constitutionally protected parental rights to direct his child's education, to protect his child, and to exercise the care, custody and control of his child. Moreover, by enforcing statutes and policies which are antithetical to Mr. Doe's rights, the Attorney General, the Acting Commissioner of the NJBOE, and the Board are violating such rights. Thus, it is likely that Mr. Doe will succeed on the merits.

**B. Irreparable Harm.**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod, supra*, 427 U.S. at 373. Parental rights, perhaps the oldest and most cherished of rights, are no less important than First Amendment rights. Their loss by Mr. Doe constitutes irreparable harm.

### C. Harm to Defendants.

Defendants will suffer no harm by virtue of preliminary restraints. They have no legitimate interest whatsoever in promoting, enforcing, or promulgating laws or policies which interfere with the fundamental parental rights described herein.

### D. Public Interest.

The public interest overwhelmingly supports the notion that parents are fundamentally entitled to direct the upbringing and education of their children. Nothing about the state actors' roles in this case suggests that they have any medical training or licensure which should in any way encroach on the parents' fundamental rights to direct the education of their child and to provide the care, custody, and nurture of their child. Even if such training and licensure existed, Mr. Doe already has Jane in therapy, in her best interests. As set forth above, the state may not interfere with fundamental liberty interests under the guise of protecting public interest.

POINT I

**THE PLAINTIFF IS ENTITLED THE EQUITABLE REMEDY OF HAVING A MONITOR APPOINTED TO PROTECT HIS FUNDAMENTAL RIGHTS UPON HIS DAUGHTER'S RETURN TO THE CLASSROOM.**

Among the relief that Mr. Doe seeks is the appointment of an independent monitor to ensure that the Board Defendants comply with their obligations to educate Jane without engaging in any social transitioning. To date, the Board Defendants have shown utter contempt for Mr. Doe's fundamental constitutional rights, yet Mr. Doe has no choice but to have Jane educated in the public schools.

In *Tillery v. Owens*, 907 F.2d 418, 429 (3d Cir 1990), the Third Circuit provided guidance to district court regarding the exercise of equitable powers, mainly arising from school desegregation cases. It wrote as follows (cleaned up, quotations and citations omitted):

12

First, the nature of the remedy is to be determined by the nature and scope of the constitutional violation and thus must be related to the *condition* alleged to offend the Constitution. Second, the decree must be limited to remedial purposes. Finally, the remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution. Within these guidelines, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.

Here, Mr. Doe seeks two non-injunctive equitable remedies. First, he seeks the immediate reinstatement of Jane to the classroom where she is not to be subjected to social transitioning, in keeping with Mr. Doe's parental rights and his demand that such activity cease and desist. Such remedy is related to the condition alleged to offend the Constitution, is limited to its remedial purpose, takes into account the interests of state and local authorities in managing their own affairs consistent with the Constitution, and are designed to remedy past wrongs committed against Mr. Doe's rights as related to Jane's education.

Second, Mr. Doe seeks the appointment of an independent monitor to observe the school environment in order to ensure that the Board Defendants and those acting under them do not fall into the "habit" of violating Mr. Doe's constitutional rights by acting to socially transition Jane. The Board Defendants convinced Jane, a young lady with significant emotional issues, that she should transition. There is nothing to stop the Board Defendants from secretly continuing such policy despite a temporary restraining order or preliminary injunction unless Jane or some third party reports the same, which is unlikely. Thus, an independent monitor who would act much like a full time school aid should be appointed to ensure the Board Defendants' compliance with a temporary restraining order or an injunction so that Mr. Doe can be assured that his daughter will not be subjected to social transitioning by the Board Defendants in violation of his parental rights.

The Board Defendants secreted Jane's social transition with the apparent knowledge that Mr. Doe would exercise his right to object. They did nothing to ensure that Jane was not already

receiving therapy and treatment, such that the Board Defendants interfered with the care Jane was receiving with Mr. Doe's approval. Mr. Doe only learned of the Board Defendants' violations of his constitutional rights from a third-party parent, who humiliatingly knew of such social transitioning of Jane when Mr. Doe did not. Finally, although Mr. Doe demanded that the Board Defendants cease and desist, and cited his fundamental constitutional rights as the basis, the Board Defendants rejected him. Now Mr. Doe is being forced to accept the Board Defendants' unconstitutional social transitioning of Jane even if she is to remain schooled remotely.

Mr. Doe's proposed remedy of having an independent monitor appointed at the Board's sole expense conforms with the nature and scope of the harm that the Board Defendants have purposely and knowingly caused to Mr. Doe's rights. Jane must be watched while she is under the Board Defendants' custody and control. The proposed remedy is purely remedial, and the Board Defendants already have aides in classrooms as a matter of routine, such that the monitor will not interfere with the conduct of school affairs that are consistent with the Constitution. Finally, the appointment of a monitor will remedy the past wrongs committed against Mr. Doe's fundamental constitutional parental rights while Jane was under the Board Defendants' custody and control.

## CONCLUSION

Based on the foregoing, Mr. Doe has demonstrated his right to a preliminary injunction in the form set forth in the Order to Show Cause, which should be entered as a temporary restraining order in the plaintiffs' favor pending the return of the Order to Show Cause. Moreover, Jane should immediately be readmitted to school under the supervision of an independent monitor who is appointed by the Court at the sole cost of the Board.

Respectfully submitted,

**MURRAY-NOLAN BERUTTI LLC**

*Attorneys for the plaintiff, Rebecca Petersen*

*s/ Ronald A. Berutti*

By:_____

Ronald A. Berutti

Dated: January 5, 2024