<u>**PRELIMINARY STATEMENT**</u>

The plaintiff, John Doe ("Mr. Doe"), submits this supplemental brief following the Case Status Conference held on January 31, 2024. Mr. Doe submits this in order to do the followiing:

(1) Provide the Court with new facts that have occurred since the filing of the Verified Complaint and application for an Order to Show Cause which demonstrate the emergent nature of this matter and the irreparable harm that is being caused;

(2) To further expand on the law supporting the existence of fundamental parental rights which are being abused by defendants through their acts; and

(3) To clarify the standard of review.

<u>**STATEMENT OF FACTS**</u>

It is important to highlight prior facts so that they may be put into context with new facts that have arisen since this action was filed. Such facts demonstrate the irreparable harm being caused by defendants' actions as well as the violations of Mr. Doe's fundamental rights.

- Jane is a minor child who has a documented diagnosis of Attention-Deficit/Hyperactivity Disorder ("ADHD") and Unspecified Mental Disorder ("UMD");

- Jane endured the childhood trauma of the death of her mother;

- Jane has been under the care of a therapist for depression, anxiety, and gender confusion since April 21, 2022;

- Mr. Doe, Jane's widowed father, and mental health professionals have agreed to take a cautious approach to Jane's gender confusion given her underlying trauma and

psychiatric co-morbidities. (VC¶¶ 1-2)[1];

- As a freshman at DVRHS, Jane participated in an extracurricular club known as Students Advocating for Equality ("SAFE"), which exists to "promote open discussion and awareness about modern cultures and topics surrounding intersectionality while aiming to make positive contributions to our community and school." (VC ¶9);

- Miranda is the staff advisor of SAFE and is neither a state licensed medical doctor nor psychologist. (VC ¶10);

- Jane attended a SAFE meeting and expressed to defendant Miranda that she would like to undergo a social transition from female to male in school. Miranda immediately affirmed Jane's expressed identity and began to facilitate Jane's social transition. (VC ¶11);

- Miranda did not ask Jane about her mental health history, her history of trauma, or whether Jane was currently under the care of a mental health professional, but rather asked Jane if she would like to change her name and pronouns and be known only as a male at school, to which Jane agreed. (VC ¶¶12-13);

- Thereafter, Miranda sent a communication to the entire staff of DVRHS **other than two teachers who had contact with members of Mr. Doe's household**, who were excluded so that Mr. Doe would not learn of the social transition. (VC ¶¶14-15);

- In such communication, Miranda informed staff of Jane's name change and advised that all such staff was thereafter required to utilize the alternate male name by which

---

[1] "VC" refers to the Verified Complaint; "Berutti Dec." refers to the Declaration of Ronald A. Berutti, dated January 5, 2024; "Doe Dec" refers to the plaintiff's Declaration, dated February 2, 2024.

Jane desired to be called. (VC ¶¶14-15);

- **Staff were also informed that Mr. Doe was not to be informed about Jane's social transition**. (VC ¶¶14-15);

- Thereafter, and before Mr. Doe eventually learned of the social transition of his daughter at DVRHS, **when communicating with Mr. Doe about his daughter, the school always uses Jane's given female name, which was done for the purpose of concealing Jane's social transition at DVRHS**. (VC ¶16);

- In December 2024, months after the commencement of Jane's purposely secretive social transition, Mr. Doe learned of Jane's social transition at school when another parent called Jane by a boy's name in his presence. After Mr. Doe inquired of the parent why the parent was calling Jane by a boy's name, the parent explained to Mr. Doe that Jane was being called by such name at school since she was being socially transitioned. (VC ¶17);

- Upon learning that Jane had been provided with a separate identity at school and that DVRHS and its staff was intentionally hiding such fact from him, and due to his daughter's distress at living a second life, Mr. Doe placed Jane on home instruction until he could share Jane's personal and therapeutic history with McKinney, Ashley, and the Board (the "Board Defendants"). (VC ¶18);

- On December 8, 2023, Mr. Doe met with DVRHS administration as well as Miranda, who indicated that she was not aware of Jane's ADHD and UMD diagnoses or her past trauma when she facilitated Jane's social transition. (VC ¶19);

- Miranda also advised that she was unaware that Jane was under the care of a therapist at Mr. Doe's parental direction and with his consent. (VC ¶19);

- **Mr. Doe informed the Board Defendants that he and Jane's therapist were not in agreement with Jane's social transition and expressly denied his consent to the continuance of Jane's social transition at school** but was advised that Jane would continue being socially transitioned, such that the Board Defendants specifically and deliberately aimed at interfering with protected aspects of Mr. Doe's parent-child relationship. (VC ¶¶20-21);

- Following the meeting, a Cease and Desist letter was served on the Board Defendants, which asserted, among other things, that Mr. Doe's parental rights were being violated. (VC ¶22, Ex. C);

- Thereafter on December 8, 2023, a letter was forwarded to the Board Defendants which confirmed the critical events of the meeting that had occurred, reiterated that a Cease and Desist was served, and renewed the demand that the Board Defendants cease and desist from socially transitioning Jane **against Mr. Doe's parental judgment as to Jane's best interests.** (VC ¶23, Ex. D);

- On December 22, 2023, the Board Defendants responded by advising that Jane would be approved for home instruction, but "that the District will continue to abide by federal and state law as well as the Department of Education guidance regarding transgender students to ensure that the District is not discriminating against a student based on gender identity or expression." (VC¶24, Ex. E);

- Consequently, the Board Defendants again specifically and deliberately interfered with constitutionally and statutorily protected aspects of Mr. Doe's parent-child relationship and expressed deliberate indifference to Mr. Doe's fundamental parental rights and further interfered with such constitutional and statutory rights by

establishing a policy that only way that Jane could return to the classroom is if Mr. Doe chose to waive his constitutional and statutory rights and to abide by the Board Defendants' violations thereof, based on the Board Defendants' interpretation of law and public policy. (VC ¶25);

- On January 2, 2024, counsel for the Board Defendants further noted in an email to Mr. Doe's attorney that the school district had a goal to implement "home instruction" for Jane in a public library, but that "to ensure there is no misunderstanding," **Mr. Doe should "know that during home instruction the teachers will comply with district policy, NJDOE guidance, and federal and state laws regarding (Jane's) name preference."** (VC ¶26; Berutti Dec. Ex. A);

- Thus, the Board Defendants again specifically and deliberately interfered with constitutionally and statutorily protected aspects of Mr. Doe's parent-child relationship, expressed deliberate indifference to Mr. Doe's fundamental parental rights, and further interfered with such constitutional and statutory rights by establishing a policy that made it impossible for Jane to receive a public education unless Mr. Doe yielded his constitutional and statutory parental rights. (VC ¶27);

- During the period prior to Mr. Doe learning of Jane's social transition at school in which she was leading a secret double life from her family, Jane would shut herself in her room , was disengaged from the family, and was noticeably depressed. (Doe Cert. ¶6);

- Since being home and out of school, Jane became a changed person who is more engaged in the family, has stopped shutting herself in her room and being secretive, and has become much more visibly happy. (*Id*.);

5

- On January 3, 2024, DVRHS affirmed that it would continue socially transitioning Jane in the "at home" educational settings it was offering, which was either at a public library or on a 1:1 basis after school. (Doe Cert. ¶3)

- On January 8, 2024, DVRHS was provided a letter from Jane's pediatric group requesting home instruction for Jane due to mental health concerns. (Doe Cert. ¶5);

- On January 18, 2024, DVRHS attorneys responded with an offer of 1:1 instruction for Jane after school, which did not address the district's ongoing violation of Mr. Doe's parental rights or the medical best interests of Jane, and which threatened Jane with truancy if she did not comply. (Doe Cert. ¶7);

- That same day, Mr. Doe's attorneys responded, noting that Jane did not need to be protected from her fellow students, but rather, from staff which was unyielding in its insistence that Mr. Doe's parental rights would be ignored in favor of continuing with Jane's social transition. (Doe Cert. ¶8);

- On January 20, 2024, Mr. Doe received a visit from two Department of Children and Families, Division of Child Protection workers visited Mr. Doe's home for a well check on Jane, DVRHS apparently having contacted them. Mr. Doe explained the situation and the workers appeared satisfied that Jane was well taken care of, and understood the fact the Mr. Doe was involved in litigation with DVRHS (Doe Cert. ¶9);

- On January 25, 2024, DVRHS's attorney corresponded to Mr. Doe's attorneys advising that it was offensive that DVRHS staff and administrators were asserted to be the problem for Jane, and demanding further evidence that Jane needed to be receiving at home instruction. (Doe Cert. ¶10);

- On February 2, 2024, defense counsel was provided with a copy of a new letter from Jane's pediatrics group requesting at home instruction due to anxiety and depression which is exacerbated by the emotional stress and strain in her educational setting.

## LEGAL ARGUMENT

### POINT I

**THE PLAINTIFF HAS SATISFIED ALL CRITERIA FOR A PRELIMINARY INJUNCTION.**

Mr. Doe has brought claims seeking injunctions prohibiting defendants from the continued enforcement of laws and policies which violate parental rights in the manner in which Mr. Doe's rights are being violated. An urgent need for immediate relief has been demonstrated since despite Mr. Doe's demands to the contrary, the Board Defendants are relying on state laws and policies to claim that they will continue to socially transition Jane without his consent in violation of Mr. Doe's parental rights.

"[A] TRO or preliminary injunction will issue only when the movant produces evidence sufficient to convince the court that all factors favor preliminary relief. *Chadda v. Bd. of Elections*, 222 F. App'x 147, 149 (3d Cir. 2007). Such factors are found in *Opticians Ass'n of Am, supra*, 920 F.2d at 191-92:

> When ruling on such a motion, the district court must consider four factors: "[A] the likelihood that the applicant will prevail on the merits at final hearing; [B] the extent to which the plaintiffs are being irreparably harmed by the conduct complained of; [C] the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; and [D] the public interest." *Bill Blass, Ltd. v. Saz Corp.*, 751 F.2d 152, 154 (3d Cir. 1984). Only if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief should the injunction issue. *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987).

The plaintiffs meet all four criteria and, thus, is entitled to a temporary restraining order and preliminary injunction.

**A.  Likelihood of Success.**

Mr. Doe brings claims under the federal Declaratory Judgment Act, 28 *U.S.C.* § 2201, and pursuant to Section 1983 claim. All such claims allege violations of Mr. Doe's constitutional rights, and the Declaratory Judgment Count exclusively seeks declarations of law and injunctions as substantive relief.

*Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995), provides that "[a] prima facie case under §1983 requires a plaintiff to demonstrate: (1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." Liability under Section 1983 "attaches only to those wrongdoers 'who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it.'" *National Collegiate Athletic Ass'n v. Tarkanian*, 488 *U.S.* 179, 191 (1988) (*quoting Monroe v. Pape*, 365 *U.S.* 167, 172 (1961)). Injunctions are particularly appropriate in cases involving deprivations of First Amendment rights. *See Elrod v. Burns,* 427 U.S. 347, 356-57 (1976) (affirming an injunction under § 1983 where First Amendment rights had *been violated).*

In the instant matter, defendants are state actors who are violating Mr. Doe's fundamental constitutional parenting rights. *U.S. Const.* amend. XIV, § 1 provides that "No State shall ... deprive any person of life, liberty, or property, without due process of law." The Fourteenth Amendment's Due Process Clause "includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Troxel*, *supra*, 530 U.S. at 65 (*quoting " Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). "Due Process Clause specially protects those fundamental rights and liberties which are, objectively,  deeply rooted in this Nation's history and tradition ... and implicit in the concept of

ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed ..." *Glucksberg*, *supra*, 521 U.S. at 720-721 (cleaned up). "[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition." *Moore v. East Cleveland*, 431 U.S. 494, 503-504 (1977) (plurality). "It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural." *Id.* at 504. There is an absolute liberty interest of parents and guardians to direct the upbringing and education of children under their control, *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-535 (1925), for which strict scrutiny should be applied. *Troxel*, *supra*, 530 U.S. at 80 (Thomas, J., concurring). Strict scrutiny compels the state to "prove that the law is narrowly tailored  achieve a compelling governmental interest." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 18-19 (2023). "The established doctrine is that this liberty may not be interfered with, under the guise of protecting the public interest ..." *Meyer*, *supra*, 262 U.S. at 399-400. The Third Circuit has "recognized a cognizable liberty interest in preserving the life and physical safety of a minor child. . . a right that logically extends from a parent's recognized liberty interest in the custody of his children and the maintenance and integrity of the family." *McCurdy v. Dodd*, 352 F.3d 820, 827 (3d Cir. 2003) (quotation omitted and cleaned up). "A natural parent who has demonstrated sufficient commitment to his or her children is thereafter entitled to raise the children free from undue state interference. *Hodgson v. Minnesota*, 497 U.S. 417, 447 (1990).

"The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted." *Meyer*, *supra*, 262 U.S. at 400. "Corresponding to the right of control, it is the natural duty of the parent to give his children education suitable to their station in life ..." *Ibid.* Similarly, as in *Troxell*, "[t]he liberty interest at issue in this case--the interest of parents in the care, custody, and control of their children--is

perhaps the oldest of the fundamental liberty interests recognized by ... [the United States Supreme] Court." *Id.* at 65.

Conversely, "[t]he Supreme Court has not recognized any new constitutionally protected classes in over four decades, and instead has repeatedly declined to do so." *L.W. v. Skrmetti*, 83 F.4th 460, 486 (6th Cir. 2023) (quotation omitted). The Supreme Court has not recognized transgender status as a suspect class. *Id.*

Moreover, 20 *U.S.C.* §3401(3) is the supreme law of the land and provides "parents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role." The Board Defendants actions violate such law as do the Attorney General, the Acting Commissioner of the NJBOE, and the Board to the extent that they seek to enforce laws and policies which interfere with such statutory rights.

By their actions in demanding that Mr. Doe accept the Board Defendants' insistent requirement that they socially transition Jane without his authority, the Board Defendants are directly interfering with Mr. Doe's family and his constitutionally protected parental rights to direct his child's education, to protect his child, and to exercise the care, custody and control of his child. Moreover, by enforcing statutes and policies which are antithetical to Mr. Doe's rights, the Attorney General, the Acting Commissioner of the NJBOE, and the Board are violating such rights. Thus, it is likely that Mr. Doe will succeed on the merits.

**B.  Irreparable Harm.**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod, supra*, 427 U.S. at 373. Parental rights, perhaps the oldest

and most cherished of rights, are no less important than First Amendment rights. Their loss by Mr. Doe constitutes irreparable harm.

### C.  Harm to Defendants.

Defendants will suffer no harm by virtue of preliminary restraints. They have no legitimate interest whatsoever in promoting, enforcing, or promulgating laws or policies which interfere with the fundamental parental rights described herein.

### D.  Public Interest.

The public interest overwhelmingly supports the notion that parents are fundamentally entitled to direct the upbringing and education of their children. Nothing about the state actors' roles in this case suggests that they have any medical training or licensure which should in any way encroach on the parents' fundamental rights to direct the education of their child and to provide the care, custody, and nurture of their child. Even if such training and licensure existed, Mr. Doe already has Jane in therapy, in her best interests. As set forth above, the state may not interfere with fundamental liberty interests under the guise of protecting public interest.

### POINT I

**THE PLAINTIFF IS ENTITLED THE EQUITABLE REMEDY OF HAVING A MONITOR APPOINTED TO PROTECT HIS FUNDAMENTAL RIGHTS UPON HIS DAUGHTER'S RETURN TO THE CLASSROOM.**

 Among the relief that Mr. Doe seeks is the appointment of an independent monitor to ensure that the Board Defendants comply with their obligations to educate Jane without engaging in any social transitioning. To date, the Board Defendants have shown utter contempt for Mr.

Doe's fundamental constitutional rights, yet Mr. Doe has no choice but to have Jane educated in the public schools.

In *Tillery v. Owens*, 907 F.2d 418, 429 (3d Cir 1990), the Third Circuit provided guidance to district court regarding the exercise of equitable powers, mainly arising from school desegregation cases. It wrote as follows (cleaned up, quotations and citations omitted):

> First, the nature of the remedy is to be determined by the nature and scope of the constitutional violation and thus must be related to the *condition* alleged to offend the Constitution. Second, the decree must be limited to remedial purposes. Finally, the remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution. Within these guidelines, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.

Here, Mr. Doe seeks two non-injunctive equitable remedies. First, he seeks the immediate reinstatement of Jane to the classroom where she is not to be subjected to social transitioning, in keeping with Mr. Doe's parental rights and his demand that such activity cease and desist. Such remedy is related to the condition alleged to offend the Constitution, is limited to its remedial purpose, takes into account the interests of state and local authorities in managing their own affairs consistent with the Constitution, and are designed to remedy past wrongs committed against Mr. Doe's rights as related to Jane's education.

Second, Mr. Doe seeks the appointment of an independent monitor to observe the school environment in order to ensure that the Board Defendants and those acting under them do not fall into the "habit" of violating Mr. Doe's constitutional rights by acting to socially transition Jane. The Board Defendants convinced Jane, a young lady with significant emotional issues, that she should transition. There is nothing to stop the Board Defendants from secretly continuing such policy despite a temporary restraining order or preliminary injunction unless Jane or some third party reports the same, which is unlikely. Thus, an independent monitor who would act much like

a full time school aid should be appointed to ensure the Board Defendants' compliance with a temporary restraining order or an injunction so that Mr. Doe can be assured that his daughter will not be subjected to social transitioning by the Board Defendants in violation of his parental rights.

The Board Defendants secreted Jane's social transition with the apparent knowledge that Mr. Doe would exercise his right to object. They did nothing to ensure that Jane was not already receiving therapy and treatment, such that the Board Defendants interfered with the care Jane was receiving with Mr. Doe's approval. Mr. Doe only learned of the Board Defendants' violations of his constitutional rights from a third-party parent, who humiliatingly knew of such social transitioning of Jane when Mr. Doe did not. Finally, although Mr. Doe demanded that the Board Defendants cease and desist, and cited his fundamental constitutional rights as the basis, the Board Defendants rejected him. Now Mr. Doe is being forced to accept the Board Defendants' unconstitutional social transitioning of Jane even if she is to remain schooled remotely.

Mr. Doe's proposed remedy of having an independent monitor appointed at the Board's sole expense conforms with the nature and scope of the harm that the Board Defendants have purposely and knowingly caused to Mr. Doe's rights. Jane must be watched while she is under the Board Defendants' custody and control. The proposed remedy is purely remedial, and the Board Defendants already have aides in classrooms as a matter of routine, such that the monitor will not interfere with the conduct of school affairs that are consistent with the Constitution. Finally, the appointment of a monitor will remedy the past wrongs committed against Mr. Doe's fundamental constitutional parental rights while Jane was under the Board Defendants' custody and control.

## <u>CONCLUSION</u>

Based on the foregoing, Mr. Doe has demonstrated his right to a preliminary injunction in the form set forth in the Order to Show Cause, which should be entered as a temporary restraining order in the plaintiffs' favor pending the return of the Order to Show Cause. Moreover, Jane should immediately be readmitted to school under the supervision of an independent monitor who is appointed by the Court at the sole cost of the Board.

Respectfully submitted,

**MURRAY-NOLAN BERUTTI LLC**

*Attorneys for the plaintiff, Rebecca Petersen*

*s/ Ronald A. Berutti*

By:_____

Ronald A. Berutti

Dated: January 5, 2024

14