**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**TRENTON VICINAGE**

| | |
|---|---|
| JANE DOE (said name being fictitious),<br><br>Plaintiff(s),<br><br>v.<br><br>DELAWARE VALLEY REGIONAL HIGH SCHOOL BOARD OF EDUCATION, et al.,<br><br>Defendant(s). | Hon. Georgette Castner, U.S.D.J.<br><br>Civil Action No. 24-107 (GC-JBD)<br><br><br>CIVIL ACTION |

---

**BOARD DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF**
**JOHN DOE'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUCTION**

---

ROSHAN D. SHAH, ESQ. (42302009)
**ANDERSON & SHAH LLC**
1040 Broad Street, Suite 304
Shrewsbury, NJ 07702
Tel: 732-398-6545
Fax: 732-576-0027
*Attorneys for Defendants Delaware Valley Regional High School Board of Education, Scott McKinney, and Ashley Miranda*

Of Counsel and On the Brief:
Roshan D. Shah, Esq.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

PROCEDURAL AND FACTUAL BACKGROUND ............................................ 4

STANDARD OF REVIEW ................................................................................... 9

ARGUMENT ....................................................................................................... 11

THE COURT SHOULD DENY DOE'S DEMAND FOR A TEMPORARY RESTRAINING ORDER AS HE CANNOT MEET THE STANDARD FOR SUCH EXTRAORDINARY RELIEF .......................................................................................................... 11

    A.  Doe Does Not Enjoy Any Likelihood Of Success On The Merits .......................... 11

          1.  *A Parent's Right To Direct School Curriculum Or Policy Is Not Found In Our Nation's History Or Tradition, Nor In Any Precedent*..................13

          2.  *Precedent Actually Strikes Against The Right Doe Demands This Court Recognize* ............................................... 19

          3.  *Doe Has Not Established That The Board Defendants Infringed Upon A Fundamental Right* ................................. 22

          4.  *Board Policy 5756 Easily Passes Rational Basis Review*.......................... 22

    B.  Doe Cannot Show An Irreparable Injury ............................................. 23

    C.  The Balance Of Equities Weighs Against Issuing An Injunction ......................... 24

    D.  The Public Interest Does Not Weigh In Favor Of An Injunction ......................... 25

CONCLUSION.................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

### Cases

***Page(s)***

*Acierno v. New Castle Cnty.*,
    40 F.3d 645 (3d Cir. 1994) ..........................................................................................23

*Allegheny Energy, Inc. v. DQE, Inc.*,
    171 F.3d 153 (3d Cir. 1999) .........................................................................................24

*American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*,
    42 F.3d 1421 (3d Cir.1994) ..........................................................................................11

*Blau v. Fort Thomas Pub. Sch. Dist.*,
    401 F.3d 381 (6th Cir. 2005) .................................................................................. 3, 21

*BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*,
    229 F.3d 254 (3d Cir. 2000) .........................................................................................23

*Brown v. Bd. of Ed.*,
    347 U.S. 483 (1954)......................................................................................................15

*Brown v. Hot, Sexy and Safer Productions, Inc.*,
    68 F.3d 525 (1st Cir.1995), *cert. denied*, 516 U.S. 1159 (1996).....................................20

*Caplan v. Fellheimer Eichen Braverman Kaskey*,
    68 F.3d 828 (3d Cir. 1995).............................................................................................24

*C.N. v. Ridgewood Bd. of Educ.*,
    430 F.3d 159 (3d Cir. 2005)..................................................................................... 19, 25

*Croft v. Westmoreland Cnty. Child. & Youth Servs.*,
    103 F.3d 1123 (3d Cir. 1997). ........................................................................................19

*Delaware River Port Auth. v. Transamerican Trailer Transp., Inc.*,
    501 F.2d 917 (3d Cir. 1974) ......................................................................................2, 11

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022).............................................................................................. 3, 13, 22

*Doe v. Boyertown Area Sch. Dist.*,
    897 F.3d 518 (3d Cir. 2018). ...............................................................................*passim*

*Ecosave Automation, Inc. v. Delaware Valley Automation, LLC.,*
    540 F. Supp. 3d 491 (E.D. Pa. 2021)................................................................23

*Epperson v. State of Ark.,*
    393 U.S. 97 (1968)..................................................................................................3

*Fleischfresser v. Directors of School Dist.*
    *200*, 15 F.3d 680 (7th Cir.1994) .................................................................... 21

*Gruenke v. Seip,*
    225 F.3d 290 (3d Cir. 2000)........................................................................... 18

*Grutter v. Bollinger,*
    539 U.S. 306 (2003) ........................................................................................24

*Hafer v. Melo,*
    502 U.S. 21, (1991) ............................................................................................4

*Heffner v. Murphy,*
    745 F.3d 56 (3d Cir. 2014) ........................................................................... 10

*Immediato v. Rye Neck School Dist.,*
    73 F.3d 454 (2d Cir.), cert. denied, 519 U.S. 813 (1996) ..............................20

*Instant Air Freight Co. v. C.F. Air Freight, Inc.,*
    882 F.2d 797 (3d Cir. 1989).........................................................................23

*Kos Pharms., Inc. v. Andrx Corp.,*
    369 F.3d 700 (3d Cir. 2004)...........................................................................11

*LCN Enterprises, Inc. v. City of Asbury Park,*
    197 F. Supp. 2d 141 (D.N.J. 2002) .............................................................26

*League of Women Voters of the United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ...........................................................................11

*Leebaert v. Harrington,*
    332 F.3d 134 (2d Cir. 2003)......................................................................... 10

*McCahon v. Pennsylvania Turnpike Commission,*
    491 F. Supp. 2d 522 (M.D. Pa. 2007) ...............................................25, 26

*McCurdy v. Dodd,*
    352 F.3d 820 (3d Cir. 2003)......................................................................... 19

*Meyer v. Nebraska,*
    262 U.S. 390 (1923) ........................................................................................ 16, 17, 18

*Mozert v. Hawkins County Bd. of Educ.,*
    827 F.2d 1058 (6th Cir.1987), cert. denied, 484 U.S. 1066 (1988) .............................. 21

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022) ................................................................................................. 9

*Oburn v. Shapp,*
    521 F.2d 142 (3d Cir.1975) .................................................................................. 26

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary,*
    268 U.S. 510 (1925) ........................................................................................ 17, 22

*Planned Parenthood of Cent. Missouri v. Danforth,*
    428 U.S. 52 (1976) ............................................................................................. 21

*Planned Parenthood of Se. Pa. v. Casey,*
    505 U.S. 833 (1992) ........................................................................................... 21

*Reilly v. City of Harrisburg,*
    858 F.3d 173 (3d Cir. 2017) ............................................................................. 9, 11

*Swanson v. Guthrie Indep. Sch. Dist.,*
    135 F.3d 694 (10th Cir. 1998). ............................................................................ 20

*Timbs v. Indiana,*
    586 U.S. ___, 139 S.Ct. 682 (2019) .................................................................. 13, 22

*Troxel v. Granville,*
    530 U.S. 57 (2000) ................................................................................. 2, 13, 14, 22

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ........................................................................................ 3, 13

*Weber v. Aetna Casualty & Surety Co.,*
    406 U.S. 164 (1972) ........................................................................................... 14

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) ....................................................................................... 17-18

## United States Code

20 U.S.C. § 2201 ............................................................................................ 7

20 U.S.C. § 3401 ....................................................................................... 8, 12

20 U.S.C. § 3403 ......................................................................................... 12

20 U.S.C. § 3411 ......................................................................................... 12

42 U.S.C. § 1983 .................................................................................... 8, 19

## New Jersey Statutes

N.J.S.A. § 10:6-2 ........................................................................................... 8

N.J.S.A. § 18A:38-28 ................................................................................. 23

## State Administrative Authorities

N.J. Dep't of Ed., Transgender Student Guidance for School Districts (Sept. 27, 2018) .. 5

## Secondary Sources

ELLWOOD P. CUBBERLEY, PUBLIC EDUCATION IN THE UNITED STATES 18 (Riverside Textbooks in Educ. ed., 1919)........................................................................... 15

WILLIAM BLACKSTONE, COMMENTARIES *160 (1877) ......................................... 14

Lily Durwood et al., Mental Health and Self Worth in Socially Transitioned Transgender Youth, 56 J. of the Am. Academy of Child & Adolescent Psychiatry 116 (2017).................1

## PRELIMINARY STATEMENT

Defendant Delaware Valley Regional High School Board of Education (the "Board") is a public school serving students in grades nine through twelve. Consistent with federal and state law, the Board adopted Policy 5756, which provides:

> The school district shall accept a student's asserted gender identity; parental consent is not required. A student need not meet any threshold diagnosis or treatment requirements to have his or her gender identity recognized and respected by the school district, school, or school staff members. In addition, a legal or court ordered name change is not required. There is no affirmative duty for any school district staff member to notify a student's parent of the student's gender identity or expression.

The policy informs the school community that teachers and staff will respect a high school-aged student's preferred name and pronouns. Recognizing a transgender student's preferred name and pronoun—part of what is known as social transitioning—helps reduce the serious mental health risks and suicide concerns that plague transgender youth. Lily Durwood et al., *Mental Health and Self Worth in Socially Transitioned Transgender Youth*, 56 J. of the Am. Academy of Child & Adolescent Psychiatry 116, 116 (2017). Under Policy 5756, the student—not school officials—initiates any social transition towards their expressed gender identity.

Plaintiff John Doe—the parent of Jane Doe—has filed suit alleging that Board Policy 5756 violates *his* constitutional rights as a parent because it allowed school officials to accept Jane's[1] expressed gender identity—Jane now identifies as a male—and foster her social transition without his consent. Doe readily admits that Jane approached school officials and expressed a desire to be referred to as a male. Nonetheless, Doe contends

---

[1] This brief refers to the student as "Jane" and "her" to keep consistent with the Complaint and for clarity. We mean no disrespect.

that the Board, along with its Superintendent, Scott McKinney, and guidance counselor, Ashley Miranda (collectively, the "Board Defendants"), violated both his substantive due process rights under the Fourteenth Amendment and the New Jersey Constitution's guarantee of a thorough and efficient education. Doe brings these same claims against the State of New Jersey.

Contemporaneous with the filing of his Complaint, Doe sought a temporary restraining order and preliminary injunction. In moving for relief, Doe contends he has a substantive due process right in how to raise Jane and that this right entitles him to an injunction that, among other things, prohibits the Board's teachers and staff from referring to Jane using Jane's preferred name and pronoun. The Board Defendants now respond.

To obtain an injunction, Doe—not the Board Defendants—must demonstrate that: 1) he enjoys a likelihood of success on the merits; and 2) he will suffer irreparable harm without an injunction. *Delaware River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 920 (3d Cir. 1974). If a movant makes this threshold showing, the Court should also examine: 3) if the balance of hardships weighs in favor of an injunction; and 4) whether the public interest favors an injunction. Doe can't even vault the first threshold.

The Board Defendants acknowledge—in fact, endorse—the U.S. Supreme Court's view that parents have a substantive due process right "in the care, custody, and control of their children," *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000). But this right has never been construed to permit parents to regulate the in-school environment or curriculum. Stated differently, while parents "have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how*

2

a public school teaches their child." *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005)(emphasis in original). Rather, "[b]y and large, public education in our Nation is committed to the control of state and local authorities." *Epperson v. State of Ark.*, 393 U.S. 97, 104 (1968).

What Doe truly seeks is not the enforcement of a recognized substantive due process right—no case that he cites supports his demand for relief—but rather an expansion of substantive due process rights. To do so, he must demonstrate that the right to control and administer the schools is "objectively, deeply rooted in this Nation's history and tradition[.]" *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). Any lesser showing would incorrectly conflate "what that Amendment protects with our own ardent views about the liberty that Americans should enjoy." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 239 (2022).

Doe doesn't try to make any such showing because he can't. As explained below, neither Blackstone's Commentaries, nor the genesis of our public education system, reveal a scintilla of evidence that parents ever enjoyed a fundamental right to control the school environment consistent with their own personal views. Stated plainly, the substantive due process right that Doe rests his entire claim for relief on does not exist. The theory lacks merit.

Doe cannot make the threshold showing necessary for the Court to grant him injunctive relief. And as further explained below, he can't satisfy the other factors either. Accordingly, the Board Defendants respectfully request that the Court deny Doe's application for a temporary restraining order and preliminary injunction.

## PROCEDURAL AND FACTUAL BACKGROUND

A. The Parties

Doe is the father of Jane, a minor child and student who attends Delaware Valley Regional High School (DVRHS). *Comp.*, ¶ 1. Jane suffers from Attention-Deficit/Hyperactivity Disorder ("ADHD") and Unspecified Mental Disorder ("UMD"). *Id.* at ¶ 13. While born a biological female, Jane identifies as a male, something the Complaint labels as "gender confusion" and attributes to the trauma associated with the death of her mother. *Id.*

The Board is a public entity that oversees DVRHS. *Id.* at ¶ 4. McKinney is the Superintendent. *Id.* at ¶ 2. Miranda is the high school counselor. *Id.* at ¶ 3.

Doe has also named as defendants Attorney General Matthew Platkin and Acting Commissioner of Education Angelica Allen-McMillan, but only in their official capacities. *Id.* at ¶¶ 5-6. These official capacity claims are construed as suits against the entity, the State of New Jersey. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).

B. Jane's Expression Of Gender Identity And Board Policy 5756.

Jane is a freshman at DVRHS. *See Id.* at ¶ 20. As part of her extracurricular activities, Jane joined Students Advocating for Equality ("SAFE"), a student advocacy group that "promote[s] open discussion and awareness about modern cultures and topics surrounding intersectionality while aiming to make positive contributions to our community and school." *Id.* at ¶ 20. Miranda is the faculty advisor to SAFE. *Id.* at ¶ 21. During a SAFE meeting, Jane expressed that she identified as a male and would like to "socially transition"—meaning be referred to by her identified gender. *Id.* at ¶ 22.

At no time did Miranda encourage or coerce Jane to identify as a different gender than her birth gender. *Declaration of Ashley Miranda ("Miranda Decl.")*, ¶ 18. As

Miranda explains in her declaration, if Jane had expressed today that she identified as a female, then Miranda would immediately respect that decision and begin referring to her with her female name and pronouns. *Id.* at ¶ 19.

Jane's desire to socially transition to her identified gender implicated Board Policy 5756, which states:

> The school district shall accept a student's asserted gender identity; parental consent is not required. A student need not meet any threshold diagnosis or treatment requirements to have his or her gender identity recognized and respected by the school district, school, or school staff members. In addition, a legal or court ordered name change is not required. There is no affirmative duty for any school district staff member to notify a student's parent of the student's gender identity or expression. [*Id.* at ¶ 14].

As is self-evident, the policy is only implicated when the student "assert[s]" a gender identity and seeks to "have his or gender identity recognized" by the district. *Id.* The policy does not permit school staff or teachers to lie to parents. *Declaration of Scott McKinney ("McKinney Decl.")*, ¶ 7. Rather, it merely states that there is no "affirmative duty" to notify a parent of the student's gender identity or expression. *Comp.*, ¶ 14. The purpose of the policy is to foster an inclusive and harassment-free atmosphere for all students, including transgender students. *McKinney Decl.*, ¶ 8.

The policy is consistent with guidance received from the New Jersey Dep't of Education ("NJDOE"), which "encourages [districts] to take a 'student-centered approach' to students who believe themselves to be transgender," and "declares, 'school district personnel should have an open, but confidential discussion with the student to ascertain the student's preference on matters such as chosen name, chosen pronoun use, and parental communications.'" *Id.* at ¶ 15 (citing N.J. Dep't of Ed., Transgender Student Guidance for School Districts (Sept. 27, 2018)).

Based upon Jane's gender expression, Miranda sent a communication to certain DVRHS staff about Jane's preferred name and pronouns. *Miranda Decl.*, ¶ 28. While the Complaint alleges that two teachers, Sarah Hall and Kari Gursky, *see comp.*, ¶ 26, were not included on Miranda's communication because they "have contacts with members of the Doe household," this is incorrect. *Miranda Decl.*, ¶ 29. Both staff members were, in fact, included on the e-mail. *Id.* at ¶ 30.

In the e-mail, Miranda advised recipients that Doe was not supportive of Jane's expressed gender identity and that Jane wanted the matter treated confidentially. *Id.* at ¶ 32-33. Thus, Miranda advised that Jane's preferred name would not be changed in the school's system and her birth name would be used to summon her to the office. *Id.* at ¶ 33. The latter concern was based on Jane's concern that her sibling, who also attended DVRHS, would cause issues for her at home. *Id.* at ¶ 34.

C.    Doe's Demand That The Board Disregard Jane's Gender Identity.

Doe claims he only discovered Jane's gender identity when another parent called Jane using her chosen male name. *Id.* at ¶ 28. When Doe questioned the parent, the parent allegedly told him it was because Jane "was being called by such name at school" due to her social transition. *Id.*

Doe then removed Jane from school. *Id.* at ¶ 29. He then confronted the Board Defendants and shared Jane's "personal and therapeutic history" with them. *Id.* Miranda said she was not aware of Jane's ADHD and UMD diagnoses. *Id.* at ¶ 30. Doe stated that neither he, nor Jane's therapist, agreed with Jane's gender identity and her desire to socially transition to male. *Id.* at ¶ 31. Consistent with Board Policy 5756, and NJDOE's guidance, McKinney and Miranda respectfully explained that they would continue to refer to Jane by her expressed gender identity. *See Id.* at ¶ 32.

6

Doe then escalated the matter by serving a Cease and Desist letter from his legal counsel on December 8, 2023. *Id.* at ¶ 33. That same day, Doe also served a letter on the Board's legal counsel, Fogerty & Hara, repeating the same demands. *Id.* On December 14, 2023, the Board's legal counsel responded with its own letter, explaining that the Board, consistent with federal and state law and its policy, would continue to honor Jane's self-expressed gender identity and preferred name and pronoun. *Id.* at ¶ 35. A copy of the correspondence between Doe and the Board's counsel are attached to the Complaint as Exhibits C, D and E.

Doe has continued to keep Jane out of school. *Id.* at ¶ 36. The Board Defendants offered to provide Jane one-on-one instruction at a public library, so she wouldn't continue to miss out on educational opportunities. *Id.* at ¶ 37. The Board Defendants informed Doe that, if Jane wanted to be referred to by her preferred name and pronoun during these instructional sessions, they would respect her request. *Id.* That did not result in Doe reconsidering his position.

While Doe has filed a declaration stating that the Department of Child Protection & Permanency ("DCPP") visited the home, *Supp. Declaration of John Doe*, ¶ 9, after diligent inquiry, McKinney has not been able to confirm that any Board employee reported the matter to DCPP. *McKinney Decl.*, ¶ 7.

D.    Doe Files The Instant Suit.

On January 5, 2024, Doe filed the instant suit alleging violations of his constitutional rights. The Complaint asserts three claims:

- Count I: relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, including a declaration that the New Jersey Law Against Discrimination, Board Policy 5756, and the NJDOE's guidance concerning transgender students is unconstitutional;

- Count II: claim under 42 U.S.C. § 1983 for violation of the Fourteenth Amendment's substantive due process clause and for violation of the Department of Education Organization Act of 1979, 20 U.S.C. § 3401;

-  Count III: claim under N.J.S.A. § 10:6-2 for violation of Doe's "right to parent a minor child who is receiving a thorough and efficient education."

*Comp.*, Counts I-III. Doe seeks injunctive relief, as well as compensatory and punitive damages.

On the same day he filed suit, Doe sought a temporary restraining order (TRO) and preliminary injunction. ECF No. 3. Doe's provisional remedy demands include an order:

- prohibiting the Attorney General from "enforcing the New Jersey Law Against Discrimination, N.J.S.A. 10:5-2 et seq., [to] the extent that it deprives parents of fully informed knowledge and consent with respect to any aspect of their children's education including, without limitation, issues related to his child's mental health, welfare, physical health, and social transitioning in particular";

- restraining the NJDOE from "providing guidance to school districts which deprives parents of fully informed knowledge and consent with respect to any aspect of their children's education including, without limitation, issues related to his (sic) child's mental health, welfare, physical health, and social transitioning in particular";

- restraining the Board "from enforcing Board Policy 5756 and otherwise acting to socially transition the plaintiff's daughter without his fully informed knowledge and consent;"

- requiring the Board to "re-integrate Jane Doe, said name being fictitious, into classroom instruction and shall treat her in all respects in accordance with her biological female sex;"

- appointing an "independent monitor . . . to protect Mr. Doe's parental rights, at the Board's sole expense" who would have "all powers necessary to ensure that the Board fully complies with its obligation to treat Jane Doe as a biological female so as to protect Mr. Doe's parental rights[.]"

*See* ECF No. 3-4. Though the proposed order references Jane and seeks to directly impact her, she is not a party to this case and no safeguards are in place, either in the form of a

guardian *ad litem* or other advocate, to ensure she is not harmed if the Court grants the relief Doe demands.[2]

On January 31, 2024, the Court held a teleconference and set forth a briefing schedule on Doe's demand for a TRO. The Board Defendants now respond.

## STANDARD OF REVIEW

The parties' initial dispute concerns who bears the burden of proof on Doe's application for injunctive relief. Doe contends the Board Defendants bear the burden and must satisfy the "strict scrutiny" test because "fundamental rights are in issue[.]" *Pl.'s Mvg. Br.*, *13. Doe is wrong to the extent he suggests that the burden *begins* with the Board Defendants and excuses him from having to make an initial showing that Board Policy 5756 infringes upon a fundamental right embraced by substantive due process.

"In deciding whether to issue a preliminary injunction, plaintiffs normally have the burden of demonstrating a sufficient likelihood of prevailing on the merits." *Reilly v. City of Harrisburg*, 858 F.3d 173, 180 (3d Cir. 2017). In First Amendment cases, *after* the plaintiff comes forward to show "that the law restricts protected speech," the burden shifts to the government to satisfy the requisite level of scrutiny (intermediate or strict). *Id.* at 180 n.5.

Similarly, in the Second Amendment context, after a plaintiff demonstrates the government regulation burdens his right to bear arms, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022).

---

[2] To be clear, as the sole plaintiff, Doe can only assert his own rights and interests. *Hannah v. City of Dover*, 152 F. App'x 114, 116 (3d Cir. 2005).

It's no different in the substantive due process context. Doe, as the movant, must come forward and show that he possesses a constitutionally-recognized right to control the school environment as to Jane, and that Board Policy 5756 infringes upon this purported right. *See Leebaert v. Harrington*, 332 F.3d 134, 142 (2d Cir. 2003). Without this requisite showing, the Board Defendants only need to meet rational basis review. *Heffner v. Murphy*, 745 F.3d 56, 79 (3d Cir. 2014).

Under rational basis review, a regulation "withstands a substantive due process challenge if the state identifies a legitimate state interest that the legislature could rationally conclude was served by the statute." *Id.* (citations and quotations omitted). The standard "allows legislative choices considerable latitude." *Id.* The governmental interest asserted "need only be plausible to pass constitutional muster" and courts will not "second-guess legislative choices or inquire into whether the stated motive actually motivated the legislation." *Id.*

As we explain below, Doe cannot demonstrate that the Constitution recognizes the fundamental right he espouses. Thus, the Court's review of Board Policy 5756 falls under rational basis review. And it easily passes.

**ARGUMENT**

THE COURT SHOULD DENY DOE'S DEMAND
FOR A TEMPORARY RESTRAINING ORDER
AS HE CANNOT MEET THE STANDARD FOR
SUCH EXTRAORDINARY RELIEF.

The issuance of temporary restraints is "'an extraordinary remedy' and 'should be granted only in limited circumstances.'" *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)(citing *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir.1994)). To obtain such relief, the movant must first show: (1) a reasonable likelihood of success on the merits; and (2) irreparable injury in the absence of preliminary relief. *Delaware River Port Auth.*, 501 F.2d at 919-20.  If the movant makes this "gateway" showing, *Reilly*, 858 F.3d at 179, then the court must consider the following two factors: (3) "the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."  *Delaware River Port Auth.*, 501 F.2d at 920.

The movant must "'make a clear showing that [the] four factors, *taken together*, warrant relief[.]'" *Reilly*, 858 F.3d at 178 (citing *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 6–7 (D.C. Cir. 2016))(emphasis in original)). Here, Doe has wholly failed to make the requisite showing on any factor.

A.     Doe Does Not Enjoy Any Likelihood Of Success On The Merits.

Satisfying the first factor requires the movant to "demonstrate that it can win on the merits[.]" *Reilly*, 858 F.3d at 179. This requires, at this preliminary stage, a showing "significantly better than negligible but not necessarily more likely than not" that plaintiff will prevail on the merits." *Id.*; *see also Delaware River Port Auth.*, 501 F.2d at 920

(movant must demonstrate a "reasonable probability of eventual success in the litigation").

Here, Doe's application in support of a TRO rests on Count II—which asserts violation of the Fourteenth Amendment's Due Process Clause and also a violation of the Department of Education Organization Act of 1979, 20 U.S.C. § 3401. *See Pl.'s Mvg. Br.*, **8-11. Doe cannot show a likelihood of success on either theory.

The Court can quickly dispense with Doe's reliance upon 20 U.S.C. § 3401 for injunctive relief. That provision partially codified the Department of Education Organization Act of 1979, Pub. L. No. 96-88, 93 Stat. 669 (1979). The legislation created the U.S. Department of Education. 20 U.S.C. § 3411. The legislation's preamble—which Doe relies upon in support of his theory, *pl.'s mvg. br.*, *11—recognizes that "parents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role." 20 U.S.C. § 3401. But nothing in the statute grants private persons a cause of action to enforce this preamble. In fact, a separate provision declares "it is the intention of the Congress in the establishment of the Department to protect the rights of State and local governments and public and private educational institutions in the areas of educational policies and administration of programs . . . ." 20 U.S.C. § 3403. These recitations of Congress's factual findings and intentions do not confer any enforceable statutory rights upon Doe. Thus, to the extent his claim for an injunction rests on this provision, it fails.

1.    *A Parent's Right To Direct School Curriculum Or Policy Is Not Found In Our Nation's History Or Tradition, Nor In Any Precedent.*

The Fourteenth Amendment provides that no State shall 'deprive any person of life, liberty, or property, without due process of law.'" *Troxel*, 530 U.S. at 65. This guarantee of due process contains both a procedural and substantive component. *Washington*, 521 U.S. at 719-20. Substantive due process—the only component at issue here—"provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* at 720.

The U.S. Supreme Court has "held that the Due Process Clause protects two categories of substantive rights." *Dobbs*, 597 U.S. at 237. The first category consists of those rights found in the first eight amendments, which the Court has incorporated into the Due Process Clause and made applicable to the States. *Id.* The second category consists of those "fundamental rights that are not mentioned anywhere in the Constitution," but which are recognized to fall within the Due Process Clause because they are "'deeply rooted in [our] history and tradition'" and "essential to our Nation's 'scheme of ordered liberty.'" *Id.* (citing *Timbs v. Indiana*, 586 U.S. ___, 139 S.Ct. 682, 686 (2019)(alteration in original)). This case concerns the second category.

To determine whether a purported right falls within substantive due process, courts must undertake a historical analysis. *Id.* at 238. This includes examining historical authorities, such as Blackstone's Commentaries, and state constitutions in effect at the time of the amendment's adoption. *See Id.* These "[h]istorical inquiries" are essential to avoid conflating "the Fourteenth Amendment's reference to 'liberty,'" with "our own ardent views about the liberty that Americans should enjoy." *Id.* at 239.

13

The rights of parents "in the care, custody, and control of their children" is one of the "oldest of the fundamental liberty interests" encompassed by the Due Process Clause. *Troxel*, 530 U.S. at 65-66. The Board Defendants endorse this view. However, the historical analysis of how far this right extends simply does not support the broad power that Doe believes he wields—*i.e.*, the power to dictate the school environment and and curriculum.

The duties of parents to children consist of "three particulars": their maintenance, their protection and their education. 2 WILLIAM BLACKSTONE, COMMENTARIES *160 (1877). But even here, Blackstone spoke in terms of the parent's obligation to the child, not their power over school districts and curriculum. For example, Blackstone commented that parents had a duty to provide their child[3] with a proper "culture and education" so that he avoids "grow[ing] up like a mere beast, to lead a life useless to others, and shameful to himself." *Id.* at *165. Yet after sharing this view, Blackstone acknowledged that the "municipal laws of most countries seem to be defective in this point, by not constraining the parent to bestow a proper education upon his children." *Id.* In other words, while Blackstone recognized that a parent owed his children a duty to provide them an education, he also lamented that the laws at that time did not define or enforce this obligation. Blackstone's frustration would be curious if, as Doe posits, parents had a recognized fundamental right under English common law to administer the schools and control its curriculum. Laws recognizing such a power would appear far removed from the "defective" municipal laws that drew Blackstone's ire and prevailed at the time.

---

[3] Blackstone was only speaking of duties owed to children born in wedlock, as children born out of wedlock were only owed maintenance. 2 WILLIAM BLACKSTONE, COMMENTARIES, *172. Today, these distinctions are constitutionally infirm. *See Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164 (1972).

In the same vein, in the mid-17th century, the colony of Massachusetts enacted the Law of 1647—the bedrock of public education today. ELLWOOD P. CUBBERLEY, PUBLIC EDUCATION IN THE UNITED STATES 18 (Riverside Textbooks in Educ. ed., 1919). The law required every town with at least 50 households to appoint a reading and writing teacher, and pay appropriate wages. *Id.* In addition, towns with at least 100 households were required to provide a grammar teacher who would prepare children for "university." *Id.* The principles underlying this legislation, as articulated by historian George Martin, recognized that the "obligation to furnish [] education rests primarily upon the parent," but that the State has a "right to enforce this obligation" and—most critically here— "***determine the kind of education***, and the minimum amount." *Id.* at 19 (emphasis added). The Massachusetts Law of 1647 became the basis for legislation in all other American colonies (except Rhode Island). *Id.* at 19.

Further evidence of the government's power to regulate instructional content within the schools is gleamed from the public debate in the early 19th century over whether schools should be taxpayer-funded. *See Id.* at 121-22. One of the chief concerns raised by opponents of taxpayer funded schools was that schools may teach non-English classes, thereby "supplant[ing] instruction" in the parents' preferred language. *Id.* at 122. If, as Doe contends, parents had a recognized right to commandeer the schools, this wouldn't have been seen as a valid concern.

Indeed, at the time of the Fourteenth Amendment's passage, American schools were almost unrecognizable when compared to schools today. "The curriculum was usually rudimentary; ungraded schools were common in rural areas; the school term was but three months a year in many states; and compulsory school attendance was virtually unknown." *Brown v. Bd. of Ed.*, 347 U.S. 483, 490 (1954). If parents actually had a

constitutional right to administer the schools and the curriculum, it's hard to believe they would have neglected exercising it and simply settled for "rudimentary" curriculum.

There simply isn't a single authority—either cited by Doe or that the Board has located—that suggests a historical right of parents to control or direct the school environment or curriculum.

Even the U.S. Supreme Court has refrained from conferring upon parents the broad rights that Doe claims. The Court recognized the "natural duty of the parent to give his children education suitable to their station in life" in *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923). In doing so, the Court overturned a private school teacher's criminal conviction for teaching in German, thereby running afoul of a Nebraska law that prohibited teaching subjects in any "modern" language—*i.e.*, German, French, Spanish, Italian (Latin, Greek, and Hebrew were considered classical languages under the law)— until students graduated the eighth grade. The Court reasoned that the teacher's "right [] to teach and the right of parents to engage him so to instruct their children" fell within the right of liberty conferred by the amendment. *Id.* at 400.

But in the same breath that it recognized this right, the Court tempered its breadth by recognizing that States have the power "to make reasonable regulations for all schools, including a requirement that they shall give instructions in English" and "prescribe a curriculum for institutions which it supports." *Id.* at 402. Nebraska ran afoul of the Constitution because its statute "interfere[s] only with teaching . . . a modern language, leaving complete freedom as to other matters," thereby rendering the law arbitrary and capricious. *Id.*

Nothing in *Meyer*, of course, recognized a parent's right to dictate the school's curriculum or otherwise administer the schools. The Court did not recognize, for example,

a parent's right to compel a teacher to provide foreign language instruction against the teacher's will or school's policy.

Two years later, in *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (1925), the Court returned to the intersection between parents and schools. The Court struck down an Oregon statute that required parents to send their kids to public schools between the ages of 8 and 16. *Id.* at 535. The suit was brought by private institutions that sought to provide educational opportunities to students of the same age covered by the law. *Id.* at 531-32. The Court found that the statute unconstitutionally infringed upon "the liberty of parents and guardians to direct the upbringing and education of children under their control" by eliminating their ability to send them to private school. *Id.* at 534.

*Pierce* recognizes the right of parents to select which schools to attend—*i.e.*, private versus public. It says nothing about parents dictating board policy or curriculum choices.

The Court would revisit the issue of parental rights and schooling in *Wisconsin v. Yoder*, 406 U.S. 205 (1972). There, the Court affirmed the right of Amish families to withdraw their students from the educational system after the eighth grade. *Id.* at 234-35. The Court found that Wisconsin's compulsory education statute requiring students to attend schools until age 16 violated the First Amendment's Free Exercise Clause and the Amish parents' liberty interest protected by the Fourteenth Amendment. *Id.* at 234.

*Yoder* turned on the parents' right to remove a child from school after a certain age. Nothing in *Yoder* grants parents the right over how schools operate, their policies, or their curriculum.

Taken together, *Meyer*, *Pierce* and *Yoder* recognize parents' rights to attend private versus public schools, *Pierce*, 268 U.S. at 535; to remove a child from school after

a certain age based on religious teachings, *Yoder*, 406 U.S. at 234; and receive certain curriculum that "is not injurious to the health, morals or understanding of the ordinary child" and which *both* the parent and local school district approve, even though the State may disagree, *Meyer*, 262 U.S. at 403. Running this precedent through the fastest of centrifuges will not distill any rule that remotely suggests parents have a constitutional right to control the school environment. The U.S. Supreme Court has never recognized any such substantive due process right.

The precedent from the Third Circuit Court of Appeals that Doe relies upon also does not recognize any such right. In *Gruenke v. Seip*, 225 F.3d 290, 305-06 (3d Cir. 2000), the court found that a high school swim coach improperly interfered with a student and family's "right to be free from state interference with family relations" when he pressured the student into taking a pregnancy test in front of her teammates. This allowed the test results to spread throughout the school community, making it impossible for the family to deal with the matter privately. *Id.* at 306. The court held that school-sponsored counseling and testing that "pry[s] into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution." *Id.* at 307. But despite this analysis, the Court then dismissed the substantive due process claim on the basis that the law was not so clearly established as to prohibit the coach's conduct. *Id.*

At most, *Seip* stands for the proposition that schools may not pry into, or compel students to divulge, sensitive personal and family matters. *See Id.* at 307. Of course, none of that has any application here, as nobody at DVRHS coerced or compelled Jane to undergo any tests related to her gender. Nor did anyone at DVRHS randomly or systematically select Jane for social transition. As the Complaint admits, Jane approached

18

the school district and expressed her gender preferences, not the other way around. *Comp.*, ¶ 22; *see also Miranda Decl.*, ¶ 15.

In *McCurdy v. Dodd*, 352 F.3d 820, 828 (3d Cir. 2003), the court declined to find that the Due Process Clause protected a parent's "liberty interest in the companionship, care, and affection of his independent adult son." The case arose from a father's attempt to bring a Section 1983 claim based on the wrongful shooting and death of his adult son. *Id.* at 822-23. The case had nothing to do with schools or education.

In *Croft v. Westmoreland Cnty. Child. & Youth Servs.*, 103 F.3d 1123, 1126-27 (3d Cir. 1997), the court found a county child welfare agency and its caseworker interfered with a parent's liberty interest when the employee threatened to place a four-year-old child in foster care, unless the father left the home. The agency had received an anonymous tip of child abuse but the caseworker admitted she "had no opinion one way or the other whether sexual abuse had occurred," yet still issued the alleged threat of removal. *Id.* at 1127. Neither the words "school," "education," nor "curriculum" appear anywhere in *Croft*.

None of these authorities assist Doe in trying to have this Court discover a constitutional right of parents over the school environment or curriculum.

> 2. *Precedent Actually Strikes Against The Right Doe Demands This Court Recognize.*

The right of parents to "control a child's upbringing and education" is "neither absolute nor unqualified." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005). Rather, in "certain circumstances the parental right to control the upbringing of a child must give way to a school's ability to control curriculum and the school environment." *Id.* at 182.

For example, in *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 528–29 (3d Cir. 2018), the court rejected a substantive due process claim—one predicated on privacy grounds—that took issue with a school policy permitting transgender students to use locker rooms associated with their gender identity, not their anatomy.  The court held that the district had a compelling interest in protecting transgender students, as "[m]istreatment of transgender students can exacerbate gender dysphoria, lead to negative educational outcomes, and precipitate self-injurious behavior." *Id.* at 529. The court didn't mince words about what's at stake: "[w]hen transgender students face discrimination in schools, the risk to their wellbeing cannot be overstated—indeed, it can be life threatening." *Id.*

Similarly, in *Swanson v. Guthrie Indep. Sch. Dist.*, 135 F.3d 694, 703 (10th Cir. 1998), the court rejected the substantive due process claim of a parent and student who desired to attend school on a part-time basis. The plaintiffs complained that the school policy directing students to attend school on a full-time basis infringed on the familial relationship, as well as the free exercise of their religion. *Id.* at 697. The court rejected this argument, finding that "parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject." *Id.* at 699. In its survey of how other federal courts had addressed the scope of parental authority in the education domain, the court found "that parents have no right to exempt their children from certain reading programs the parents found objectionable, or from a school's community-service requirement, or from an assembly program that included sexually explicit topics." *Id.* (citing *Immediato v. Rye Neck School Dist.*, 73 F.3d 454 (2d Cir.), cert. denied, 519 U.S. 813 (1996)); *Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525 (1st Cir.1995), cert. denied, 516 U.S. 1159 (1996);

*Fleischfresser v. Directors of School Dist. 200*, 15 F.3d 680 (7th Cir.1994); *Mozert v. Hawkins County Bd. of Educ.*, 827 F.2d 1058 (6th Cir.1987), cert. denied, 484 U.S. 1066 (1988)).

Even in the area of parental consent on matters of an extremely personal or sensitive nature affecting minors, courts have not recognized a "right to know and consent" under its substantive due process jurisprudence. For instance, in *Planned Parenthood of Cent. Missouri v. Danforth*, the Court struck down that portion of a Missouri statute that required an unmarried minor to obtain the "consent of a parent or person *in loco parentis* as a condition for abortion[.]" 428 U.S. 52, 74 (1976), overruled on other grounds in part by *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992). The Court found that "the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision" by the minor to terminate a pregnancy. *Id.* Even when the Court later upheld a statute requiring parental consent, it did so on the basis that such a requirement did not impose an undue burden on the minor's right to an abortion—and not because the parent had a constitutional right to know and approve. *See Casey*, 505 U.S. at 899.

The intersection between parental rights and education leads to one inescapable conclusion: "[w]hile parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a fundamental right generally to direct *how* a public school teaches their child." *Blau*, 401 F.3d at 395 (6th Cir. 2005)(emphasis in original).

>   3.    *Doe Has Not Established That The Board Defendants Infringed Upon A Fundamental Right.*

Doe cannot show a substantial likelihood of success on the merits. He simply cannot show a recognized substantive due process right that allows him to commandeer or otherwise administer DVRHS. While his brief cites cases repeating the venerable principle that the "'custody, care and nurture of the child reside first in the parents,'" *pl.'s mvg. br.*, *8 (citing *Troxel*, 530 U.S. at 65), these broad statements simply do not assist him in showing what he must: a constitutional right, grounded in substantive due process, that allows him to dictate how school districts react to a transgender student's request that staff use his preferred name and pronoun. No court has ever recognized such a right. And there is nothing "deeply rooted in [our] history and tradition,'" *Dobbs*, 597 U.S. at 237 (citing *Timbs*, 586 U.S. ___, 139 S.Ct. at 686), which would justify recognizing such a right now.

While Doe certainly has the right to remove Jane from public school and enroll her in private school or arrange for home-schooling, *see Pierce*, 268 U.S. at 525, he has no right to demand that the school district bend to his will on matters of curriculum, school administration, or policies concerning how to treat transgender students, such as Jane.

>   4.    *Board Policy 5756 Easily Passes Rational Basis Review.*

Because Doe cannot establish any fundamental rights are at issue here, the Court's review of Board Policy 5756 is subject to rational basis review. This is easily met. Board Policy 5756 is intended to create an inclusive, discrimination-free environment for transgender students and promote their well-being and welfare inside the school environment. *McKinney Decl.*, ¶ 8. These interests were found to be compelling in

*Boyertown Area Sch. Dist.*, 897 F.3d at 528-29. They easily meet rational basis review here.

For these reasons, Doe cannot establish the first factor necessary to justify a TRO. That alone dooms his application.

### B.  Doe Cannot Show An Irreparable Injury.

To satisfy the second factor necessary for a TRO or preliminary injunctive relief, plaintiff must show an irreparable injury. *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994). This factor requires showing that the injury "cannot be redressed by a legal or an equitable remedy following a trial." *Id.* (internal quotations and citations omitted). The injunctive relief "must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 801 (3d Cir. 1989). The harm "cannot be remote or speculative; it must be poised to occur before the District Court can hold a trial on the merits." *Ecosave Automation, Inc. v. Delaware Valley Automation, LLC*, 540 F. Supp. 3d 491, 500 (E.D. Pa. 2021)(citing *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263-64 (3d Cir. 2000)).

Here, Doe cannot establish any such irreparable injury. His entire argument on this point rests on his mistaken assertion that the "violation of constitutional rights is facially apparent here, and DVRHS has promised that it shall continue to so violate Mr. Doe's rights." *Pl.'s Mvg. Br.*, *13. As we explained above, though, the Board Defendants did not violate Doe's constitutional rights.

Moreover, to the extent Doe claims that Jane being held out of school constitutes irreparable harm, he runs into two problems. First, such harm would run to Jane, who is a non-party. Second, and more pointedly, Doe's decision to keep Jane out of school—in violation of New Jersey's compulsory education law, N.J.S.A. § 18A:38-28—because he

disagrees with the Board's transgender support policy is of his own making. As a matter of law, this cannot constitute irreparable harm. *Caplan v. Fellheimer Eichen Braverman Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995)("If the harm complained of is self-inflicted, it does not qualify as irreparable"). Thus, Doe cannot meet the second threshold factor necessary to obtain injunctive relief.

While this should end the analysis, for the sake of thoroughness, the Board Defendants will analyze the third and fourth factors.

C.    The Balance Of Equities Weighs Against Issuing An Injunction.

The third factor examines whether the balance of equities weighs in favor of granting the injunction. *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 167 (3d Cir. 1999). Doe spends all of one sentence addressing this factor. He writes: "[t]here is no harm to defendants if injunctive relief is granted since they have no compelling governmental interest in violating parental rights." *Pl.'s Mvg. Br.*, *13. This conclusory statement is just a recasting of Doe's belief that his action has merit. As we explained above, it does not.

The Board Defendants have a "compelling state interest in protecting transgender students from discrimination," *Boyertown Area Sch. Dist.*, 897 F.3d at 529. Schools that provide inclusive, safe environments for transgender students foster "inclusivity, acceptance, and tolerance." *Id.* "When a school promotes diversity and inclusion, 'classroom discussion is livelier, more spirited, and simply more enlightening and interesting [because] the students have the greatest possible variety of backgrounds.'" *Id.* (citing *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003)).

More specifically on the issue of social transition, the Third Circuit has recognized: "[f]or transgender individuals, an important part of social gender transition is having

others perceive them as being the gender the transgender individual most strongly identifies with." *Boyertown Area Sch. Dist.*, 897 F.3d at 522. This "transition can help alleviate gender dysphoria and is a useful and important tool for clinicians to ascertain whether living in the affirmed gender improves the psychological and emotional function of the individual." *Id.* at 523.

Board Policy 5756 seeks no less than to address these concerns and create the type of school environment that permits all students, no matter their background, to thrive. *See McKinney Decl.*, ¶ 8.

Whatever Doe's disagreements with the Board's goals, his disagreement—no matter how vehement and sincere—does not override the Board's "ability to control curriculum and the school environment, *C.N.*, 430 F.3d at 182. Nothing in Board Policy 5756 interferes with his own interactions with Jane or how Jane is addressed outside the school environment. Nor does the policy prohibit him from removing Jane from DVRHS and enrolling her in a private or public school that does not have a transgender support policy.

There's simply no showing that allowing Jane to be referred to by her preferred name and pronoun elevates *Doe's harm* to such a level that it would support the claimed injunctive relief. Thus, Doe cannot meet the third factor either.

> D.     The Public Interest Does Not Weigh In Favor Of An Injunction.

"Among the more nebulous concepts of equitable relief is the public interest factor of injunction analysis." *McCahon v. Pennsylvania Turnpike Commission*, 491 F. Supp. 2d 522, 528 (M.D. Pa. 2007). "This factor requires the court to look beyond the parties' respective interests and to gauge the injunction's potential effects on the community as a whole." *Id.* In particular, the court "must also consider the hardship to

any interested third parties." *LCN Enterprises, Inc. v. City of Asbury Park*, 197 F. Supp. 2d 141, 153 (D.N.J. 2002)(citing *Oburn v. Shapp,* 521 F.2d 142, 152 (3d Cir.1975)).

Once again, Doe gives this factor short shrift, stating only that "the public interest favors the plaintiff since the adherence to fundamental constitutional rights is always in the greatest public interest." *Pl.'s Mvg. Br.*, *14. As with the second and third factors, Doe's argument here more or less points the Court back to his argument on the "likelihood of success" factor. The Board Defendants do not believe this properly addresses the fourth factor and we will not repeat our arguments for why Doe's substantive due process claim lacks merit. Rather, we ask that the Court take into account the impact an injunction will have on the school community, just as the fourth factor envisions. *McCahon*, 491 F. Supp. 2d at 528.

To reiterate: what Doe asks is for an injunction that prohibits school officials from addressing transgender students with that student's preferred names and pronouns unless the parents consent. Indeed, Doe seeks to have this Court insert a special monitor in the school to ensure Jane is referred to by her female name and pronouns, despite *Jane's expressed wishes*. ECF No. 4.

But despite his heavy-handed demand for relief, Doe never once addresses the rights of the third parties who will actually be directly impacted by the injunction— transgender students, such as Jane.

Let's start with Jane. Nowhere in Doe's analysis of the injunction's impact does she appear. *See Pl.'s Mvg. Br.*, *13. But ignoring Jane doesn't erase her. The fact remains that an injunction will impact how Jane experiences school. Considering that even Doe admits that it was Jane who approached school officials to express that she identified as a male and wanted to be referred to as such, *Comp.*, ¶ 22, this issue is one of significant and

critical importance to her. The Court does not have before it any medical evidence as to the impact this may have on Jane.

But Jane isn't the only transgender student impacted. If Doe's demand for injunctive relief is granted, the Board would be required to disregard the gender identity of all transgender students who had disapproving parents. That places them at risk also. What are the risks? "In a survey of 27,000 transgender individuals, 40% reported a suicide attempt (a rate nine times higher than the general population)." *Boyertown Area Sch. Dist.*, 897 F.3d at 523. However, "when transgender students are addressed with gender appropriate pronouns and permitted to use facilities that conform to their gender identity, those students reflect the same, healthy psychological profile as their peers." *Id.* (citations and internal quotations omitted). We respectfully submit that these concerns should not be disregarded or taken lightly.

Thus, the public interest factor overwhelmingly weighs against granting the injunction.

## <u>CONCLUSION</u>

Because Doe cannot make the requisite showing, the Court should deny his application for a temporary restraining order and preliminary injunction.

Dated: February 7, 2024                         Respectfully submitted,

**ANDERSON & SHAH, LLC**
**ATTORNEYS AT LAW**
*Attorneys for Defendants Delaware Valley Regional High School Bd. of Ed., Scott McKinney, and Ashley Miranda*

By: */s/ Roshan D. Shah*
       Roshan D. Shah, Esq.

27