<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOHN DOE, said name being fictitious,<br><br>Plaintiff,<br><br>v.<br><br>DELAWARE VALLEY REGIONAL HIGH SCHOOL BOARD OF EDUCATION, et al.,<br><br>Defendants. | Civil Action No. 24-00107 (GC) (JBD)<br><br><u>**OPINION**</u> |

<u>**CASTNER, District Judge**</u>

 **THIS MATTER** comes before the Court by way of Plaintiff's motion for a Temporary Restraining Order (TRO) and Preliminary Injunction.  (ECF Nos. 3 & 4.)  The Court has carefully considered the parties' submissions and decides the motion without oral argument pursuant to Federal Rule of Civil Procedure (Rule) 78(b) and Local Civil Rule 78.1(b).  For the reasons set forth below, and other good cause shown, Plaintiff's motion for a TRO is **DENIED**.

I. <u>**BACKGROUND**</u>

 **A.  Factual Background**

 Jane Doe[1] is a freshman at Delaware Valley Regional High School in Frenchtown, New Jersey.  (ECF No. 1 at 2-3, 5.)[2]  Jane is a minor diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD) and Unspecified Mental Disorder (UMD), and has been under the care of a

---

[1] The Court refers to Plaintiff's child as "Jane Doe," consistent with Plaintiff's Verified Complaint and the parties' briefing.

[2] Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

therapist for anxiety, depression, and gender confusion since April 2022.  (*Id.* at 4.)  Plaintiff John Doe is Jane's father.  (*Id.* at 2-3.)  Plaintiff alleges that he and mental health professionals "agreed to take a cautious approach to Jane's gender confusion" given her mental health diagnoses and the trauma following the death of Jane's mother.  (*Id.* at 4.)

At school, Jane participated in an extracurricular club known as "Students Advocating for Equality," or "SAFE," which "promote[s] open discussion and awareness about modern cultures and topics surrounding intersectionality while aiming to make positive contributions to [the] community and school."  (*Id.* at 5.)  Defendant Ashley Miranda is a school counselor and the staff advisor of SAFE.  (*Id.*; ECF No. 30-1 ¶ 3.)

According to the Complaint, "Jane attended a SAFE meeting and expressed to . . . Miranda that she would like to undergo a social transition from female to male in school."  (ECF No. 1 at 5.)  Plaintiff alleges that Miranda "immediately affirmed Jane's expressed identity and began to facilitate Jane's social transition" and "asked Jane if she would like to change her name and pronouns and be known only as a male at school, to which Jane agreed."  (*Id.* at 5-6.)  Plaintiff alleges that Miranda subsequently emailed the entire high school staff, except two teachers, informing them of Jane's name change, but that Plaintiff was not notified.  (*Id.* at 6)

Plaintiff alleges that Miranda and the school concealed Jane's social transition from him in several ways.  In her email to the staff, Miranda informed the staff that Plaintiff "was not to be informed of Jane's social transition."  (*Id.*)  Miranda also allegedly excluded two teachers from the email because they "have contacts with members of the Doe household."[3]  (*Id.*)  And Plaintiff

---

[3]     This fact is contested by Miranda through a sworn declaration.  (ECF No. 30-1.)  In a responsive declaration, Jane Doe says that she asked Miranda not to include two teachers on the email because of their relationship with her family.  (ECF No. 32-1.)  Even accepting Plaintiff's allegations as true, it is currently undisputed that Miranda's alleged actions were done at Jane's

claims that when he communicated with the school about Jane, the school only ever referred to Jane by her given female name "for the purpose of concealing Jane's social transition."  (*Id.*) Plaintiff learned of Jane's social transitioning at school "months after it commenced," when another parent called Jane by a male name in Plaintiff's presence.  (*Id.*)  In response, Plaintiff pulled Jane from the regular classroom and placed her "on home instruction."  (*Id.* at 6-7)

In December 2023, Plaintiff met with the high school administration, including Miranda. (*Id.* at 7.)  Plaintiff informed the administration that he and Jane's therapist "were not in agreement with Jane's social transition and expressly denied his consent to the continuance of Jane's social transition."  (*Id.*)  The school district replied that it was compelled by law and policy to call Jane by her preferred male name until such time as Jane indicated otherwise.  (*Id.*)

Following that meeting, Plaintiff sent a cease-and-desist letter to Scott McKinney, the superintendent of Delaware Valley Regional High School and chief executive of the school district. (*Id.*; ECF No. 1-3 at 2-3.)  In the letter, Plaintiff reasserted his parental rights and demanded that the administration stop socially transitioning Jane.  (ECF No. 1-3 at 2-3.)  By letter dated December 14, 2023, counsel for the Board advised Plaintiff that "the District has and will continue to act in accordance with applicable federal and state laws, and the New Jersey Department of Education's guidance on transgender students."  (ECF No. 1-5 at 2.)  The Board also advised that because Jane had not attended school for more than ten days, she would "be considered truant and the District may have to take further action, as it is required by law to do . . . if she continues to be absent." (*Id.* at 3 (citing N.J.A.C. 6A:16-7.6).)

---

request.  The parties will have an opportunity to provide a more fulsome record on this point in advance of a preliminary injunction hearing.

In early January 2024, while the school district worked to implement approved home instruction for Jane, counsel for the Board informed Plaintiff that "during home instruction the teachers will comply with district policy, NJDOE guidance, and federal and state laws" regarding Jane's name preference.  (ECF No. 4 at 11.)  Plaintiff contends that the school's insistence to refer to Jane by her preferred name and pronouns against Plaintiff's wishes "interfere[s] with . . . [Plaintiff]'s parent-child relationship," violates his "fundamental parental rights," and establishes "a policy that [makes] it impossible for Jane to receive a public education unless [Plaintiff] yielded his constitutional and statutory parental rights."  (*Id.*)

Since commencing this lawsuit, Plaintiff has further alleged that "Jane was threatened with truancy" if Plaintiff did not send Jane to approved instruction.  (ECF No. 27 ¶ 7.)  Plaintiff also alleges that two workers from the Department of Children and Families, Division of Child Protection, visited his home to conduct a wellness check and that they "obviously had been sent" by the school.  (*Id.* ¶ 9.)

Exhibit A to Plaintiff's Verified Complaint is a copy of Board Policy 5756, titled "Transgender Students."  (ECF No. 1-1 at 2.)  In relevant part, the Policy states the following:

> *The school district shall accept a student's asserted gender identity; parental consent is not required.*  A student need not meet any threshold diagnosis or treatment requirements to have his or her gender identity recognized and respected by the school district, school, or school staff members.  In addition, a legal or court-ordered name change is not required.  *There is no affirmative duty for any school district staff member to notify a student's parent of the student's gender identity or expression.*
>
> [(*Id.* (emphases added).)]

If a parent disagrees with the minor student's use of a different name and pronouns, the Policy instructs "the Superintendent or designee [to] consult the Board Attorney regarding the minor student's civil rights and protections under the [New Jersey Law Against Discrimination],"

but staff "should continue to refer to the student in accordance with the student's chosen name and pronoun at school." (*Id.*)  The Policy also notes that school officials "should have an open, but confidential discussion with the student" about the student's preferences and "parental communications," and "should also discuss with the student, and any other individuals at the student's request, the risks associated with the student's transgender status being inadvertently disclosed." (*Id.* at 3.)

The Board Policy mirrors the New Jersey Department of Education's guidance that "provide[s] direction for schools in addressing common issues concerning the needs of transgender students." (ECF No. 1-2 at 2.)  New Jersey's guidance also "assist[s] schools in establishing policies and procedures that ensure a supportive and nondiscriminatory environment for transgender students" consistent with the New Jersey Law Against Discrimination (NJLAD), and Title IX of the Education Amendments of 1972. (*Id.*)

### B.  Procedural History

On January 5, 2024, Plaintiff filed the Verified Complaint (ECF No. 1) together with the motion for a TRO and preliminary injunction (ECF Nos. 3 & 4).[4]  Upon receipt, the Court declined to decide the motion *ex parte* and directed Plaintiff to serve Defendants in accordance with the applicable federal and state rules. (ECF No. 11.)  On January 31, after the parties were served with Plaintiff's Complaint and motion, the Court held a telephonic status conference.  The parties were permitted to submit further evidence and briefing through February 9.  Plaintiff filed a supplemental brief with additional exhibits. (ECF No. 25.)  Defendants opposed, and Plaintiff replied. (ECF Nos. 30-32.)

---

[4]      The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331.

Plaintiff asserts three counts against Defendants, alleging violations of his constitutional parental rights. (ECF No. 1 at 9-18.) The Board Defendants include the Delaware Valley Regional High School Board of Education; Ashley Miranda; and Scott McKinney. (*Id.* at 6-7.) The State Defendants are Angela Allen-McMillan in her capacity as the Acting Commissioner of the New Jersey Department of Education,[5] and New Jersey Attorney General Matthew J. Platkin. (*Id.* at 3.)

Count One seeks relief under the Declaratory Judgment Act, 28 U.S.C. § 2201. Plaintiff alleges that the Attorney General is "actively litigating the legal position that . . . school districts must follow" Board Policy 5756 and similar statewide guidance, "since to do otherwise would violate the New Jersey Law Against Discrimination." (*Id.* at 4.) Thus, under Count One, Plaintiff seeks a declaration that the NJLAD and Board Policy 5756 are "unconstitutional and void . . . to the extent that [they] would deprive parents of fully informed knowledge and consent with respect to any aspect of their children's education including . . . social transitioning in particular"; and that "there is no fundamental constitutional right for a minor to socially transition." (*Id.* at 12-14.) Plaintiff also seeks to enforce statutory rights under the Department of Education Organization Act of 1979, 20 U.S.C. § 3401. (*Id.* at 13-14.)

In addition, Plaintiff asks the Court to permanently enjoin the New Jersey Attorney General from enforcing the NJLAD "or any other state law to the extent that it may" violate Plaintiff's substantive due process parental rights; "the Acting Commissioner of the NJDOE and anyone acting under her from providing guidance to school districts in accordance with Policy 5756"; and "the District, Superintendent, the Board, and all employees thereof, from enforcing Board Policy 5756 and otherwise acting to socially transition [Plaintiff's] daughter without his fully informed

---

[5]     As of this Opinion, the Acting Commissioner of the New Jersey Department of Education is Kevin Dehmer.

knowledge and consent." Plaintiff also seeks an order requiring "the Board to provide mainstream classroom instruction to Jane" and appointing "an independent monitor to protect [Plaintiff's] parental rights, at the Board's sole expense, upon Jane's return to school." (*Id.* at 13-14.)

Count Two asserts a claim under 42 U.S.C. § 1983 for violations of Plaintiff's constitutional parental rights under the Fourteenth Amendment's substantive due process clause. (*Id.* at 15-17.)

Count Three asserts a violation of the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2, *et seq.*, for interfering with Plaintiff's "right to parent a minor child who is receiving a thorough and efficient education." (*Id.* at 17-18.)

## II.  LEGAL STANDARD

### A.  Temporary Restraining Order

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotation marks and citation omitted). The elements for a preliminary injunction and a temporary restraining order are the same. *See Koons v. Reynolds*, 649 F. Supp. 3d 14, 22 (D.N.J. 2023). A plaintiff seeking a TRO must establish that (1) he is reasonably likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3rd Cir. 2017); *see also HR Staffing Consultants, LLC v. Butts*, Civ. No. 15-3155, 2015 WL 3492609, *7 (D.N.J. June 2, 2015) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). If a plaintiff meets the first two factors, the court "then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly*, 858 F.3d at 179.

"A primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). Thus, "[a] party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." *Id.* at 653 (citation omitted). The party seeking to alter the status quo "must meet a higher standard of showing irreparable harm in the absence of an injunction." *Bennington Foods LLC v. St. Croix Renaissance Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008).

### B.  Burden of Proof

Generally, the moving party bears the burden to convince the court that all four factors favor preliminary relief. *Peter v. Att'y Gen. of N.J.*, Civ. No. 23-03337, 2023 WL 4627866, at *1 (D.N.J. July 19, 2023) (citing *AT&T v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)). Because "the burdens at the preliminary injunction stage track the burdens at trial," there are instances when the burden may shift. *See Reilly*, 858 F.3d at 179 (citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, et al.*, 546 U.S. 418, 429 (2006)). For preliminary injunctions related to constitutional rights, the moving party must first demonstrate a likelihood of successfully showing that a fundamental right is being infringed. *See id.* at 180 n.5 (noting that the party seeking injunctive relief under the First Amendment "still retains the burden of proof in two principal ways: it must prove that the law restricts protected speech and that it will suffer irreparable harm" (citing *Goodman v. Illinois Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 438 (7th Cir. 2005))).

If the moving party makes that showing, the burden shifts to the government to justify its restriction under the appropriate level of scrutiny. *See id.* (citing *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011)). "If the government succeeds in justifying the restriction,

then the motion for a preliminary injunction fails because there is no likelihood of success on the merits. And even if the moving party prevails on that prong, it still bears the burden of showing irreparable injury." *Id.*

Here, Plaintiff must show that he is reasonably likely to succeed in proving that Defendants infringed on a substantive due process right. If Plaintiff makes that showing, the burden shifts to Defendants to justify their actions under the appropriate level of scrutiny. Plaintiff also has the burden of establishing irreparable harm in the absence of preliminary relief. *Id.*

## III.  DISCUSSION

### A.  Likelihood of Success on the Merits

#### 1.  *Counts One & Two*

The Court will first address Plaintiff's likelihood of success on the merits. Because the Declaratory Judgment Act does not provide an independent cause of action,[6] the Court turns to Plaintiff's claims under § 1983 and the Department of Education Organization Act of 1979, 20 U.S.C. § 3401.

Plaintiff's reliance on 20 U.S.C. § 3401(3) appears misplaced. Section 3401(3) provides that "parents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role." This provision is one of ten congressional findings enumerated in the legislation that created the

---

[6]     *See, e.g.*, *Malhan v. Sec. U.S. Dep't of State*, 938 F.3d 453, 457 n.3 (3d Cir. 2019) ("[T]he Declaratory Judgment Act is procedural only, and presupposes the existence of a judicially remediable right. It creates a remedy, not rights." (internal quotation marks and citations omitted)); *Everest Indem. Ins. Co. v. All Risks LTD*, Civ. No. 16-3582, 2023 WL 4295778, at *4 n.8 (D.N.J. June 30, 2023) ("Declaratory judgment is a remedy, not an independent cause of action." (collecting cases)).

U.S. Department of Education in 1979.[7]  Plaintiff argues that § 3401 is "the supreme law of the land" and that Board Policy 5756 violates § 3401(3) by removing "parents from having primary responsibility for the education of their children."  (ECF No. 4 at 15; ECF No. 1 at 10.)  But Plaintiff has not cited, nor has the Court found, any authority supporting the argument that § 3401 confers an enforceable statutory right.  Absent such authority, the Court finds that at this stage, Plaintiff has not demonstrated that these Congressional findings are anything more than "general statements of federal policy" as opposed to "newly created legal duties."  *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 22-23 (1981); *see also E. Shoshone Tribe v. N. Arapaho Tribe*, 926 F. Supp. 1024, 1032 (D. Wyo. 1996) (finding reliance on "novel, untested" theory "does not provide any assurance of eventually prevailing on the merits"); *Ruppert v. Washington*, 366 F. Supp. 683, 685 (D.D.C. 1973) (denying preliminary injunction where the "issues [we]re novel" and "the likelihood of success on the merits appear[ed] very slight").  Therefore, Plaintiff has not met his burden to establish a likelihood of success on the merits for his claims based on § 3401.

Next, to establish a claim under 42 U.S.C. § 1983, Plaintiff must show that he has been deprived of a federal constitutional right under color of state law.  *See Anspach ex rel. Anspach v. City of Phila., Dept. of Pub. Health*, 503 F.3d 256, 261 (3d Cir. 2007) (noting that courts are to "remain mindful that section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law").  Here, Plaintiff asserts that Defendants are "state actors who are violating [Plaintiff's] fundamental constitutional parenting rights" under the substantive Due Process Clause of the Fourteenth Amendment of the

---

[7]    Department of Education Organization Act, Pub. L. No. 96-88, 93 Stat. 668 (1979); *see Cottrell v. United States Department of Educ.*, 430 F. Supp. 3d 1287, 1290 (N.D. Fl. 2019) ("The Department of Education ('DOE') is an executive-branch agency that Congress created in 1979 through the Department of Education Organization Act . . . codified at 20 U.S.C. §§ 3401-3508.").

United States Constitution.  (ECF No. 4 at 13.)

The Fourteenth Amendment forbids states from depriving "any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause enumerates both substantive and procedural rights.  *See Steele v. Cicchi*, 855 F.3d 494, 501 (3d Cir. 2017).  Plaintiff asserts only substantive due process violations.  (*See* ECF No. 4 at 13.)  To show a violation, Plaintiff must "demonstrate that he has 'been deprived of a particular interest that is protected by . . . substantive due process.'"  *Holland v. Rosen*, 895 F.3d 272, 292 (3d Cir. 2017) (quoting *Steele*, 855 F.3d at 501).

The substantive component of the Due Process Clause protects both those rights guaranteed by the first eight amendments, and fundamental rights that are not mentioned in the Constitution but are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quotation marks and citations omitted).  Asserting a substantive due process right "requires 'a careful description of the asserted fundamental liberty interest.'"  *Holland*, 895 F.3d at 292 (first quoting *Chavez v. Martinez*, 538 U.S. 760, 775-76 (2003); and then quoting *Glucksberg*, 521 U.S. at 721).  "[V]ague generalities . . . will not suffice."  *Id.*  "Both the Supreme Court and [the United States Court of Appeals for the Third Circuit] have repeatedly warned that we cannot read these phrases too broadly to expand the concept of substantive due process."  *Id.* at 293.  "A court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution."  *Id.* (quotations and citation omitted).  Because a court's expansion of the concept of due process "place[s] the matter outside the arena of public debate and legislative action," the "doctrine of judicial self-restraint requires [courts] to exercise the utmost

care whenever [they] are asked to break new ground in this field." *Doe by and through Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp. 3d 324, 383 (3d Cir. 2017), *aff'd*, 897 F.3d 518 (3d Cir. 2018) (citations omitted).

In this case, Plaintiff asserts a liberty interest in "the care, custody, and control of" his child, which "is perhaps the oldest of the fundamental liberty interests" protected by the Due Process Clause. (*See* ECF No. 4 at 14 (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).)  In support, Plaintiff cites to Supreme Court precedent recognizing a parent's general right to make decisions concerning the care, custody, and control of their children.  (ECF No. 25 at 11-14 (collecting cases).)

But the question before the Court is not whether there is a general parental right related to the care, custody, and control of children.  The question is whether Plaintiff has a fundamental constitutional right that requires the Board Defendants to obtain Plaintiff's consent prior to recognizing and referring to Jane as to her preferred gender.  At this stage, based on a careful review of all submissions, the Court finds that Plaintiff has not shown a likelihood of success on the merits as to this question.

For one, the cases that establish fundamental parental rights — and define the scope of those rights in a school setting — do not support the type of unqualified right that Plaintiff asserts in this case.  Although United States Supreme Court precedent has affirmed the right of parents to control the upbringing of their children, it has also recognized that this right is not absolute in a school setting and that schools may impose reasonable regulations.  *See, e.g.*, *Meyer v. Nebraska*, 262 U.S. 390, 402 (1923) ("The power of the state to compel attendance at some school and to make reasonable regulations for all schools . . . is not questioned."); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534 (1925) ("No question is raised concerning the power of the state reasonably to

regulate all schools . . . and that nothing be taught which is manifestly inimical to the public welfare."); *Wisconsin v. Yoder*, 406 U.S. 205, 213-14 (1972) (recognizing the power of the state "to impose reasonable regulations for the control and duration of basic education," which must be balanced "when it impinges on fundamental rights").

The Third Circuit has similarly recognized that although the "Supreme Court has never been called upon to define the precise boundaries of a parent's right to control a child's upbringing and education," it is "clear . . . that the right is neither absolute nor unqualified." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005) (collecting cases). And "despite the Supreme Court's 'near-absolutist pronouncements' concerning the right to familial privacy, the right is necessarily qualified in a school setting where 'the state's power is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults.'" *Id.* (quoting *Gruenke v. Seip*, 225 F.3d 290, 304 (3d Cir. 2000)).

The Third Circuit has also found dispositive that in each of the foundational Supreme Court cases recognizing the right of parents to direct the upbringing of their children, "the state was either requiring or prohibiting some activity" by the parents. *See Anspach*, 503 F.3d at 263-64. In *Anspach v. City of Philadelphia, Department of Public Health*, a public health center that provided a minor with emergency contraceptive pills without her parents' knowledge or consent was found not to have violated the parents' substantive due process rights. *Id.* at 264-65. The Third Circuit reasoned that the state in *Anspach* was not constraining or compelling any action by the parents, in contrast to the laws at issue in Supreme Court cases such as *Meyer*, *Pierce*, and *Yoder*.[8] *Id.* at

---

[8]     In *Meyer*, the Supreme Court struck down a blanket prohibition against the teaching of foreign languages, holding that parents have a right "to engage [a teacher] . . . to instruct their children" in a language other than English. 262 U.S. at 400. In *Pierce*, the Court found that a law requiring parents to send children to public schools violated the parents' right "to direct the upbringing and education" of their children because it prohibited sending the children to private

263-65.   Phrased differently, "[e]very Supreme Court case discussing fundamental rights of parents with respect to their children address[es] a state law or regulation that *requires children to engage in an activity* their parents do not want them to engage in, or *prohibits children from engaging in an activity* their parents do want them to engage in."   *Reardon v. Midland Comm. Schs.*, 814 F. Supp. 2d 754, 769 (E.D. Mich. 2011) (emphasis added).

Here, Board Policy 5756 does not impose the kind of "constraint or compulsion" that the Supreme Court and the Third Circuit have found violative of parental rights.   *See Anspach*, 503 F.3d at 264.   The Policy does not *require* Jane to engage in an activity that Plaintiff does not want her to engage in, nor does it *prohibit* Jane from engaging in an activity that Plaintiff wants her to engage in.   Rather, Board Policy 5657 directs the school to refer to students by the their preferred gender identity without requiring the school to obtain a parent's consent or to affirmatively notify parents.

In contrast, Plaintiff asks the Court to "impose a *constitutional* obligation on state actors to contact parents of a minor" who requests to be recognized by a different gender identity, regardless of the minor's preference as to parental notification.   *Anspach*, 503 F.3d at 262 (emphasis in original).   Based on the current record and posture of this case, the Court is not convinced that imposing such an affirmative obligation is within "the scope of the familial liberty interest protected under the Constitution."   *Id.*   Plaintiff has not demonstrated on the factual record at this preliminary stage that such a right is "deeply rooted in this Nation's history and tradition" or "implicit in the concept of ordered liberty," and this Court is guided by the Supreme Court's and Third Circuit's admonitions not to "read these phrases too broadly to expand the concept of

schools.  268 U.S. at 534-35.  And in *Yoder*, the Court found that a law prohibiting Amish parents from withdrawing children from school after a certain age violated both the First Amendment and the parents' substantive due process rights.  406 U.S. at 234.

substantive due process . . . with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution." *Holland*, 895 F.3d at 293.

Nor does the current record establish the type of proactive, coercive interference with the parent-child relationship that the Third Circuit has found to violate parents' constitutional rights in analogous circumstances.

In *Gruenke v. Seip*, for example, a high school swim coach pressured a student to take a pregnancy test without her parents' knowledge or consent. 225 F.3d 290, 295-97 (3d Cir. 2000). The plaintiffs asserted several violations of constitutional rights, including that the coach's actions "violated [the mother's] constitutional right to manage the upbringing of her child" and "obstruct[ed] the parental right to choose the proper method of resolution" of her daughter's pregnancy. *Id.* at 306. Given the coach's "continued intrusion into what was a private family matter . . . contrary to [the student's] express wishes that he mind his own business," the Third Circuit found that the plaintiffs had established an "unconstitutional interference with familial relations." *Id.* at 306-07.

Five years later, in *C.N. v. Ridgewood Board of Education*, the Third Circuit contrasted the *Gruenke* defendant's behavior with a school survey that questioned students without parental consent about sensitive topics, such as sexual activity. 430 F.3d 159 (3d Cir. 2005). The Third Circuit held that the survey did not violate the parents' right to control their children's upbringing because the survey, unlike the coach's actions in *Gruenke*, did not "strike at the heart of parental decision-making authority on matters of the greatest importance." *Id.* at 184. The Court reasoned that a "parent whose middle or high school age child is exposed to sensitive topics or information in a survey remains free to discuss these matters and to place them in a family's moral or religious context, or to supplement the information . . . [but] School Defendants in no way indoctrinated the

15

students in any particular outlook on these sensitive topics." *Id.* at 185.  Thus, the Court concluded that the survey's interference with parental-decision making authority did not amount to a constitutional violation.  *Id.*

The Court in *Anspach* similarly found that its holding in *Gruenke* "does not extend to circumstances where there is no manipulative, coercive, or restraining conduct by the State."  503 F.3d at 266.  In *Anspach*, the Court emphasized that the coach in *Gruenke* acted "contrary to the student's express wishes that he mind his own business," and "against her express wishes, the coach . . . attempt[ed] to have her admit to being pregnant, . . . paid for a pregnancy test and told her, through other members on the team, that unless she took the pregnancy test, he would take her off the relay team."  *Id.* at 266.  The Third Circuit contrasted the coach's behavior with that of the health clinic, which neither coerced the minor into taking emergency contraceptives, nor discouraged her from discussing the issue with her parents.  *Id.* at 266-67.   The minor was "only given the pills because she asked for them," and no one at the center coerced her into taking the pills or discouraged her from discussing the issue with her parents.  503 F.3d at 264-65.

The *Anspach* decision also distinguished *Arnold v. Board of Education of Escambia County, Alabama*, a case in the United States Court of Appeals for the Eleventh Circuit where school officials "not only pressured [minor students] to refrain from discussing [a] pregnancy and abortion with their parents, but also imposed their own will on the decision of the children regarding whether to abort the pregnancy in various ways, including by providing them with the money for the procedure and hiring a driver to take them to the appointment."  *Id.* at 265 (citing *Arnold v. Bd. of Educ. of Escambia, County, Ala.*, 880 F.2d 305, 308-09 (11th Cir. 1989), *overruled on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 113 (1993)).  Critical here, while the school officials' behavior in *Arnold* and *Gruenke* violated parental

liberty rights, the Third Circuit highlighted that "neither *Arnold* nor *Gruenke* provide for a [parent's] constitutional right to notice." *Id.* at 270.

Here, Plaintiff has not established that the Board Defendants engaged in the type of proactive intrusion into private family matters that the Third Circuit found dispositive in *Gruenke*. The record so far indicates that the Board Defendants only began referring to Jane by her preferred gender identity at Jane's request, did not coerce Jane into making the request, and did not prevent or discourage Jane from discussing the transition with Plaintiff. Plaintiff does not allege otherwise in the Complaint or the sworn declarations. Although Plaintiff, in his brief, makes a conclusory remark that the "Board Defendants convinced Jane . . . that she should transition" (ECF No. 4 at 17), Plaintiff cannot amend his pleadings by way of his brief,[9] nor has Plaintiff alleged a factual basis to substantiate this assertion. The present record lacks particularized facts suggesting that the Board Defendants prompted Jane to initiate her request or proactively encouraged her to socially transition. Instead, Plaintiff alleges that "Jane attended a SAFE meeting and expressed to defendant Miranda that she would like to undergo a social transition." (ECF No. 1 at 5.) To the extent the Board Defendants "continue[] insisting on socially transitioning Jane" (ECF No. 27 ¶ 8), they are doing so only at Jane's affirmative request. (ECF No. 1 at 7 ("The District advised that it would continue to have Jane called by a male name until such time as Jane indicated otherwise.").)

Plaintiff's allegations show that the Board Defendants accepted Jane's request to be recognized by a different name and pronouns, and for the school not to report her request to her

---

[9]     *See, e.g.*, *Kwanzaa v. Brown*, Civ. No. 05-5976, 2009 WL 4139393, at *25 (D.N.J. Nov. 17, 2009) (finding that a plaintiff may not amend his complaint through arguments in a brief supporting a motion for a TRO (citing *Bell v. City of Phila.*, 275 Fed. App'x 157, 160 (3d Cir. 2008)).

father, consistent with Board Policy 5657.  Because the record indicates that Jane made her own request to be recognized by a different gender identity and to withhold this information from Plaintiff — as opposed to doing so at the direction of the Board Defendants — this Court is not yet persuaded that the Board Defendants have engaged in a level of interference comparable to that in *Gruenke*, where a school official "exploit[ed his] authority to persuade or coerce a minor into disclosure of a reproductive health condition," and "insist[ed] on a course of action." *Anspach*, 503 F.3d at 270 (citing *Gruenke*, 225 F.3d at 307).

This Court is further guided by the decisions of other District Courts that have weighed parental liberty interests against similar transgender student policies and have distinguished between school officials who proactively coerce students and those who recognize a student by the student's preferred gender identity.

In *Littlejohn v. School Board of Leon County Florida*, a middle school developed a support plan for a student who requested to socially transition — including changing the student's name, pronouns, and preferred restroom — without including or immediately notifying the parents, despite the parents' previously informing the school that they did not consent.  647 F. Supp. 3d 1271, 1273-74 (N.D. Fla. 2022).  The school was also aware that the student had previously been diagnosed with ADHD and was "expressing gender confusion."  *Id.* at 1273.  In bringing suit, the parents alleged that the school had violated their protected liberty interests in familial privacy, the upbringing of their child, and the medical and mental health decision-making for their child.  *Id.* at 1282.  On a motion to dismiss, the District Court for the Northern District of Florida found that the school had not infringed on the parents' substantive due process rights in part because the student had approached the school on his own volition and asked the school to use his preferred name and pronouns.  *Id.* at 1282 n.6.  The student had not been "singled out" or "forced to adopt

a support plan against [the student's] will.  *Id.* at 1282-83.

Similarly, in *Willey v. Sweetwater County School District No. 1 Board of Trustees*, the parents argued that a school district's policy directing school officials to refer to students by their preferred names and pronouns, and to "respect the privacy of all students regarding such choice," violated the parents' Fourteenth Amendment rights to direct the upbringing of their children, make decisions regarding their children's medical care, and familial privacy.  Civ. No. 23-069, 2023 WL 4297186, at *1, *10 (D. Wy. Jun. 30, 2023).  On a motion for a preliminary injunction, the District Court for the District of Wyoming found it unlikely that the parents would successfully assert a right to direct medical care absent "evidence the Student was suffering or diagnosed with a mental health condition related to gender identity."  *Id.* at *11.  The court opined that even if the student had been diagnosed with a mental health condition related to gender identity, the school's policy did not constitute a "treatment" that interfered with the parents' right to make medical decisions, because the school did not actively suggest that the student change their name and pronouns — "the school merely addressed the Student by the Student's requested preferred name and pronoun."  *Id.*  The court found that the policy was likely unconstitutional only to the extent that it "would preclude a teacher or school district personnel, absent a minor student's consent, from answering or responding to a parent's or guardian's inquiry as to whether their child is being called by other than their legally given name or required to lie to a parent or guardian as to the name the minor student is being called by."  *Id.* at *13-14 (but finding it unlikely that the Constitution imposes an affirmative obligation to actively disclose such information to parents absent a parent's inquiry or request).

And in *Regino v. Staley*, a school district's regulation permitted school personnel to refer to students by their preferred name and pronouns, and prohibited school personnel from informing

a student's parents of the student's social transition without the student's consent, with some limited exceptions. Civ. No. 23-00032, 2023 WL 4464845, at *1 (E.D. Cal. 2023). An elementary school student then asked school officials to recognize her as a different gender, and not to inform the student's mother. *Id.* The student's mother filed suit, arguing that the regulation violated the mother's substantive due process rights to make important medical and social decisions for her child. *Id.* at *2. The plaintiff argued that "social transitioning is a significant form of psychological treatment" and "can have grave consequences for children." *Id.* at *3. The District Court for the Eastern District of California held that the plaintiff was "advocating for an expansion of her parental substantive due process rights that is not supported by precedent." *Id.* The regulations at issue, the court explained, were "not proactive, but reactive; District staff are not directed to force students to adopt transgender identities or keep their identities secret from their parents." *Id.* at *4. "[T]he decision to openly express a transgender identity through the use of a different name and pronouns [was] made by the student, not the District." *Id.*

The school officials' actions in *Littlejohn*, *Willey*, and *Regino*, like those in this case, are different from those at issue in *Tatel v. Mount Lebanon School District*, 637 F. Supp. 3d 295, 336 (W.D. Pa. 2022). In *Tatel*, the plaintiff parents were found to have asserted a plausible substantive due process claim against a teacher who discussed gender dysphoria and transgender transitioning with first graders. *Id.* at 303-04. The teacher did so despite the published first-grade curriculum not mentioning these topics, and despite a school official assuring parents who expressly objected to these topics that "there were no formal lessons about gender identity, especially in first grade." *Id.* at 304-06. The teacher in *Tatel* showed the children books and videos on transgender topics; told first graders that "parents make mistakes about gender; instructed students not to discuss this topic with their parents; told a child she would never lie (implying the parents may be lying about

the child's [gender] identity); targeted one student for repeated approaches about his becoming like her transgender child; and caused another child to be confused about how her parents determined her gender." *Id.* at 326.  Under these circumstances, the District Court for the Western District of Pennsylvania found that the plaintiffs asserted plausible substantive due process violations of parental rights because transgender topics "implicate a core parental interest in forming the identity of their children" and that "[t]eaching a child how to determine one's gender identity at least plausibly is a matter of great importance that goes to the heart of parenting." *Id.* at 326, 336 (citing *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522 (3d Cir. 2018)).

Here, unlike in *Tatel*, Plaintiff has not yet established that the Board Defendants engaged in coercive behavior that violate parental rights.  Again, it appears undisputed that the Board Defendants acted in response to Jane's affirmative request to be recognized as to her preferred gender identity.  Under Board Policy 5756, "the decision to openly express a transgender identity through the use of a different name and pronouns is made by the student," not the Board Defendants.  *See Regino*, 2023 WL 4464845, at *4.  The Court's ruling aligns with several other courts' holdings that a school district's recognition of a student's preferred gender identity does not violate parental constitutional rights.  *Id.*; *Littlejohn*, 647 F. Supp. 3d at 1282-83; *Willey*, 2023 WL 4297186, at *12-16.  Nor does the Policy encourage students to keep their preferred gender identities secret from their parents.[10]  The issue here, like in *Regino*, is "not whether it is a good

---

[10]    Even accepting Plaintiff's allegations that Miranda did not send her staff-wide email to two teachers close to the Doe family, and generally referred to Jane by her given name when speaking to Plaintiff, this conduct alone would not rise to the level of active deception resulting in a constitutional violation.  *See Willey*, 2023 WL 4297186, at *13-14 (finding that the Constitution does not impose an affirmative obligation on the District to disclose a student's asserted gender identity to the student's parents, but that a policy precluding school officials from responding to a parent's inquiry, or requiring officials to lie upon a parent's inquiry, likely violated the

idea for school districts to notify parents of a minor's gender identity and receive consent before using alternative names and pronouns, but whether the United States Constitution mandates such parental authority [and consent]." 2023 WL 4464845, at *4. The Court finds that it does not.

Plaintiff is also unlikely at this stage to succeed in showing an infringement of his "right to make healthcare and medical decisions for his child." (ECF No. 1 at 2.) Plaintiff alleges that Jane "has been under the care of a therapist for . . . gender confusion" and that Plaintiff and "mental health professionals have agreed to take a cautious approach to Jane's gender confusion." (*Id.* at 4.) Gender dysphoria has been "recognized by the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ('DSM') as clinically significant distress or impairment related to gender incongruence.'" *Willey*, 2023 WL 4297186, at *11 (citations omitted). But Plaintiff has not alleged here that Jane has been diagnosed with gender dysphoria. (*See* ECF No. 1 at 4.) And even if Jane's visits with therapists for "gender confusion" amount to a "mental health condition related to gender identity," Plaintiff has not yet shown that the Board Defendants' recognition of Jane's preferred gender identity has violated Plaintiff's right to direct Jane's medical treatment. Again, there are no allegations that the Board Defendants engaged in "treatment" by "actively approach[ing] [Jane] regarding [Jane's] preferred name," or that they suggested that Jane be referred to by a particular name and pronoun. *See Willey*, 2023 WL 4297186, at *11 (citing *Foote v. Town of Ludlow*, Civ. No. 22-30041, 2022 WL 18356421, at *5 (D. Mass. Dec. 14, 2022)). Where, as here, it appears that "the school merely addressed the Student by the Student's requested preferred name and pronoun," and that "it was the Student initiating and requesting the use of a different name, not the District," Plaintiff has not yet established a likelihood of showing that the

---

Constitution). Plaintiff has not cited to any case law that would support a contrary finding. Nor has Plaintiff demonstrated that Board Policy 5756 categorically prohibits school officials from responding to parental inquiries, or requires them to lie about a child's preferred gender.

Board Defendants have interfered with Plaintiff's right to make medical decisions for Jane. *Id.*

In sum, Plaintiff has not identified precedent that would support a finding based on the current record that "the scope of the familial liberty interest protected under the Constitution" obligates the Board Defendants to refrain from recognizing Jane by her preferred gender identity without Plaintiff's consent or obligates the Board Defendants to notify Plaintiff about Jane's request. *See Anspach*, 503 F.3d at 262. Because Plaintiff has not yet established infringement of a fundamental right, Board Policy 5756 need only satisfy a rational basis review. *See Glucksberg*, 521 U.S. at 2271 (finding that a law that did not infringe on a fundamental liberty interest must "be rationally related to legitimate government interests"). And the Third Circuit has already held, under a strict scrutiny analysis, that a school district has "a compelling state interest in protecting transgender students from discrimination." *Boyertown*, 897 F.3d at 529. Specifically, the Third Circuit found that a school district's policy of allowing transgender students to use bathrooms and locker rooms consistent with the students' gender identities served the compelling interest of shielding transgender students from discrimination and was narrowly tailored to accomplish this purpose. *See id.* at 529-30. The Third Circuit also recognized that "when transgender students are addressed with gender appropriate pronouns . . . those students 'reflect the same, healthy psychological profile as their peers.'" *Id.* at 523 (citation omitted).

Here, the State Defendants argue that Board Policy 5756 advances the same compelling interest as that in *Doe* — "shielding [transgender students] from discrimination." (ECF No. 31 at 33.) The State Defendants further argue that the Policy advances the compelling state interests of "foster[ing] an environment of inclusivity, acceptance, and tolerance," and "protecting the physical and psychological well-being of minors," particularly where there is evidence that when transgender identities are affirmed, transgender students "reflect the same, healthy psychological

profile as their peers." (ECF No. 31 at 33-35 (citing *Doe*, 897 F.3d at 528-29).) The Board Policy itself purports to address "common issues concerning the needs of transgender students, and to assist schools in establishing policies and procedures that ensure a supportive and nondiscriminatory environment for transgender students." (ECF No. 1-1 at 2.) For purposes of this TRO, Defendants are likely to successfully show that these objectives are legitimate state interests, and that Board Policy 5756 reasonably advances these legitimate objectives by requiring schools to recognize transgender students by their preferred gender identity without affirmatively notifying or seeking consent from a parent.

For these reasons, the Court concludes that Plaintiff has not yet proven a reasonable chance of success on the merits of his § 1983 claim sufficient to grant the extraordinary emergency injunctive relief that he seeks.

### 2. Count Three

Finally, Plaintiff does not advance a specific argument in his moving papers about his likelihood of success on the merits of Count Three, which alleges a violation of "the right to parent a minor child who is receiving a thorough and efficient education." (ECF No 1 at 17.) The New Jersey State Constitution sets forth that the New Jersey "Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." N.J. Const. art. VIII, § 4, para. 1. Plaintiff generally asserts that Board Policy 5657 makes it "impossible for Jane to receive a public education unless [Plaintiff] yield[s] his constitutional and statutory parental rights." (ECF No. 4 at 11.) Nevertheless, because this Court finds that Plaintiff has not yet established an infringement of his parental rights, this argument cannot prevail at this time. Plaintiff has not cited any case law showing that this clause in the New Jersey Constitution applies

under such circumstances.  Therefore, at this stage, Plaintiff does not meet his burden of proving a reasonable chance of success on the merits with respect to Count Three.

### B.  Irreparable Harm

Turning to irreparable harm — Plaintiff's asserted irreparable harm is his loss of parental rights, "for even [a] minimal period[] of time."  (ECF No. 4 at 15.)  Plaintiff also asserts that an attorney for the school "threatened Jane with truancy" if Plaintiff continues to withhold her from school.  (ECF No. 25 at 10.)  Because Plaintiff has not shown a reasonable likelihood that he can prove that his fundamental parental rights are being infringed, Plaintiff has not established a likelihood that his parental rights will be irreparably harmed if the Board Defendants continue to recognize Jane by her preferred gender identity.

Some record evidence suggests that the school may have to address Jane's absence from school, which may include initiating truancy proceedings.  (*See* ECF No. 1-5 at 3 (a letter from counsel for the school district dated December 14, 2023, stating: "[Jane] will be considered truant and the District may have to take further action, as it is required by law to do, N.J.A.C. 6A:16-7.6, if she continues to be absent."); ECF No. 24-4 at 2 (a letter from counsel for the school district dated January 18, 2024 stating: "If [Jane] participates in scheduled home instruction regularly then the District will not have to take action regarding [Jane's] attendance.  If [Jane] does not participate in home instruction the District is required to address the compulsory education requirements.").)  But the record does not suggest that truancy proceedings are imminent.  Moreover, Plaintiff states that "two workers from the Department of Children and Families, Division of Child Protection, visited [his] home and began inquiring about Jane for a well check and to make sure that she was okay."  (ECF No. 27 ¶ 9.)  Plaintiff further notes that the "workers indicated that they were very satisfied with the manner in which [Plaintiff] was handling the situation and protecting Jane."  (*Id.*)

And to the extent that truancy proceedings could occur if Plaintiff continues to withhold Jane from school, Plaintiff has not yet shown a likelihood of success on the merits that this potential harm is tied to an infringement of Plaintiff's constitutional parental rights. Thus, without a reasonable likelihood of success on the merits, Plaintiff has not met the "particularly heavy burden" to justify the extraordinary injunctive relief that would alter the status quo — that is, the Board Defendants' continued adherence to Board Policy 5756. *See Acierno*, 40 F.3d at 653 (citation omitted).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a Temporary Restraining Order (ECF Nos. 3 & 4) is **DENIED.** An appropriate Order follows.

Dated: February 21, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE