**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| JOHN DOE (said name being fictitious),<br><br>Plaintiff,<br><br>v.<br><br>DELAWARE VALLEY REGIONAL HIGH SCHOOL BOARD OF EDUCATION, SCOTT MCKINNEY, individually and in his official capacity as Superintendent of Schools, ASHLEY MIRANDA, individually and in her official capacity as school counselor, MATTHEW J. PLATKIN, in his official capacity as Attorney General of the State of New Jersey, ANGELICA ALLEN-McMILLAN, in her official capacity as Acting Commissioner of the New Jersey Department of Education, and JOHN ROES 1-10 (said names being fictitious), individually and in their official capacities,<br><br>Defendants. | Civil Action No. 3:24-CV-107 (GC(JBD) |

---

**BRIEF IN SUPPORT OF PLAINTIFF**
**JOHN DOE'S MOTION FOR PRELIMINARY INJUNCTION**

---

MURRAY-NOLAN BERUTTI LLC
136 Central Avenue, 2nd Floor
Clark, New Jersey 07066
908-588-2111
ron@murray-nolanberutti.com
Attorneys for Plaintiff John Doe

On the Brief:
Ronald A. Berutti - 023361992

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF CONTENTS........................................................................................ i

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS .....................................................................................2

     A.    Background…………………………………………………………..…2

     B.    Social Transitioning has Medical and Therapeutic
           Consequences the Require Parental Involvement…………………………………3

     C.    Jane is Socially Transitioned in Secret and Contrary to her Medical and
           Therapeutic Treatments…………………………………………………………...6

STANDARD OF REVIEW ...................................................................................10

LEGAL ARGUMENT...........................................................................................11

POINT I .................................................................................................................11

     MR. DOE IS ENTITLED TO A PRELIMINARY INJUNCTION
     GIVEN THAT DEFENDANTS ARE VIOLATING FEDERAL LAW,
     WHICH IS THE SUPREME LAW OF THE LAND,
     IN INTERFERING WITH HIS RIGHTS…..…………………………………………11

POINT II ...............................................................................................................19

     THE SUBSTANTIVE DUE PROCESS RIGHTS WHICH ARE HELD
     BY PARENTS OVER THEIR MINORS DO NOT PERMIT DEFENDANTS'
     ACTIONS SUCH THAT THEY MUST BE ENJOINED………………………………19

     A.    Mr. Doe has a fundamental constitutional right to be fully informed
           of Jane's social transition since there is no state interest in preventing
           potential discrimination by a parent which fits within the confines of
           Supreme Court and Third Circuit parents' rights holdings………………………25

     B.    The New Jersey Law Against Discrimination does not provide a vehicle
           for the State to assume that parents will discriminate against
           their own children…………………………………………………………...…33

CONCLUSION......................................................................................................37

i

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## <u>CASES</u>

*Anspach v. City of Philadelphia, Dept. of Health*,
503 F.3d 256 (3d Cir. 2007) ..... 21, 23, 28, 29, 33

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) ..... 16

*Bond v. United States*, 564 U.S. 211, 223-224 (2011) ..... 15

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 292 (2022) ..... 21, 22

*Gibbons* v. *Ogden*, 22 U.S. 1, 9 Wheat. 1, 186-189 (1824) ..... 22

*Georgia v. Public.Resource.Org, Inc.,* 140 S. Ct. 1498, 1507 (2020) ..... 34

*Graham v. N.J. Real Estate Com*, 217 N.J. Super. 130, 138 (App. Div. 1987) ..... 34

*Griswold* v. *Connecticut*, 381 U.S. 479, 496 (1965) ..... 26, 27

*Gruenke v. Seip*, 225 F.3d 290, 303-304 (3d Cir. 2000) ..... 27, 29, 30, 31

*In re S.L.G.*, 110 A.3d 1275, 1286 (D.C. Cir. 2015) ..... 25

*Loving v. Virginia*, 388 U.S. 1, 12 (1967) ..... 23

*Marbury v. Madison*, 5 U.S. 137, 177 (1803) ..... 13

*May* v. *Anderson*, 345 U.S. 528, 533 (1953) ..... 26

*Meyer* v. *Nebraska*, 262 U.S. 390, 399 (1923) ..... 27, 28

*M.L.B. v. S.L.J.*, 519 U.S. 102, 118 (1996) ..... 26

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ..... 34

*Parham v. J.R.,* 442 U.S. 584, 603 (1979) ..... 28, 32

*Pennhurst State Scho. & Hosp. v. Halderman,* 451 U.S. 1, 22-23 (1981)   12

*Pierce* v. *Society of Sisters,* 268 U.S. 510 (1925)   26

*Prince* v. *Massachusetts*, 321 U.S. 158, 166 (1944)   27

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017)   10, 11

*Richter v. Oakland Bd. of Educ.*, 246 N.J. 507, 537 (2010)   33

*Skinner* v. *Oklahoma*, 316 U.S. 535, 541 (1942)   26, 27

*Smith v. Millville Rescue Squad*, 225 N.J. 373, 390 (2021)   33

*Stanley v. Ill.*, 405 U.S. 645, 651 (1972)   26

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.,* 143 S. Ct. 2141, 2160-2161 (2023)   34

*The Slaughter-House* Cases, 83 U.S. (16 Wall) 36 (1872)   20

*Troxel v. Granville, 530 U.S. 57 (2000)*   21, 25, 26

*Twining v. N.J.*, 211 U.S. 78 (1908)   22

*United States v. Budd*, 144 U.S. 154, 163 (1892)   34

*United States v. Gettysburg Elec. Ry.*, 160 U.S. 668, 680 (1896)   15

*United States v. Napolitan*, 2012 U.S. Dist. LEXIS 108983, *5 (W.D. Pa.)   35

*Washington v. Glucksberg,* 521 U.S. 702, 720-21 (1997)   20, 22

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)   10

*Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008)   10

*Wisconsin v. Yoder*, 406 U.S. 205, 232-33 (1972)   28

## <u>STATUTES</u>

*American Rescue Plan Act of 2021*, *American Rescue Plan Act of 2021*, 20     14, 15

*The Developmentally Disabled Assistance and Bill of Rights Act*     12

*N.J.S.A.* 10:5-1     3

*N.J.S.A.* 10:5-4     34

*Pub. L. 117-2, title II, §§2001-2004, Mar. 11, 2021, 135 Stat.19*     14

*U.S. Const.* Art. VI, Cl. 2     15, 16, 17

20 U.S.C. § 3401     1, 11, 13, 14, 15, 16, 17

20 U.S.C. § 3403     12, 13

## <u>PUBLICATIONS</u>

*Federalist 51*     19

*Standards of Care for the Health of Transgender and Gender Diverse People, Version 8,* WPATH, International J. Trans. Health 2022, Vol. 23, No. S1-S258 (2022)     4

*The Age of Marital Capacity: Reconsidering Civil Recognition of Adolescent Marriage*, Boston Univ. Law Rev., Vol.92:1817, 1827 (2012)     24

## PRELIMINARY STATEMENT

The plaintiff, John Doe ("Mr. Doe"), submits this brief in support of a preliminary injunction following his filing of an Amended Complaint. A preliminary injunction in his favor is appropriate because Mr. Doe has demonstrated a probability of success on the merits both with respect to his right to an injunction under 20 *U.S.C.* §3401(3), which is the supreme law of the land and must be obeyed regardless of whether private civil remedies flow from such statute, and with respect to Mr. Doe's claim that his fundamental substantive due process rights have and continue to be violated. More specifically, a parent's rights to prevent a minor from undertaking actions that interfere with the parent's best judgment as to the care, custody, control, medical decision making, and education of the child eclipse any right of the child to have a school keep the child's desire to socially transition secret from the parent. At the very least, defendants may not violate the parent's wishes once the parent learns of such secret and reveals a separate course of medical intervention which has been undertaken for the child. Thus, even if the school had a legitimate interest in protecting a child from discrimination by her parents, which is the claimed state interest--it does not--once the school was informed that its actions contradict medical and therapeutic interventions being undertaken based on parental judgment, it violated such right by refusing to yield to Mr. Doe and threatening truancy proceedings if he did not abdicate his parental rights..

1

Under such circumstances, this Court must reassess its Opinion in which it denied a temporary restraining order in Mr. Doe's favor, and should enter a preliminary injunction since all criteria for the same are met by Mr. Doe.

## STATEMENT OF FACTS

### A. Background.

Jane Doe ("Jane") is a minor child who has a documented diagnosis of Attention-Deficit/Hyperactivity Disorder ("ADHD") and Unspecified Mental Disorder ("UMD"), who endured the childhood trauma of the death of her mother. Jane has been under the care of a therapist for depression, anxiety, and gender confusion since April 21, 2022. Mr. Doe and mental health professionals have agreed to take a cautious approach to Jane's gender confusion given her underlying trauma and psychiatric comorbidities. (Amd. Cpt. ¶¶21-22)

Defendant Delaware Valley Regional High School Board of Education (the "Board") has a policy titled "5756 - Transgender Students," ("Board Policy 5756") a true copy of which is attached to the Verified Complaint as Exhibit A and is incorporated herein by reference, which provides, in part:

> The school district shall accept a student's asserted gender identity; parental consent is not required. A student need not meet any threshold diagnosis or treatment requirements to have his or her gender identity recognized and respected by the school district, school, or school staff members. In addition, a legal or court-ordered name change is not required. There is no affirmative duty for any school district staff member to notify a student's parent of the student's gender identity or expression. (Amd. Cpt. ¶23)

2

The NJDOE published guidance to New Jersey public schools encourages them to take a "student-centered approach" to students who believe themselves to be transgender, which declares, "school district personnel should have an open, but confidential discussion with the student to ascertain the student's preference on matters such as chosen name, chosen pronoun use, and parental communications." A true copy of such guidance is attached to the Verified Complaint a as Exhibit B and is incorporated herein by reference. (Amd. Cpt. ¶24)

Upon information and belief, the AG is actively litigating the legal position that although such policy is merely guidance, school districts must follow it since to do otherwise would violate the New Jersey Law Against Discrimination, ("LAD") *N.J.S.A.* 10:5-1 *et seq.*, which provides certain anti-discrimination provisions with respect to gender identity. (Amd. Cpt. ¶25) However, such merely is the AG's interpretation of the LAD, and is not specified in the statute itself.

### B. Social Transitioning has Medical and Therapeutic Consequences the Require Parental Involvement.

When a student's name and pronouns are changed by a school so that the student can live as the opposite sex while at school and/or elsewhere, the school is initiating a social transition. **Social transition is a psychotherapeutic intervention and is not a neutral act**. Cass, H., *Independent review of gender identity services for children and young people: Interim report* (2022).  (Amd. Cpt. ¶26)

3

Gender dysphoria is considered a serious mental-health condition that requires professional help. "Since it is impossible to definitively delineate the contribution of various factors contributing to gender identity development for any given young person, a comprehensive clinical approach is important and necessary" *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8,* WPATH, International J. Trans. Health 2022, Vol. 23, No. S1-S258 (2022) ("WPATH"). (Amd. Cpt. ¶27) The Board, and defendants ScottMcKinney ("McKinney")  Ashley Miranda ("Miranda") were not and remain unequipped to determine whether Jane is suffering from gender dysphoria and did not even attempt to make any assessment about her mental health prior to socially transitioning her. (Amd. Cpt. ¶28) Studies show that a large percentage of children who transition are autistic and/or obsessive compulsive, and that children with psychiatric conditions and/or who are neuro-diverse children are more likely to commit suicide than those with gender dysphoria, such that the mistaken belief that a child has gender dysphoria as opposed to psychiatric conditions may be dangerous to the child. *https://statsforgender.org/autism/* . (Amd. Cpt. ¶29) Indeed, at least one study has found that a significant majority of children with gender dysphoria have at least one mental health or neurodevelopmental issue. *https://statsforgender.org/comorbidity/* (Amd. Cpt. ¶30)

In a comprehensive survey of numerous studies released this week by the American College of Pediatricians, found as follows regarding mental health problems among transgender adolescents:

> Adolescents who have a gender identity not congruent with their biological sex have an increased incidence of mental health issues, including depression and suicidal ideation. Both before and after "gender affirming therapy" (GAT), adolescents who have gender identity incongruence are at higher risk for psychopathology than their peers who identify with their biological sex. Previous adverse childhood experiences may play a major role in that psychopathology and needs to be explored in helping these patients. There are no long-term studies demonstrating benefits nor studies evaluating risks associated with the medical and surgical interventions provided to these adolescents. There is no long-term evidence that mental health concerns are decreased or alleviated after "gender affirming therapy." Many individuals who have been treated with "GAT" later regret those interventions and seek to align their gender identity with their sex. Because of the risks of social, medical, and surgical interventions, many European countries are now cautioning against these interventions while encouraging mental health therapy. (Amd. Cpt. ¶31)

Parents must be permitted to seek a mental health evaluation prior to any psychological intervention. Mental health providers "should provide guidance to parents/caregivers and supports to a child when a social gender transition is being considered" so that the parents can succeed in "making informed decisions about the advisability and/or parameters of a social transition for their child." WPATH at S78 (Amd. Cpt. ¶32).

**C.     Jane is Socially Transitioned in Secret and Contrary to her Medical and Therapeutic Treatments.**

As a freshman at DVRHS, Jane participated in an extracurricular club known as Students Advocating for Equality ("SAFE"), which purportedly exists or claims to exist to "promote open discussion and awareness about modern cultures and topics surrounding intersectionality while aiming to make positive contributions to our community and school." (Amd. Cpt. ¶33) Miranda is the staff advisor of SAFE and is neither a state licensed medical doctor nor psychologist. (Amd. Cpt. ¶34) Jane attended a SAFE meeting and expressed to defendant Miranda that she would like to undergo a social transition from female to male in school. Miranda immediately affirmed Jane's expressed identity and began to facilitate Jane's social transition. (Amd. Cpt. ¶35) **Given Jane's psychological disorders and history of trauma, she was not capable of making the important choice to socially transition without the full knowledge and consent of her father who has guided her and has obtained appropriate medical and therapeutic treatment for years prior to Jane's expressed desire to socially transition.** (Amd. Cpt. ¶36) Miranda did not ask Jane about her mental health history, her history of trauma, or whether Jane was currently under the care of a mental health professional. (Amd. Cpt. ¶37) Contrarily, **Miranda asked Jane** if she would like to change her name and pronouns and be known only as a male at school, to which Jane agreed. (Amd. Cpt. ¶38)

Miranda advised Jane that she would send a communication to the entire staff of DVRHS other than two teachers who Jane asked not be advised. Such a communication was, in fact, made to all staff. However, contrary to Miranda's promise to Jane that the two specified teachers would not be contacted, Miranda breached her promise to Jane by so advising at least one of those teachers, thus deceiving Jane. (Amd. Cpt. ¶39) In such communication, Miranda informed staff of Jane's name change and advised that all such staff were required thereafter to use the alternate male name by which Jane desired to be called. Staff were also informed that Mr. Doe was not to be informed of Jane's social transition. (Amd. Cpt. ¶40) In her Declaration in opposition to Mr. Doe's application for a TRO, Miranda asserted, "While Doe contends I omitted certain recipients from the e-mail--specifically, Ms. Sarah Hall and Ms. Kari Gurski--this isn't the case." (Miranda Dec. ¶29) Miranda continued, "Both of those staff members were included on the e-mail." (*Id.* ¶30). Yet as as noted by Jane in her Reply Declaration, Ms. Miranda either lied to Jane or to the Court. Specifically, Jane noted that she asked Miranda not to include Ms. Hall and Ms. Gursky in the email, and that Miranda agreed. (Jane Doe Dec., ¶3). Jane Doe continued: "Therefore, if Ms. Miranda included Ms. Hall and Ms. Gursky in the email advising the staff that I was to be called by a boy's name, then Ms. Miranda was not truthful with me." (*Id.* ¶4) "In other words," Jane Doe notes, "Ms. Miranda is either being untruthful with the court or was untruthful with me." (*Id.* ¶5).

7

Thereafter, when communicating with Mr. Doe about his daughter, and before Mr. Doe eventually learned of the social transition of his daughter at DVRHS, the school always used Jane's given female name, which was done for the purpose of concealing Jane's social transition at DVRHS, thus demonstrating a knowing interference with Mr. Doe's rights. (Amd. Cpt. ¶41) In December 2023, months after it commenced, Mr. Doe learned of Jane's social transition at school when another parent called Jane by a boy's name in his presence. Only after Mr. Doe inquired of the parent why the parent was calling Jane by a boy's name, the parent explained to Mr. Doe that Jane was being called by such name at school since she was being socially transitioned. (Amd. Cpt. ¶42)

Upon learning that Jane had been provided with a separate identity at school and that DVRHS and its staff was intentionally concealing such fact from him, and due to his daughter's distress at living a second life, Mr. Doe placed Jane on home instruction until he could share Jane's personal and therapeutic history with McKinney, Ashley, and the Board (the "Board Defendants"). (Amd. Cpt. ¶44) On December 8, 2023, Mr. Doe met with DVRHS administration as well as Miranda, who indicated that she was not aware of Jane's ADHD and UMD diagnoses or her past trauma when she facilitated Jane's social transition. Miranda also advised that she was unaware that Jane was under the care of a therapist at Mr. Doe's parental direction and with his consent. (Amd. Cpt. ¶45) **Mr. Doe informed the District that**

**he and Jane's therapist were not in agreement with Jane's social transition and expressly denied his consent to the continuance of Jane's social transition at school**. (Amd. Cpt. ¶46) The District advised that it would continue to have Jane called by a male name until such time as Jane indicated otherwise, such that it specifically and deliberately insisted on interfering directly with protected aspects of Mr. Doe's parent-child relationship. (Amd. Cpt. ¶¶45-50) On January 2, 2024, counsel for the Board Defendants further noted in an email to Mr. Doe's attorney that the school district had a goal to implement "home instruction" for Jane in a public library, but that "to ensure there is no misunderstanding," Mr. Doe should "know that during home instruction the teachers will comply with district policy, NJDOE guidance, and federal and state laws regarding A.H.'s name preference." (Amd. Cpt. ¶¶52-53)

At all times since removing Jane from school, Mr. Doe was acting in what he believed was his minor daughter's best interests, which act was undertaken on advice of Jane's healthcare providers, and was undertaken in the good faith belief that defendants' actions were and continue to violate Mr. Doe's constitutional and statutory rights. (Amd. Cpt. ¶54) Indeed, Jane's medical provider provided written documentation that keeping her home in the circumstances was in the best interests of her health in light of defendants' insistence on continuing with the social transition. (Berutti Declaration Ex. A) Regardless, defendants, or others at their

direction, further contacted the State's child protective services to have agents visit the Doe household out of concern that Mr. Doe was mistreating Jane. The visit was fruitless as Jane's mental health and well-being is improving since being pulled from DVRHS, yet the threat of truancy remains. (Amd. Cpt. ¶61)

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right ... courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (cleaned up). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* (*quoting Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

In *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (cleaned up), the Third Circuit reiterated that the moving party must make the following proofs in order to obtain a preliminary injunction:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured if relief is not granted. In addition, the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of

harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

The first two factors are "gateway factors" which are most critical, meaning that a moving party "must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief.)" *Id.* at 179. Thereafter, the remaining factors shall be considered with the Court determining "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* "[T]he more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.*

## LEGAL ARGUMENT

### POINT I

### MR. DOE IS ENTITLED TO A PRELIMINARY INJUNCTION GIVEN THAT DEFENDANTS ARE VIOLATING FEDERAL LAW, WHICH IS THE SUPREME LAW OF THE LAND, IN INTERFERING WITH HIS RIGHTS.

In examining 20 U.S.C. § 3401 (the "Act"), which was the enabling legislation of the Department of Education, this Court gave short shrift to the argument that Mr. Doe was entitled to any relief thereunder because the language was in the Act's preamble. Further, the authorizing legislation did not provide any remedy to an aggrieved plaintiff where such language is violated. However, the United States Supreme Court has provided that in such circumstances where the supreme law of

11

the land is being violated and no statutory remedy exists to cure the same, that an injunction is appropriate. Such is the case here.

In its Opinion, the Court affirmed that 20 U.S.C. § 3401(3) provides "parents have the primary responsibility for the education of their children, and the States localities, and private institutions have the primary responsibility for supporting that parental role." (Opinion p. 9) This Court did not disagree that such statutory language, although it is a congressional finding, is the supreme law of the land. It is for all education institutions receiving federal funding, including the Delaware Valley Regional High School District. What this Court did find was that the statute "confers no enforceable statutory right," in the absence of which there is no demonstration "that these Congressional findings are anything more than 'general statements of federal policy' as opposed to 'newly created legal duties.'" (Opinion, p. 10) (*quoting Pennhurst State Scho. & Hosp. v. Halderman,* 451 U.S. 1, 22-23 (1981).

In *Pennhurst*, the question before the Court was whether *The Developmentally Disabled Assistance and Bill of Rights Act*, which created a federal grant program, provided any substantive rights to a certain standard of services and facilities. The Court found there to be no such entitlement based on the language in the statute's preamble.

The present case is distinguishable from *Pennhurst*. Specifically, the Act was

not set up to provide grant monies and does not make compliance voluntary. Rather, it sets forth federal education policy in creating the Department of Education. Thus, the scenario under which each set of laws was passed is very different.

All public policy must comport with the Unites States Constitution. *See Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be, that an act of the legislature, repugnant to the constitution, is void.") As this Court noted, the Act specifies as public policy that "parents have the primary responsibility for the education of their children, and the States, localities, and private institutions have the primary responsibility for supporting that parental role." 20 U.S.C. § 3401(3).

The third section of the Act, 20 U.S.C. § 3403, concerns principles of federalism. Specifically, 20 U.S.C. § 3403(a) notes that it is Congress's intention "to protect the rights of State and local governments and public and private educational institutions in the areas of educational policies and administration of programs and to strengthen and improve the control of such governments and institutions over their own educational programs and policies." Such section continues: "The establishment of the Department of Education shall not increase the authority of the Federal Government over education or diminish the responsibility for education

which is reserved to the States and the local school systems and other instrumentalities of the States." Such language must be read in the context of the stated overarching policy that "parents have the primary responsibility for the education of their children, and the States, localities, and private institutions have the primary responsibility for supporting that parental role." Thus, by declaring that the relationship between the federal and state governments was not being changed by the Act, Congress noted the existing order of federalism to be that in every state, as confirmed by Congress in the Act, parents are the ultimate arbiters of education, and that schools exist to support parents.[1]

Following that balance of federalism, *Pub. L. 117-2, title II, §§2001-2004, Mar. 11, 2021, 135 Stat.19* was passed as part of the *American Rescue Plan Act of 2021*, and appropriated $122,774,800,000.00 for grants to the states to support their education programs. The statutory authority for *Pub. L. 117-2, title II, §§2001-2004, Mar. 11, 2021, 135 Stat.19*, is noted as being 20 U.S.C. § 3401. Thus, in accepting federal money pursuant to the *American Rescue Plan Act of 2021*, the states and all districts receiving such funding did so by accepting the established premise of federalism that parents have the primary responsibility for the education of their

---

[1] Mr. Doe has been unable to find any challenge to the constitutionality of the Act and, thus, it is presumed to be valid. *United States v. Gettysburg Elec. Ry.*, 160 U.S. 668, 680 (1896).

children, and that the states, localities, and private institutions play a supporting role to the parent. Thus, unlike in *Pennhurst*, where optional federal grant programs were created via substantive parts of the statutory scheme which were not ties to its general preamble, with the *American Rescue Plan Act of 2021*, Congress left no room for doubt that states and localities receiving such federal funds are bound by the Act's language in 20 U.S.C. § 3401(3), which was part of the enabling legislation. Thus, in receiving such federal funds, defendants implicitly accepted Congress's finding that parental authority is primary in relation to the state government and school district's secondary authority, which is to support the parents.

"Just as it is appropriate for an individual, in a proper case, to invoke separation-of-powers or checks-and-balances constraints, so too may a litigant, in a proper case, challenge a law as enacted in contravention of constitutional principles of federalism." *Bond v. United States*, 564 U.S. 211, 223-224 (2011).

Here, Mr. Doe contends that under the principles of federalism, noted above, to the extent that the LAD is intended to  impede the parents' primary role in education by requiring the secreting of social transition of minor children and by not informing parents of the same, the statute violates Art. VI, cl. 2 of the United States Constitution, the "Supremacy Clause," since 20 U.S.C. § 3401(3) is the supreme law of the land and must be obeyed by the states, localities, and private institutions as

concerns education. The same goes for the New Jersey Department of Education ("NJDOE") policies and guidelines, and the Board's Policy 5756.

While 20 USCS § 3401 *et seq.* does not create any enforcement mechanism such that those aggrieved by state actors that fail to comply are left with no legislative remedy, injunctive relief remains appropriate. "To say that the Supremacy Clause does not confer a right of action is not to diminish the significant role that courts play in assuring the supremacy of federal law." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). The United States Supreme Court has "long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.,* 575 U.S. 320, 326 (2015). Similarly, a court may not hold a civil defendant liable under state law for conduct federal law requires. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

To the extent that the LAD is intended to preclude parental knowledge and consent of social transitioning of their minor children, it is contrary to and cannot be harmonized with the responsibilities of school districts in the state to support parents' educational upbringing of their minor children per 20 *U.S.C.* §3401(3) and, thus, is unconstitutional as violating the Supremacy Clause, *U.S. Const.* Art. VI, Cl. 2, such that it void and unenforceable.

The NJDOE's guidance violates 20 *U.S.C.* §3401(3), since the state's school districts receive federal funding, the guidance removes parents from having primary responsibility for the education of their children, and the guidance places the primary responsibility for the education of children as to social transitioning with state and localities that do not necessarily support the parental role, but rather interfere with the parental role, as in Mr. Doe's case.

The District's Policy 5756 is unconstitutional as violating the Supremacy Clause, *U.S. Const.* Art. VI, Cl. 2, since the district receives federal funding and is thus required to comply with 20 *U.S.C.* §3401(3), which it is violating by not notifying parents of their child's desire to socially transition, secreting such facts from parents, and then refusing to yield when a parent learns of the same and advised that he does not consent to such social transitioning.

To the extent that any other federal or state laws or policies on which defendants, or some of them, purport to rely in further proceeding with Jane's social transition, such laws and/or policies are void and unenforceable by reason of their violating 20 *U.S.C.* §3401(3), in whole or in part, for the reasons set forth above.

Based on the above, Mr. Doe has established there to be reasonable probability of success on the merits with respect to seeking a preliminary injunction in his Fourth Count. Further, Mr. Doe was and continues to be irreparably injured in his parental rights if such relief is not granted, since defendants insist that they shall continue

17

socially transitioning Jane if she is returned to a classroom or other alternative school setting in violation of his parental rights.

In addition, since the New Jersey Attorney General continues to seek enforcement of the LAD in a manner which does not comport with the Act, and since the NJDOE continues to push policy recommendations with do the same; and since the Board continues pressing forward with local policy 5756, which also does not conform to the Act, there is a very strong likelihood that other parents are being and will continue to be harmed by the subject policies, all such parents will be harmed by the denial of an injunction, and assisted if such injunction is granted. Finally, fundamental to the public interest is to uphold the constitutional order and the rule of law. The State has no interest in seeking to protect minor children from the possibility of discrimination by the minor children's parents. There simply is no historical precedent for the notion that children are generally the subject of invidious discrimination by their own parents, or that parents in general will not act in their children's best interests. Such argument is a fallacy that must be shattered and swept away by this Court.

**POINT II**

**THE SUBSTANTIVE DUE PROCESS RIGHTS WHICH ARE HELD BY PARENTS OVER THEIR MINORS DO NOT PERMIT DEFENDANTS' ACTIONS SUCH THAT THEY MUST BE ENJOINED.**

It is impossible to image the Founding Fathers debating gender and the rights of parents to be provided notice and the right to withhold consent for social transitioning of a child who wants to be treated as a person of the other biological sex. The concept of such a debate is farcical since the Founders were concerned with human nature as it exists and how human nature is key to the formation of a republic which protects the rights of individuals.[2] Similarly, the Fourteenth Amendment was adopted in the wake of the Civil War. Again, the notion that parents' rights over the custody and control over the fundamental nature of their minor children somehow had to yield to government's desire to protect children from their parents is an absurdity. The contrary is true. The Thirteenth Amendment ended the barbaric practice of slavery wherein children were separated from their families, and the Fourteenth Amendment established the privileges and immunities of citizenship,

---

[2] *See, e.g.,* Madison, *Federalist 51* ("The interest of the man must be connected with the constitutional rights of the place. **It may be a reflection on human nature, that such devices should be necessary to control the abuses of government. But what is government itself, but the greatest of all reflections on human nature?** If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself.") (Emphasis added)

equal protection under the law, and due process as permanent constitutional values. The right of parenting was a critical component of the Fourteenth Amendment since it is estimated that as many as one in three African American children were separated from their mothers by the age of fourteen prior to the Thirteenth Amendment being ratified.[3] In such context, it is abundantly clear that either the privileges and immunities of citizenship,[4] or notions of substantive due process protect the parents-child relationship as a natural and overarching fundamental right which may not be abridged by state actors who would cut parents out of the most basic of questions of their child's nature: "Is my boy a boy and is my girl a girl?"

So considered, defendants' actions must be enjoined as they interfere with such fundamental rights which unquestionably are "deeply rooted in this Nation's history and tradition" and are "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg,* 521 U.S. 702, 720-21 (1997); (Opinion, p. 11).

In determining that a temporary restraining order would not be granted, this

---

[3] *See https://www.journalofthecivilwarera.org/2021/12/enslaved-children-trauma-and-american-family-values-a-recap-of-the-2021-southerns-sawh-keynote/.*

[4] Mr. Doe raises claims under the Privileges and Immunities clause of the Fourteenth Amendment in his Fifth Count. Since a line of Supreme Court precedent beginning with *The Slaughter-House* Cases, 83 U.S. (16 Wall) 36 (1872), would have to be modified or reversed in order to succeed on such argument, Mr. Doe does not rely on the same in seeking a preliminary injunction, but rather, has simply raised such claim in order to preserve it for further appeal.

Court primarily relied on *Anspach v. City of Philadelphia, Dept. of Health*, 503 F.3d 256 (3d Cir. 2007), which assessed substantive due process parental rights cases from the perspective of whether "the state was either requiring or prohibiting some activity" by parents. (Opinion, p. 13) In other words, if the school district did not require a student to do something, or it did not preclude the student from doing something, yet simply affirms the student's choice, then there is no substantive due process right of the parent being violated.

First, *Anspach* is distinguishable from the present action and also is of dubious precedential value. Specifically, *Anspach* concerned a female student who wished to obtain the contraceptive "morning after" abortion pill without her parents' knowledge or consent. *Anspach* was concerned with balancing the child's right to privacy--that is, the right to seek abortion services--against the parents' rights to the care, custody, and nurture of their child. Since then, the purported right to seek abortion services has been vitiated by *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 292 (2022), which held that "the Constitution does not confer a right to abortion." Such determination was made because the Supreme Court's "inescapable conclusion is that a right to abortion is not deeply rooted in the Nation's history and traditions." *Id.* at 250.

In *Troxel v. Granville,* 530 U.S. 57 (2000) (plurality), the Supreme Court was similarly concerned with competing interests, being the parent's right to the care,

custody, and control of their child versus the "child's best interests" standard. In his dissent, Justice Kennedy noted that "[o]n the question whether one standard must always take precedence over the other in order to protect the right of the parent or parents, 'our Nation's history, legal traditions, and practices' do not give us clear or definitive answers." *Id.* at 96 (Kennedy, J., dissenting) (*quoting Washington* v. *Glucksberg,* 521 U.S. 702, 721 (1997)). When determining questions of substantive due process, the history and traditions of the nation long have been the key subject of judicial analysis, *see, e.g., Twining v. N.J.*, 211 U.S. 78 (1908), and now more than ever is the focus of such questions, as is highlighted by *Dobbs*. The Supreme Court has not looked to the question of whether a state actor is "requiring or prohibiting" some activity in making such determinations, as *Anspach* suggests, as such question is irrelevant to the question of whether the perceived substantive due process right is deeply rooted in the Nation's history and traditions.

Indeed, in *Dobbs* itself, the Supreme Court noted that "Constitutional analysis must begin with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding document means. *Dobbs*, *supra*, 597 U.S. at 235 (*quoting Gibbons* v. *Ogden*, 22 U.S. 1, 9 Wheat. 1, 186-189 (1824)). Where there is no right conferred in the Constitution's language, then a court determining whether a substantive due process right exists must look to whether the purported right is "objectively, deeply rooted in this Nation's history and tradition," *Id.* at 239 (*quoting*

*Glucksberg, supra,* 521 U.S. at 720-21). The *Anspach* consideration of whether "the state was either requiring or prohibiting some activity" is not a factor in such analysis. Thus, *Anspach* does not conform with what now is the Supreme Court's clearly asserted methodology of substantive due process analysis as it looks at the issue not from the perspective of the Constitution and the history and traditions of the Nation, but rather based on a technical assessment of whether the law coerces activity or deprives a privilege, which is not part of the constitutional analysis.

It is conceded that "Parents' Rights" are not conferred in the Constitution's language. Thus, the only appropriate method of determining whether Mr. Doe has a substantive due process right to control whether his child shall be treated as a boy in the public school, when she is a biological female, is to look to the history and traditions of the nation.

In *Loving v. Virginia*, 388 U.S. 1, 12 (1967), the Supreme Court held that "[t]he freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men," thus establishing the "right to marry" as a substantive due process right. However, the history and traditions of the Nation amply demonstrate that such right does not supersede the parent's rights to the care, custody, and nurture of their children. Indeed, in June 2018, an act outlawing marriages of all minors under the age of 18 was signed into law by New Jersey Governor Murphy. Prior thereto, children aged 16 and 17 could get married

23

with the consent of a parent.[5] Indeed, the history and traditions of the Nation have always provided that the substantive due process right of minors to marry must yield to parental consent, which dates back to pre-constitutional English law. *See* Hamilton, Vivian E., *The Age of Marital Capacity: Reconsidering Civil Recognition of Adolescent Marriage*, Boston Univ. Law Rev., Vol.92:1817, 1827 (2012) (noting that Hardwicke's Marriage Act of 1753 precluded marriage before the age of 21). Currently, despite marriage being a substantive due process right, no state permits minors to marry without parental consent. *See* *https://worldpopulationreview.com/state-rankings/child-marriage-laws-by-state* (reviewing the childhood marriage minimum age for every U.S. state).

As noted above, neither the Founding Fathers nor the "Second Founding" Fathers conceived of gender fluidity when establishing the Constitution or adopting the Fourteenth Amendment. The Nation's history and traditions at the time of adoption was quite simply, and remains, that parents may direct choices that preclude minor children from doing anything they wish in terms of issues fundamental to their existence and welfare. A child may not simply decide on any given day that she is a boy or that he is a girl with state support, as the parents are left in the dark. Rather, in the case of social transitioning, the state is obligated to

---

[5] *https://www.nj.gov/governor/news/news/562018/approved/20180622b_child_marriage_ban.shtml*.

fully inform parents of such fundamental aspects of their child's health, safety, and welfare and then respect parental rights by proceeding in the manner consented to by the parents of the minor child.

> A. *Mr. Doe has a fundamental constitutional right to be fully informed of Jane's social transition since there is no state interest in preventing potential discrimination by a parent which fits within the confines of Supreme Court and Third Circuit parents' rights holdings.*

"Parental Rights" are collected in the numerous Supreme Court cases that have been cited by Mr. Doe to date.

We know for certain that the Supreme Court does not permit State actors to presume parental unfitness, which is at the heart of defendants' argument. In *Troxel,* the Supreme Court reversed a decision that failed to presume a mother's parental fitness and affection for her child. "[T]here is a presumption that fit parents act in the best interests of their children." *Troxel., supra*, 530 U.S. at 68. "[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* at 68-69. "This presumption in favor of the natural parent is a strong one that reflects and reinforces the fundamental and constitutionally protected liberty interest that natural parents have in the care, custody, and management of their children." *In re S.L.G.*, 110 A.3d 1275, 1286 (D.C. Cir. 2015). In *S.L.G.*, the District of Columbia Circuit Court of Appeals applied a

clear and convincing standard which must be proved by a party seeking to have a parent deemed unfit, which is in keeping with United States Supreme Court precedent. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 118 (1996) ("a 'clear and convincing' proof standard is constitutionally required in parental termination proceedings.") The parent-child bond is simply not to be interfered-with absent compelling reasons. Justice Thomas noted in his concurring opinion in *Troxel,* "*Pierce* v. *Society of Sisters,* 268 U.S. 510 (1925), holds that parents have a fundamental constitutional right to rear their children, including the right to determine who shall educate and socialize them." *Troxel* 530 U.S. at 80 (Thomas, J., concurring). Thus, concurring with the majority that there exists a recognized "fundamental right of parents to direct the upbringing of their children," Justice Thomas avowed that he "would apply strict scrutiny to infringements of fundamental rights." *Ibid.*

Time and again the Supreme Court has ruled for parents, and against the state, where parental rights are alleged to be usurped, such as here. To be sure, the Supreme Court in *Stanley v. Ill.*, 405 U.S. 645, 651 (1972) (emphasis added), recounted and wrote:

> The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed "essential," *Meyer* v. *Nebraska*, 262 U.S. 390, 399 (1923), "basic civil rights of man," *Skinner* v. *Oklahoma*, 316 U.S. 535, 541 (1942), and "rights far more precious . . . than property rights," *May* v. *Anderson*, 345 U.S. 528, 533 (1953). **"It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations**

the state can neither supply nor hinder." *Prince* v. *Massachusetts*, 321 U.S. 158, 166 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer* v. *Nebraska, supra*, at 399, the Equal Protection Clause of the Fourteenth Amendment, *Skinner* v. *Oklahoma, supra*, at 541, and the Ninth Amendment, *Griswold* v. *Connecticut*, 381 U.S. 479, 496 (1965) (Goldberg, J., concurring).

Further, "choices about **marriage**, family life, and the upbringing of children are among associational rights this Court has ranked **as of basic importance in our society**, rights sheltered by the Fourteenth Amendment against the State's unwarranted **usurpation, disregard, or disrespect**." *Id.* at 116 (citation and internal quotes omitted) (emphasis added) (as quoted in *Gruenke v. Seip*, 225 F.3d 290, 303-304 (3d Cir. 2000)). Thus, the Supreme Court has specifically held that "usurpation, disregard, and disrespect" of Parents Rights is not permitted, which is contrary to the *Anspach* holding relied on by this Court, which would allow usurpation, disregard, and disrespect of so long as government was neither coercing nor an act or depriving a benefit.

"Familial relationships are the quintessential 'personal bonds' that 'act as critical buffers between the individual and the power of the State.'" *Gruenke, supra*, 225 F.3d at 305. "[A] school's policies might come into conflict with the fundamental right of parents to raise and nurture their child. But when such collisions occur, **the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest.**" *Ibid*.

27

Such a robust body of Supreme Court and Third Circuit Court of Appeals case law exists which shields parents from State action related to their children, because "our constitutional system long ago rejected any notion that a child is 'the mere creature of the State,'" *Parham v. J.R.*, 442 U.S. 584, 602 (1979). Thus, it is this Court's constitutional duty to place the claimed State interest in protecting transgender students against parental discrimination--a nonsensical concept in light of our long-standing constitutional parental rights jurisprudence--against decades of Supreme Court case law protecting parents' fundamental rights to a broad array of fundamental family matters including the right to the custody, care, and nurture of their children, *Troxel, supra;* to direct their children's education, *Meyer*, *supra*, 262 U.S. 390; to recognize and prepare their children for life's obligations and to make important decisions for them, *Parham, supra*, 442 U.S. at 602, and others. Indeed, the "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232-33 (1972). All such fundamental rights exist under the Constitution as a backstop to Western civilization itself. *Parham*, *supra,* 442 U.S. at 602.

In such context, parents plainly have a right to be fully informed when their children are being socially transitioned from one sex to another in school so that they may weigh in on the issues as part of their fundamental care, custody, and nurture rights for their children, and their rights to direct the educational choices for their

children. To do otherwise would be to usurp, disregard, and disrespect parents' rights.

The holding in *Gruenke, supra,* 225 F.3d 290, is much more compelling when one considers whether the school therein acted in a manner which usurps, disregards, and disrespects parental rights, which the Supreme Court has determined to be improper, than whether "the state was either requiring or prohibiting some activity," as set forth in *Anspach*. In *Gruenke*, the Third Circuit was confronted with the case of a swim coach who harassed a female swimmer into taking a pregnancy test which was very publicly discussed by swim team members due to the coach's open discussions about his belief that the child was pregnant. **The swim coach failed to call the swimmer's parents or otherwise send them a note to inform them of his concerns, but instead seemed to consider his position as a school swim coach to provide him a right to substitute his judgment for the swimmer's parents.** Thus, the Third Circuit determined that the swim coach and the school district violated the parent's rights of the minor swimmer.

In reviewing *Gruenke*, one is struck by the fact that the guidance counselor involved, who was aware of the situation, apparently did not advise the coach to notify the parents. Nor did the counselor herself undertake that responsibility. Even the principal (himself a former guidance counselor), who did not become aware of the matter until late in the game, failed even to comment that this was a matter for

the parents and not school authorities. "His reprimand to the coach did not mention the supremacy of the parents' interest **in matters of this nature**." *Id.* at 306 (emphasis added). In other words, the defendants in *Gruenke* completely usurped the parental function, disregarded the parental function, and disrespected the parental function.

What were the "matters of this nature" where the principal should have known were questions which the supremacy of the child's parents' interests should have been obvious? These were questions of female biology, sexuality, health and wellbeing, changes to the child's body, and the potential lifelong repercussions to the child and the family involved which are properly handled within the family bonds, and are not to be used as a wedge by the state to separate parents from their children under the false auspices of protecting the children from being discriminated against by their parents. These are the same types of matters involved here. Questions related to Jane Doe's female biology, sexuality, health and wellbeing, and potential lifelong repercussions to Jane and her father are involved in the matter *sub judice*. The parents' rights in *Gruenke* were fundamental rights. The Third Circuit noted that "[i]t is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect these rights." *Id* at 307. The same is true for Mr. Doe's rights and responsibilities. Indeed, one may speculate that the swimmer's parents may get

angry to find out that their daughter may be pregnant, or may somehow punish her, yet the notion that the parents should be kept in the dark about the issue because them may *discriminate* against their daughter is nowhere to be found in *Gruenke*. Such notion would be an absurdity, as it is here, and is being used by defendants as a way to separate the child from her father in very material ways, which violates the fundamental intent of the Fourteenth Amendment to the extent it instills the privilege of maintaining family bonds for all citizens, contrary to the practice of slave owners prior to the Civil War.

Mr. Doe also notes that in *Gruenke*, there was no evidence that the swim coach or the school purposely kept the issue of the swimmer's potential pregnancy secret from her parents. Not so here. While DVRHS officials were socially transitioning Jane in school so that she was being called by a boy's name, whenever they called home to Mr. Doe, they purposefully referred to Jane by her given name. Further, Mr. Doe has alleged that DVRHS officials deliberately did not tell two teachers who had ties to the Doe family of Jane's social transition so that they would not inform Mr. Doe. Significantly, defendant Miranda has now asserted under oath that, in fact, she did include those two teachers of Jane's social transition. If that is the case, Jane asserts that Miranda lied to her by telling Jane that she would not tell the two teachers in question, at Jane's request. The fact that neither of those two teachers ever spoke to Mr. Doe about the issue seems to bear out that they were not informed by

defendant Miranda, contrary to her Declaration. Regardless, whether defendant Miranda advised the two teachers at the time, or did not, she is caught in a trap of dishonesty of her own making. She either lied to this Court, or else she lied to Jane. Yet defendants want this Court to believe that somehow, Miranda should be trusted with something so important as the social transition of Jane while keeping her father completely in the dark. Acceptance of such argument, especially in light of her lying and of the holding in *Gruenke* would be incomprehensible.

Just as a parent may preclude a minor child from exercising the fundamental right of marriage, so too may a parent preclude a child from demanding to be treated as a member of the opposite biological sex while at school. The school must respect the same.

Further, "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Parham, supra*, 442 U.S. at 603. As set forth at length in the Amended Complaint, engaging in the social transition of a minor is not a neutral act, it is one that is a therapeutic/medical act. Schools are not equipped or prepared to diagnose conditions such as gender dysphoria which may have highly damaging long-term consequences to the child. Defendants have not refuted any of the allegations in the Verified Complaint or the Verified Amended Complaint such that all evidence supports Mr.

Doe in such regard.

At the very least, once defendants learned that Mr. Doe had Jane in therapy and under medical care related to her childhood trauma, gender confusion and related cognitive issues, defendants were obligated to respect Mr. Doe's parental rights. Yet they have insisted that in spite of the same, Jane will continue to be socially transitioned at school, the medical and therapeutic experts of Mr. Doe's choice be damned. Even under *Anspach* such conduct constitutes interference with parental rights by making social transition mandatory in the face of contrary medical advice. Plainly such conduct also usurps, disregards, and disrespects Mr. Doe's parental rights and Jane's health, well-being, and safety.

> *B. The New Jersey Law Against Discrimination does not provide a vehicle for the State to assume that parents will discriminate against their own children.*

In opposition to the TRO, defendants expended much ink on LAD. All parties to this litigation agree with the premise that ""The LAD's worthy purpose is no less than eradication of 'the cancer of discrimination' in our society.'" *Smith v. Millville Rescue Squad*, 225 N.J. 373, 390 (2021) (*quoting Richter v. Oakland Bd. of Educ.*, 246 N.J. 507, 537 (2010)). Where Mr. Doe parts ways with defendants, as does the LAD itself, is that the law was designed to protect children against the possibility of discrimination by their own parents. Once again, when such form of 'discrimination' is stripped away from defendants' arguments, there remains no substantive argument

at all on which defendants can rely.

*N.J.S.A.* 10:5-4 reads (emphasis added):

All persons shall have the opportunity to obtain employment, **and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of** race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, liability for service in the Armed Forces of the United States, nationality, sex, **gender identity or expression** or source of lawful income used for rental or mortgage payments, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.

Defendants' presumption that parents will discriminate against their transgender children such that the LAD protects against such discrimination is specious. It is fundamental to our nation's laws that people are presumed to know and follow the law.

"[N]o man is presumed to do wrong or to violate the law, and every man is presumed to know the law." *United States v. Budd*, 144 U.S. 154, 163 (1892); *see also Georgia v. Public.Resource.Org, Inc.,* 140 S. Ct. 1498, 1507 (2020) ("Every citizen is presumed to know the law"); *Graham v. N.J. Real Estate Com*, 217 N.J. Super. 130, 138 (App. Div. 1987) ("every person is conclusively presumed to know the law, statutory and otherwise"); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) (generally presuming citizens to be law-abiding).

Further, the plain language of the LAD makes no presumption that any person

is likely to discriminate. If it did, the LAD would violate the Equal Protection Clause of the 14th Amendment. *See ..." Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.,* 143 S. Ct. 2141, 2160-2161 (2023) ("The equal protection clause requires equality of treatment before the law for all persons").

The assumption made by defendants is contrary to unsupported by any law. **Defendants fail to present a single legal case that stands for the proposition that the LAD presumes that parents may discriminate against their children**. Such concept is wholly at odds with long-established precedent of the United States Supreme Court and New Jersey. And while shielding transgenders from discrimination from third parties in contexts such as the use of bathrooms may be an important government interest, (Opinion, p. 23), such interest is unrelated to the relationship between parent and child as parents may not be presumed to discriminate against their children.

Moreover, the statute's plain language applies to discrimination in places of public accommodation. The home is not a place of public accommodation, and it may not be presumed that discrimination will occur if activity occurring in school is reported to the parent. One Court in this Circuit has even noted that "[o]ne's home is sacrosanct." *United States v. Napolitan*, 2012 U.S. Dist. LEXIS 108983, *5 (W.D. Pa.). In other words, the entire notion that the NJLAD protects against possible discrimination by parents of their children related to transitioning at school is

completely unfounded in law, and most definitely does not protect against such possible alleged discrimination in the family home.

Under the circumstances, Mr. Doe has established the probability of success on the merits. The Nation's history and traditions support that at the time the Fourteenth Amendment was ratified, the right of parents to the care, custody, and nurture of their children was fundamental in nature and was a critical component of the Civil War Amendments since prior thereto, separation of families through the horror of the slave trade was commonplace. The state may not emotionally separate minor children from their parents, and certainly may not interfere with the medical decision making of parents once it is determined, as here, that Mr. Doe had Jane in therapy and under medical care related to her gender confusion, among other things. Defendants' conduct is interfering with and contradicting such treatment. Thus, Mr. Doe is likely to succeed on the merits of such claims at least as related to the conduct that occurred after the school received notice, such that an injunction in his favor is the probable outcome.

By forcing Mr. Doe to take action to keep Jane home and away from defendants' disrespectful usurpation of his medical decision making for Jane, there is no question that Mr. Doe is being irreparably harmed and shall continue to be in the absence of a preliminary injunction. That preliminary injunction should compel defendants to cease and desist with any efforts to interfere with Mr. Doe's decision

making, and should result in the equitable appointment of a monitor who ensures that defendants comply with such legal obligations.

Having succeeded in demonstrating the existence of the gateway factors, this Court certainly can examine the final two factors of the preliminary injunction test to determine that if defendants are permitted to continue acting in a manner which usurps, disregards, and disrespects parents, then others may well be hurt. Thus, in no uncertain terms should the Court compel that defendants must provide fully informed notice to parents of their children's desired social transition, and that defendants must abide by the parent's wishes in such regard, since parents are presumed to be fit to make such fundamental decisions.

Finally, the public interest always favors enforcement of fundamental rights, such that Mr. Doe has satisfied all factors of the preliminary injunction test.

## <u>CONCLUSION</u>

Based on the foregoing, and on the papers heretofore filed and those filed herewith, Mr. Doe is entitled to a preliminary injunction.

Respectfully submitted,
**MURRAY-NOLAN BERUTTI LLC**
*Attorneys for the plaintiff, John Doe*

*s/Ronald A. Berutti*

By:_____
         Ronald A. Berutti

Dated: April 12, 2024