

**ROSHAN D. SHAH** | Managing Partner
rshah@andersonshahlaw.com
P: 732-398-6544 | F: 732-576-0027

August 30, 2024

**VIA CM/ECF ONLY**
Hon. Georgette Castner, U.S.D.J.
Clarkson S. Fisher Building
      & U.S. Courthouse
402 East State Street, Courtroom 5E
Trenton, NJ 08608

      Re:    **Doe v. Delaware Valley Reg'l High School Bd. of Ed., et al.**
               **Civil Action No. 24-107 (GC-JBD)**

Dear Judge Castner:

      This Firm represents Defendants Delaware Valley Regional High School Board of Education, Scott McKinney, and Ashley Miranda (collectively, the "DVRHS Defendants") in the above-referenced matter. Please accept this supplemental letter brief in further support of the DVRHS Defendants' opposition to plaintiff's currently pending motion for a preliminary injunction. The DVRHS Defendants also join in the arguments posited by co-Defendant Angela Allen-McMillan, the Acting Commissioner of the New Jersey Department of Education. This supplemental submission is aimed at the medical "evidence" provided by plaintiff John Doe with his reply papers on April 29, 2024.

## ARGUMENT

I. **Doe's Demanded Relief Is Moot, As Discovery Has Revealed That Jane Has Abandoned Her Desire To Socially Transition.**

"[M]ootness implicates the subject matter jurisdiction of the federal courts under Article III" and, thus, "a mootness challenge is never waivable." *Williams v. Sec'y Pennsylvania Dep't of Corr.*, 447 F. App'x 399, 402 (3d Cir. 2011). "The doctrine of mootness requires that 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *New Jersey Tpk. Auth. v. Jersey Cent. Power & Light*, 772 F.2d 25, 31 (3d Cir. 1985). "The doctrine of mootness is centrally concerned with the court's ability to grant effective relief: [i]f developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of the suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." *Am. Littoral Soc. v. U.S. E.P.A. Region*, 199 F. Supp. 2d 217, 245 (D.N.J. 2002)(citations and quotations omitted).

Here, Doe seeks injunctive relief "prohibiting the DVRHS Defendants from taking further actions to socially transition Jane Doe pending the outcome of this matter[.]" ECF No. 44-4. His concern is that, if Jane returns to school, the DVRHS Defendants will honor *her wishes*, pursuant to Board Policy 5756, and refer to Jane by her preferred male name and pronouns. This concern no longer presents a live controversy. That's because Debra Pirozzoli, a Licensed Clinical Pastoral Counselor, testified that Jane no longer wishes to socially transition:

```
20        Q.   So let me just try to clarify:  Are you
21   saying that based on conversations you've had with
22   A.H. recently, your understanding is that she no
23   longer wishes to use male pronouns or a male name at
24   school?
25        A.   Right.
```

*Deposition of Debra Pirozzoli ("Pirozzoli Dep."),* Tr. 63:20-25, attached as Exhibit A to the Declaration of Roshan D. Shah, Esq. ("Shah Decl."). Ms. Pirozzoli made this assessment based on current information from Jane, which included a meeting with her during the week beginning August 11, 2024. *Id.* at Tr. 63:4-5. This evidence renders the claim for injunctive relief moot. Doe simply has no need for a court order to prevent Jane from socially transitioning, as Jane no longer wishes to do so. Board Policy 5756 only applies to students who wish to voluntarily transition. *Am. Compl.*, ¶ 23, ECF No. 40. That group no longer includes Jane. For this reason alone, the Court should deny Doe's application for a preliminary injunction.

II. **Doe Has Failed To Submit Any Competent Medical Evidence To Demonstrate That Jane's Desire to Socially Transition Is Harming Her.**

Doe submitted a certification from Ms. Pirozzoli and a medical note from Nurse Practitioner Lori Ioratti in support of his application for a preliminary injunction. *See* ECF Nos. 49-1 and 49-3. After submitting the evidence, Doe steadfastly maintained that he isn't relying on it, but simply wanted to address the arguments raised by defense counsel about the lack of medical evidence to support any claim that social transitioning was harming Jane.[1] After taking the depositions, it's clear that these proofs aren't

---

[1] Doe posited this argument during a June 28, 2024, teleconference with the Court as part of an effort to deny the defendants' application to depose Ms. Pirozzoli and Nurse Ioratti.

remotely competent to support any contention that Jane's desire to socially transition is harmful.

    A.    **Ms. Pirozzoli Cannot Support Any Suggestion That Social Transitioning Is Harming Jane.**

        1.    *Nothing In Ms. Pirozzoli's Background Indicates Any Expertise In Treating Transgender Patients.*

Ms. Pirozzoli is a Licensed Clinical Pastoral Counselor. *Pirozzoli Dep.*, Tr. 9:24-Tr. 10:3, Exhibit A, Shah Decl. She is not a Licensed Clinical Social Worker and doesn't hold any State-issued licenses. *Id.* at Tr. 12:12-18. She is a counselor who "listens to people, who helps them find their way." *Id.* at Tr. 23:12-14. She admits she doesn't diagnose patients. *Id.* at Tr. 23:14. She doesn't utilize the Diagnostic and Statistical Manual of Mental Disorders, not the fourth edition or the fifth edition. *Id.* at Tr. 23:12-23. Her treatment plans consist of listening to patients, and then recommending activities such as writing, reading or "working through grief." *Id.* at Tr. 28:15-Tr. 29:6. She is not authorized to prescribe medications. *Id.* at Tr. 14:2-4. Ms. Pirozzoli has treated only one transgender person through the course of her career: Jane. *Id.* at Tr. 29:14-20. Perhaps most importantly, Ms. Pirozzoli doesn't hold herself out as any type of expert. Indeed, when asked point blank whether she considers herself an expert, Ms. Pirozzoli waxed philosophical:

```
11      Q.   Do you hold yourself out as an expert in
12   any sort of scientific field, scientifically
13   recognized field?
14          MR. WEBBER:  Objection.
15          But you can answer if you understand.
16      A.   I don't understand.
17      Q.   What part of it don't you understand?
18      A.   Who is an expert?  Well, what do you
19   mean by expert?
```

August 30, 2024
Page 5

*Id.* at Tr. 41:11-19.

        2.    *Ms. Pirozzoli Has No Medical Or Scientific Basis For The Opinions Expressed In Her Certification.*

Ms. Pirozzoli began seeing Jane in April or May of 2022, which is before Jane entered Delaware Valley Regional High School in September 2023. See *Id.* at Tr. 25:17-Tr. 26:15. At the time, Jane was suffering from "[a]nger, sadness, isolation" and was lashing out at her family in frustration. *Id.* at Tr. 30:16-22. All of this, again, is before Jane ever set foot in the high school. Throughout her treatment of Jane, Ms. Pirozzoli did not diagnose her with any mental condition or illness. *Id.* at Tr. 33:17-23.

When pressed on the certification she submitted, Ms. Pirozzoli either provided evasive answers, flat out admitted she had no basis for the statements offered, or made clear that Jane's issues don't pertain to social transitioning *per se*, but rather arise from her lack of trust in Ms. Miranda for disclosing her social transition to two of Jane's teachers.

. For example, Ms. Pirozzoli was shown paragraph 19 of her certification, which states:

> 19. To the contrary, it appears to me that the defendants are concerned only with a political outcome that does not take into account the whole person that is Jane or the long-term damage they have done due to undermining Jane's therapeutic and medical treatment, while also breaching her trust.

ECF No. 49-1. Ms. Pirozzoli didn't recall who drafted that paragraph. *Pirozzoli Dep.*, Tr. 47:3-7, Exhibit A, Shah Decl. Nor did she even recall who the defendants in the case were. *Id.* at Tr. 48:18-22. When shown the names, she admitted she didn't have any factual basis to opine on their politics and, instead, made assumptions. *Id.* at Tr. 49:4-17.

August 30, 2024
Page 6

    Ms. Pirozzoli was then shown paragraph 7, which states:

> 7. It is extremely unhealthy for a child to hide behind an adult under any circumstance, much less one which involves potentially permanent and irreparable damage to mental health and wellness in the case of a child with underlying psychological conditions and trauma who is suffering with gender confusion. Such actions often lead to actual gender dysphoria and to further psychological and emotional trauma.

ECF No. 49-1. Ms. Pirozzoli stated that the "permanent and irreparable damage" she was referring to here was a "[l]ack of trust." *Pirozzoli Dep.*, Tr. 55:1-7, Exhibit A Shah Decl. She doesn't claim socially transitioning increased the risk that Jane would suffer from a lack of trust. Rather, she reverted back to the disputed allegation that Ms. Miranda promised Jane she wouldn't tell certain teachers about her social transition and then did so anyway. *Id.* at Tr. 55:15-Tr. 56:2. In other words, the harm in this paragraph is not the social transition itself.

    She was then shown paragraph 10, which states:

> 10. Children need to know that the path beginning with social transition often leads to physical transitioning. Physical transitioning usually results in irreversible physical, psychological, and emotional results. Those who go through physical transition when young, as their brains become fully mature, or if their experience turns out to be bad, often wish to detransition. Unfortunately, after years of puberty blockers and sometimes surgeries, the ability truly to detransition and to be the person one was at birth is usually impossible; the physical and emotional scars become permanent and the ability to have families and the types of relationships and intimacy that such individuals wish for becomes extremely difficult and, in many instances, impossible.

ECF No. 49-1. Ms. Pirozzoli could not identify any scientific materials to support either the first or second sentence of her duly sworn certification. *Id.* at Tr. 62:7-10. Instead, she claimed the statements were supported by her experience—which, again, has consisted solely of treating one transgender patient, Jane. *Id.* at Tr. 62:7-20.

While the 1.5 hour time-limit left us without the ability to further examine Ms. Pirozzoli, even on this limited record, it's clear that her certification is of extremely limited value.

  B. Nurse Practitioner Ioratti Effectively Admitted That The Medical Note She Submitted To The Court Was Borne Of False Information Provided By Doe.

    1. *Ms. Ioratti Does Not Treat Or Diagnose Patients For Transgender-Related Issues.*

Ms. Ioratti is a registered nurse and holds a certificate as an Advanced Practice Nurse and for Primary Mental Health. *Deposition of Lori Ioratti ("Ioratti Dep.")*, Tr. 9:14-20, attached as Exhibit B to the Shah Decl. She has been employed by Hunterdon Pediatric Associates for 12 years. *Id.* at Tr. 8:10-12.

Ms. Ioratti treats patients who present for physical exams and sick visits. *Id.* at Tr. 12:1-5. She also treats adolescent patients for ADHD and anxiety. *Id.* at Tr. 12:4-5. When it comes to specialty areas—such as, for example, gender dysphoria—Ms. Ioratti refers those patients to other providers. *Id.* at Tr. 13:2-13.

    2. *Ms. Ioratti Admits The American Psychiatry Association Warns Against Familial And Societal Rejection Of A Transgender Person's Gender Identity.*

Ms. Ioratti testified that the American Psychiatry Association "sets guidelines and rules for [providers] to follow in case of a diagnosis[.]" *Id.* at Tr. 15:12-21. When shown a printout from the APA's website concerning gender dysphoria, Ms. Ioratti testified that the APA recommended social affirmation—*i.e.*, adopting a transgender person's preferred

pronouns to affirm their gender identity or expression. *Id.* at Tr. 19:5-12. She acknowledged that the APA also says that familial and societal rejection of a transgender person's gender identity is a strong predictor of a mental health crisis or mental health episode. *Id.* at Tr. 19:19-23.

> 3. *Ioratti Has Been Providing Medical Notes To Excuse Jane's Absence Based On Misinformation Provided By Doe, Not Any Independent Medical Assessment.*

Ms. Ioratti has been treating Jane for several years and is her primary medical provider. *Id.* at Tr. 21:14-18. Ms. Ioratti's notes indicate Jane has been having behavioral issues as far back as 2019, when she was 10-years-old. *Id.* at Tr. 23:13-Tr. 27:8. On August 8, 2023—before she entered high school—Jane was diagnosed with having mild anxiety. *Id.* at Tr. 35:14-Tr. 36:9.

On November 28, 2023, Jane presented with her father and stepmother. *Id.* at Tr. 37:12-40:24. Jane had a cough, but her parents also expressed concern about Jane's social transition. *Id.* at Tr. 41:17-22. Both parents claimed that Jane was not mature enough to understand what it meant to be transgender. *Id.* at Tr. 42:13-25. Ms. Ioratti did not make any diagnosis or make any professional judgment about whether Jane was mature enough to express her gender identity. *Id.* at Tr. 43:5-15. However, she noted that Jane told her she was "very comfortable using male pronouns and a male name." *Id.* at Tr. 44:13-16.

Ms. Ioratti discussed counseling and the parents responded by telling her that Jane was already in counseling. *Id.* at Tr. 45:5-8. Ms. Ioratti did not know the name of the counselor and it appears she never asked. *See Id.* at Tr. 45:9-13. Despite Jane's parents telling Ms. Ioratti that they had contacted a lawyer and didn't feel Jane was safe at school, Ms. Ioratti didn't come to that same conclusion. *Id.* at Tr. 45:19-Tr. 46:1.

  Ms. Ioratti was shown a series of notes she had written to excuse Jane's absence from the school. *Id.* at Tr. 46:5-Tr. 62:17. These letters are in the same format as that submitted to the Court with Doe's reply papers. *See* ECF No. 49-3. The note, dated April 24, 2024, submitted with Doe's reply papers states:

> The above referenced patient continues to have difficult with Anxiety and depression which significantly increased with social transitioning in the school setting increasing emotional stress a strain. At this time based on my evaluation and continue counseling it is in ▓▓▓▓ best interests continue home instruction setting until this is resolved.

*Id.* On its face, this note indicates to any reader, including the Court, that Jane's anxiety and depression are being negatively impacted by her choice to socially transition and, thus, "based on [Ioratti's] evaluation and continue[d] counseling," Jane should remain out of school. *Id.* On the basis of this note and a series of notes like it, Jane has been excused from having to attend school. For reasons explained below, this is alarming.

  During her examination, Ms. Ioratti admitted that all of these letters were based on phone conversations she had with Doe, who asked for a note and told Ms. Ioratti that Jane was treating with a "psychologist." *Id.* at Tr. Tr. 45:19-Tr. 46:1. For example, after the November 28, 2023 visit where Jane says she is "very comfortable" socially transitioning, Ms. Ioratti prepared and signed a note, dated December 9, 2023, stating that Jane's anxiety is being exacerbated by the use of pronouns at school. *Id.* at Tr. 48:8-16. But the records do not indicate that any visit took place between November 28th and December 9th. Ms. Ioratti did not conduct any examination of Jane before issuing a letter to keep Jane out of school. *Id.* at Tr. 54:10-14. In fact, over the course of writing five different letters—dated December 9, 2023, January 4, 2024, February 27, 2024, March 28, 2024, April 24, 2024—which were intended for the school and used to keep Jane out

of it, Ms. Ioratti saw Jane precisely once, on February 27, 2024. *Id.* at Tr. 46:5-Tr. 62:12.

Instead of an examination or diagnosis, Ms. Ioratti relied upon Doe:

```
 5    Q.   Do you recall what prompted you to write
 6    any of those letters?
 7    A.   Yes.  The father called and said that
 8    she missed a lot of school and they needed the
 9    doctor's note to say that she was having difficulty
10    with mental health and needed to be provided home
11    instruction.
12    Q.   Okay.  So what prompted those notes
13    being written?  Was the father calling the office
14    and asking for them?
15    A.   Yes.
```

*Id.* at Tr. 70:5-15.

Sadly, Ms. Ioratti was misled, as Doe told her that Jane was treating with a psychologist, something she accepted without question and, unfortunately for Jane, without any further inquiry or diligence:

```
 2    A.   It's not documented in that note but,
 3    like I said previously, I am sure they were seeing a
 4    psychologist.
 5    Q.   When you say you're sure they were
 6    seeing a psychologist, what's your basis for that?
 7    A.   I would have referred them in that note
 8    if they weren't already seeing a psychologist.
 9    Q.   Well, that's -- you can make a referral.
10    But just because you make a referral doesn't mean
11    they follow it, right?
12    A.   Correct.
13    Q.   Okay.  Do you know, who's the
14    psychologist you referred them to?
15    A.   I did not.  What I'm saying is they had
16    a psychologist.
17    Q.   And did that information come from the
18    father?
19    A.   Yes.
20    Q.   And did you ever speak to the
21    psychologist?
22    A.   No.
```

August 30, 2024
Page 11

*Id*. at Tr. 50:2-22.

With all due respect, Ms. Ioratti's medical note, ECF No. 49-3, is nothing more than a regurgitation of information provided by Doe. It's not competent medical evidence in any sense of the word.

## **CONCLUSION**

For these reasons, the Court should deny Doe's motion for a preliminary injunction.

Respectfully submitted,

***/s/Roshan D. Shah***

ROSHAN D. SHAH, ESQ.
For the Firm

c:  All Counsel of Record