**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN DOE, said name being fictitious,<br><br>Plaintiff,<br><br>v.<br><br>DELAWARE VALLEY REGIONAL HIGH SCHOOL BOARD OF EDUCATION, *et al.*,<br><br>Defendants. | Civil Action No. 24-00107 (GC) (JBD)<br><br>**OPINION**<br><br>**FILED UNDER SEAL** |

**CASTNER, District Judge**

      **THIS MATTER** comes before the Court by way of Plaintiff's second Motion for a Preliminary Injunction. (ECF No. 44.) Defendants opposed and Plaintiff replied. (ECF Nos. 45-46, 49.) The parties submitted supplemental briefing after conducting limited discovery. (ECF Nos. 80-87.) The Court has carefully considered the parties' submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure (Rule) 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Plaintiff's Motion for a Preliminary Injunction is **DENIED**.

## I.      BACKGROUND

### I.

      Jane Doe[1] is a student at Delaware Valley Regional High School in Frenchtown, New Jersey. (ECF No. 40 ¶¶ 10, 21, 33.) Plaintiff John Doe is Jane's father. (*Id.* ¶ 10.) Jane is a minor

---

[1]     The Court refers to Plaintiff's child as "Jane Doe," consistent with Plaintiff's Amended Complaint and the parties' briefing.

who experienced the childhood trauma of the death of her mother and has been diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD), high-functioning autism, and anxiety. (*Id.* ¶ 21; ECF No. 82 at 30, 35:14-36:16; 40, 75:21-25.[2])

Jane entered her freshman year of high school in September 2023. As a freshman, Jane participated in an extracurricular club known as "Students Advocating for Equality," or "SAFE," which exists to "promote open discussion and awareness about modern cultures and topics surrounding intersectionality while aiming to make positive contributions to [the] community and school." (ECF No. 40 ¶ 33.) Defendant Ashley Miranda is a school counselor and the staff advisor of SAFE. (*Id.* ¶ 34; ECF No. 46-2 ¶ 3.)

In September 2023, "Jane attended a SAFE meeting and expressed to . . . Miranda that she would like to undergo a social transition from female to male in school." (ECF No. 40 ¶ 35; ECF No. 46-2 ¶ 7.) Jane expressed to Miranda that "she identified as a transgender male." (ECF No. 46-2 ¶ 12.) According to the Amended Complaint, Miranda "immediately affirmed Jane's expressed identity" and "asked Jane if she would like to change her name and pronouns and be known only as a male at school, to which Jane agreed." (ECF No. 40 ¶¶ 35-38.) Miranda attests that "Jane expressed a desire to be referred to using a masculine name and pronouns" and that Miranda "did not initiate Jane's request to socially transition." (ECF No. 46-2 ¶¶ 15-17.)

Jane told Miranda that "she did not want school staff to report her social transition to her father" because Plaintiff "was not supportive of her gender identity and . . . she did not want to cause issues in the home." (*Id.* ¶¶ 22-23.) Miranda subsequently emailed the entire high school staff informing them of Jane's preferred name and pronouns. (*Id.* ¶¶ 28-31; ECF No. 40 ¶¶ 39-

---

[2]    Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

40.)  Jane attests that she had asked Miranda not to include two teachers on the email because of their relationship with her family, and that Miranda agreed.  (ECF No. 32-1 ¶¶ 3-4.)  Miranda denies promising Jane that she would keep Jane's social transition a secret from these two teachers.  (ECF No. 46-3 ¶ 5.)

Exhibit A to Plaintiff's Amended Complaint is a copy of Board Policy 5756, titled "Transgender Students."  (ECF No. 1-1 at 2; ECF No. 40 ¶ 23.)  In relevant part, the Policy states the following:

> *The school district shall accept a student's asserted gender identity; parental consent is not required*.  A student need not meet any threshold diagnosis or treatment requirements to have his or her gender identity recognized and respected by the school district, school, or school staff members.  In addition, a legal or court-ordered name change is not required.  *There is no affirmative duty for any school district staff member to notify a student's parent of the student's gender identity or expression.*
>
> [(ECF No. 1-1 at 2 (emphases added).)][3]

If a parent becomes aware of the student's use of a different name and pronouns and objects, the Policy instructs "the Superintendent or designee [to] consult the Board Attorney regarding the minor student's civil rights and protections under the [New Jersey Law Against Discrimination]," but staff "should continue to refer to the student in accordance with the student's chosen name and pronoun at school."  (*Id.*)  The Policy also notes that school officials "should have an open, but confidential discussion with the student" about the student's preferences and "parental communications," and "should also discuss with the student, and any other individuals at the

---

[3]    The Board Policy mirrors the New Jersey Department of Education's (NJDOE's) guidance that "provide[s] direction for schools in addressing common issues concerning the needs of transgender students."  (ECF No. 1-2 at 2.)  The Department's guidance also "assist[s] schools in establishing policies and procedures that ensure a supportive and nondiscriminatory environment for transgender students" consistent with the New Jersey Law Against Discrimination (NJLAD), and Title IX of the Education Amendments of 1972.  (*Id.*)

student's request, the risks associated with the student's transgender status being inadvertently disclosed." (*Id.* at 3.) According to Scott McKinney, the superintendent of the Delaware Valley Regional High School District, although the Policy "does not affirmatively require teachers and staff members to notify parents about a student's expressed gender identity," the Board does not interpret the Policy as permitting staff members to "lie to parents or guardians if they inquire about their child's gender identity or expression." (ECF No. 46-1 ¶¶ 3, 7.)

Miranda claims that "[c]onsistent with Board Policy 5756, and Jane's explicit instructions," Miranda "did not affirmatively disclose Jane's gender identity or desire to social transition to" Plaintiff. (ECF No. 46-2 ¶ 24.) Following Miranda's email, staff were instructed to refer to Jane by her given name over the school's announcement system "due to Jane's concern that her sibling," who also attended the school, "would learn of her social transition and may cause issues for her at home." (*Id.* ¶ 34.) According to Plaintiff, the staff only ever referred to Jane by her given female name "for the purpose of concealing Jane's social transition." (ECF No. 40 ¶ 41.) In late November 2023, Plaintiff learned that the school was referring to Jane by a male name and pronouns when another parent called Jane by a male name in Plaintiff's presence. (*Id.* ¶ 42; ECF No. 82 at 170.) In response, Plaintiff pulled Jane from the regular classroom and placed her "on home instruction." (ECF No. 40 ¶ 44.) When Plaintiff approached Miranda and the school administration regarding Jane's social transition, the school confirmed that Jane had requested to be referred by a male name and pronouns. (ECF No. 46-2 ¶ 25; ECF No. 40 ¶ 45.)

On December 8, 2023, Plaintiff met with the high school administration and Miranda. (ECF No. 40 ¶ 45.) Plaintiff informed the administration that he and Jane's therapist "were not in agreement with Jane's social transition and expressly denied his consent to the continuance of

Jane's social transition." (*Id.* ¶ 46.) The school district replied that it would continue to refer to Jane by her preferred name and pronouns. (*Id.* ¶ 47)

After the meeting, Plaintiff sent a cease-and-desist letter to McKinney. (*Id.* ¶ 48; ECF No. 1-3 at 2-3.[4]) In the letter, Plaintiff demanded that the administration stop "facilitating [Jane's] use of a male identity at school without parental notice or consent." (ECF No. 1-3 at 2-3.) By letter dated December 14, 2023, counsel for the Board advised Plaintiff that pursuant to "applicable federal and state laws, and the New Jersey Department of Education's guidance on transgender students," the school district would continue to accept Jane's "asserted gender identity" and would honor her "request to be called by a name or pronoun other than that which she was assigned at birth." (ECF No. 1-5 at 2-3.) To date, Plaintiff has kept Jane on home instruction due to the school's position that its staff would continue to refer to Jane by her preferred name and pronouns. (ECF No. 40 ¶ 52.) Plaintiff alleges that the school's actions interfere with "aspects of [Plaintiff's] parent-child relationship," making it "impossible for Jane to receive a public education unless [he] yield[s] his constitutional and statutory parental rights." (*Id.* ¶ 53.)

Plaintiff also alleges that he removed Jane from school "in what he believed was his minor daughter's bests interests" and "on advice of Jane's healthcare providers." (*Id.* ¶ 54.) In support, Plaintiff provided the school with monthly medical notes from Plaintiff's primary care provider stating that Jane continued to have difficulty "with [a]nxiety and depression which significantly increased with social transitioning in the school setting increasing emotional stress and strain," and that home instruction would therefore be in Jane's best interests "until this is resolved." (*See* ECF No. 82 at 33-37, 46:5-62:12; ECF No. 49-3 at 2.)

---

[4]    The Court refers to the exhibits attached to the original Complaint, which are not attached to the Amended Complaint but are incorporated by reference. (*See* ECF No. 40 ¶¶ 23-24.)

## II.

Jane has seen her primary care provider for several years for "well visits," "sick visits," and "anxiety." (ECF No. 82 at 27, 21:14-23:15.) In August 2023, the provider diagnosed Jane with mild anxiety. (*Id.* at 30, 35:14-36:16.) On November 28, 2023, Jane visited the provider with her stepmother and Plaintiff, who informed the provider that they had just learned that Jane could change her name and pronouns at school and that they were concerned that Jane was "cognitively not mature enough for this." (ECF No. 82 at 170.) Jane reported that she was "upset about the situation" but "felt very comfortable using male pronouns and a male name." (*Id.*) This visit was the first time the provider learned that Jane believed she was transgender. (*Id.* at 31, 40:4-10.)

From December 2023 to April 2024, Jane only visited her provider once in February, when Jane told the provider that she "is much less anxious when she is not in the school building itself." (*Id.* at 41, 77:11-20.) The provider, however, does not recall Jane ever informing her that she was more anxious at school than at home due to social transitioning. (*Id.* at 40, 73:16-75:3.) The provider testified in her deposition that she wrote the letters to the school because Jane's "father called and said she missed a lot of school and they needed the doctor's note to say that she was having difficulty with mental health and needed to be provided home instruction." (*Id.* at 39, 70:5-15.) The provider has not made any diagnosis or professional judgment about whether Jane is mature enough to socially transition. (*Id.* at 32, 43:5-15.) Nor has she diagnosed Jane with gender confusion or dysphoria. (*Id.* at 34, 52:4-14.)

In support of his Motion for a Preliminary Injunction, Plaintiff also provided a declaration from Jane's pastoral counselor, whom Jane has been seeing since April 2022 over "concerns that included [Jane]'s anxiety, depression, and questions about her identity." (ECF No. 82 at 6, 9:24-10:3; 58.) The counselor stated in her declaration that the trauma Jane suffered due to the loss of

her mother and her high-functioning autism "contributed to Jane's development of gender confusion." (ECF No. 49-1 ¶ 5.) She also stated that in the fall of 2023, Jane began exhibiting "greater confusion, lacking in motivation, demonstrating situational depression, and feeling isolated," which "correlated with . . . the school 'socially transitioning' Jane without her father's involvement." (*Id.* ¶ 11.) She believes that Plaintiff was "undermined by the defendants' actions when defendants secretly agreed to socially transition Jane," which has "had demonstrably negative effects on Jane's mental and emotional health." (*Id.* ¶ 16.) The counselor believes that since Jane has been out of school, she has been "in a much better emotional state" and the counselor is "fearful of [Jane] going back to school because of her lack of trust in how [Jane's] situation will be handled." (*Id.* ¶ 17.) The counselor practices talk therapy with Jane but does not hold any professional or clinical social worker licenses with the State of New Jersey and cannot diagnose patients. (ECF No. 82 at 6-7, 12:10-13:21.) Accordingly, she has never diagnosed Jane with any mental health condition or illness. (*Id.* at 12, 33:17-23.)

Jane is also the first and only patient that the counselor has treated who has identified as transgender. (*Id.* at 11, 29:14-30:6.) Jane discussed her gender identity and use of a masculine name and pronouns with her counselor as early as November 2022, a year before she started high school. (*Id.* at 72-74.) The counselor believes that Jane suffers from gender confusion and sexual disorientation based on Jane's report to her that she does not feel "comfortable . . . in her skin," and "sort of sometimes in between a boy and a girl." (*Id.* at 16, 50:22-51:22.) The counselor defines "sexual disorientation" as when "somebody has a desire to be a different gender," and gender confusion as "more about not understanding why this is happening." (*Id.* at 16, 52:9-25.)

During the week of August 11, 2024, the counselor testified at her deposition that she was under the impression that Jane no longer wanted to socially transition at school:

Q.    . . . Are you still treating [Jane]?

A.    Yes.

Q.    When is the last time that you saw her?

A.    The beginning of this week.

Q.    Have you had any discussions with [Jane] about use of pronouns or names at school?

A.    No.

Q.    So as you sit here are you aware of whether [Jane] wishes to use male pronouns or a male name at school?

A.    In prior conversations she no longer wants to be a part of what had transpired before she wants to move on.  In the past, yes, she was with a group of people, and in the midst of learning about the different things in those pronouns, and not knowing -- or revealing anything concrete, what she preferred.

Q.    So let me just try to clarify: Are you saying that based on conversations you've had with [Jane] recently, your understanding is that she no longer wishes to use male pronouns or a male name at school?

A.    Right.

[(ECF No. 82 at 19, 63:1-25.)]

## III.

On January 5, 2024, Plaintiff filed the Verified Complaint (ECF No. 1) together with the motion for a temporary restraining order and preliminary injunction (ECF Nos. 3 & 4).[5]  On February 21, the Court denied Plaintiff's motion.  (ECF Nos. 37 & 38.)  On March 15, Plaintiff filed the Amended Complaint.  (ECF No. 40.)  Plaintiff filed a second motion for a preliminary injunction on April 12.  (ECF No. 44.)  Defendants opposed, and Plaintiff replied.  (ECF Nos. 45-

---

[5]    The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331.

46, 49.)  The parties thereafter engaged in limited discovery.  (ECF No. 50.)  The parties filed supplemental briefs at the conclusion of discovery.  (ECF Nos. 80-87.)

Plaintiff asserts five counts against Defendants, alleging violations of his statutory and constitutional parental rights.  (ECF No. 40 ¶¶ 62-117.)  The Board Defendants include the Delaware Valley Regional High School Board of Education, Ashley Miranda, and Scott McKinney. (*Id.* ¶ 44.)  The State Defendants are Kevin Dehmer in his official capacity as the Acting Commissioner of the NJDOE,[6] and New Jersey Attorney General Matthew J. Platkin.  (*Id.* ¶¶ 14-15.)

Count One seeks relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.  Plaintiff alleges that the Attorney General is "actively litigating the legal position that . . . school districts must follow" Board Policy 5756 and similar statewide guidance, "since to do otherwise would violate the [NJLAD]."  (*Id.* ¶ 25.)  Thus, under Count One, Plaintiff seeks a declaration that the NJLAD and Board Policy 5756 are "unconstitutional and void under the Fourteenth Amendment's Due Process Clause to the extent that [they] would deprive parents of fully informed knowledge and consent with respect to any aspect of their children's education including . . . social transitioning in particular"; and that "there is no fundamental constitutional right for a minor to socially transition."  (*Id.* ¶¶ 77A-E.)

In addition, Plaintiff asks the Court to permanently enjoin the New Jersey Attorney General from enforcing the NJLAD or any other state law "to the extent that it may deprive parents of fully informed knowledge and consent with respect to any aspect of their children's education including, . . . social transitioning in particular"; the Acting Commissioner of the NJDOE "from

---

[6]     Dehmer has been substituted for Angela Allen-McMillan, the previous Acting Commissioner, pursuant to Rule 25(d).

providing guidance to school districts in accordance with Policy 5756"; and "the District, Superintendent, the Board, and all employees thereof, from enforcing Board Policy 5756 and otherwise acting to socially transition [Plaintiff's] daughter without his fully informed knowledge and consent." (*Id.* ¶¶ 77H-J.) Plaintiff also seeks an order requiring "the Board to provide mainstream classroom instruction to Jane," declaring her not to be truant, and appointing "an independent monitor to protect [Plaintiff's] parental rights, at the Board's sole expense, upon Jane's return to school." (*Id.* ¶¶ 77G-M.)

Count Two asserts a claim under 42 U.S.C. § 1983 for violations of Plaintiff's constitutional parental rights under the Fourteenth Amendment's substantive due process clause. (*Id.* ¶¶ 78-83.) Count Three asserts a violation of the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2, *et seq.*, for interfering with Plaintiff's "right to parent a minor child who is receiving a thorough and efficient education," and for "failure to provide [Plaintiff] the required due process to protect his substantive parent's rights." (*Id.* ¶¶ 84-85.) Count Four asserts a claim under § 1983 alleging that Board Policy 5756 violates the Department of Education Organization Act of 1979, 20 U.S.C. § 3401, and is therefore unconstitutional under the Supremacy Clause of Art. VI, cl. 2 of the United States Constitution. (*Id.* ¶¶ 86-102.) [7]

---

[7]    Plaintiff also brings a fifth count, asserting a claim under § 1983 for violations of the Fourteenth Amendment's Privileges and Immunities Clause. (*Id.* ¶¶ 103-117.) Plaintiff, however, concedes that in order to succeed on Count Five, "a line of Supreme Court precedent beginning with *The Slaughter-House Cases*, 83 U.S. (16 Wall) 36 (1872), would have to be modified or reversed," and Plaintiff "does not rely on the same in seeking a preliminary injunction, but rather, has simply raised such claim in order to preserve it for further appeal." (ECF No. 44-1 at 25 n.4.) Plaintiff offers no further argument in support of Count Five. Because Plaintiff has conceded that he has not established a likelihood of success on the merits with respect to Count Five, the Court need not address it herein. *See also Alpine Bus. Grp., Inc. v. Sabathia*, Civ. No. 10-4850, 2011 WL 589959, at *2 (D.N.J. Feb. 10, 2021) (citing *Conroy v. Leone*, 316 F. App'x 140, 144 n.5 (3d Cir. 2009)) ("An unsupported position is considered waived or abandoned.").

## II.    <u>LEGAL STANDARD</u>

### A.    Preliminary Injunction

Preliminary injunctive relief "is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotation marks and citation omitted). A plaintiff seeking a preliminary injunction must establish that (1) he is reasonably likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3rd Cir. 2017); *see also HR Staffing Consultants, LLC v. Butts*, Civ. No. 15-3155, 2015 WL 3492609, at *7 (D.N.J. June 2, 2015) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). If a plaintiff meets the first two factors, the court "then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly*, 858 F.3d at 179.

A primary purpose of a preliminary injunction is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). Thus, "[a] party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." *Id.* at 653 (citation omitted). The party seeking to alter the status quo "must meet a higher standard of showing irreparable harm in the absence of an injunction." *Bennington Foods LLC v. St. Croix Renaissance Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008).

### B.    Burden of Proof

Generally, the moving party bears the burden to convince the court that all four factors favor preliminary relief. *Peter v. Att'y Gen. of N.J.*, Civ. No. 23-03337, 2023 WL 4627866, at *1

(D.N.J. July 19, 2023) (citing *AT&T v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)).  Because "the burdens at the preliminary injunction stage track the burdens at trial," there are instances when the burden may shift.  *See Reilly*, 858 F.3d at 179 (citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, et al.*, 546 U.S. 418, 429 (2006)).  For preliminary injunctions related to constitutional rights, the moving party must first demonstrate a likelihood of successfully showing that a fundamental right is being infringed.  *See id.* at 180 n.5 (noting that the party seeking injunctive relief under the First Amendment "still retains the burden of proof in two principal ways: it must prove that the law restricts protected speech and that it will suffer irreparable harm" (citing *Goodman v. Ill. Dep't of Fin. & Prof'l Regul.*, 430 F.3d 432, 438 (7th Cir. 2005))).

If the moving party makes that showing, the burden shifts to the government to justify its restriction under the appropriate level of scrutiny.  *See id.* (citing *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011)).  "If the government succeeds in justifying the restriction, then the motion for a preliminary injunction fails because there is no likelihood of success on the merits.  And even if the moving party prevails on that prong, it still bears the burden of showing irreparable injury."  *Id.*

Here, Plaintiff must show that he is reasonably likely to succeed in proving that Defendants infringed on a substantive due process right.  If Plaintiff makes that showing, the burden shifts to Defendants to justify their actions under the appropriate level of scrutiny.  Plaintiff also has the burden of establishing irreparable harm in the absence of preliminary relief.  *Id.*

## III.    **DISCUSSION**

Defendants first argue that Plaintiff lacks standing to pursue injunctive relief and that his claims have been rendered moot because Jane no longer wants to socially transition at school.

(ECF No. 45 at 42-45; ECF No. 46 at 31-33.)  Because standing is a component of jurisdiction and "an assessment of standing is separate from any evaluation of a claim's merits," the Court will address Defendants' standing challenges before Plaintiff's likelihood of success on the merits.  *See Short v. N.J. Dep't of Educ.*, Civ. No. 23-21105, 2024 WL 3424729, at *4 (D.N.J. Jul. 16, 2024) (citing *Falcone v. Dickstein*, 92 F.4th 193, 202 (3d Cir. 2024)).

## A.    Standing

Article III of the United States Constitution limits a federal court's jurisdiction to actual cases or controversies.  U.S. Const., art. III, § 2, cl. 1.  The doctrine of Article III standing is "an additional limitation on the federal judicial power derived from the case-or-controversy requirement," which prohibits courts from issuing "advisory opinions."  *Lutter v. JNESO*, 86 F.4th 111, 123-24 (3d Cir. 2023).  "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing" standing.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted).  A plaintiff must meet that burden "with the manner and degree of evidence required at the successive stages of the litigation."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  Where, as here, a case is at the preliminary injunction stage, the court's "determination of the likelihood of success on the merits of the case is a separate inquiry from the threshold issue of Article III standing.  To demonstrate standing to sue, plaintiffs must only allege that they have suffered sufficient injury to comply with Article III's 'case or controversy' requirement."  *The Pitt News v. Fisher*, 215 F.3d 354, 360 (3d Cir. 2000).

A plaintiff must establish standing "for each claim that [it] press[es] and for each form of relief that [it] seek[s].'"  *Lutter*, 86 F.4th at 124 (quoting *TransUnion LLC*, 594 U.S. at 431).  To establish standing to pursue prospective injunctive relief, a plaintiff must show "(1) 'that he is

under threat of suffering "injury in fact" that is concrete and particularized'; (2) 'the threat must be actual and imminent, not conjectural or hypothetical'; (3) 'it must be fairly traceable to the challenged action of the defendant'; and (4) 'it must be likely that a favorable judicial decision will prevent or redress the injury.'"  *Free Speech Coal., Inc. v. Att'y Gen. U.S.*, 825 F.3d 149, 165-66 (3d Cir. 2016) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  The Court may consider "[p]ast wrongs" as "evidence bearing on whether there is a real and immediate threat of repeated injury," but past wrongs alone cannot establish standing for injunctive relief "if unaccompanied by any continuing, present adverse effects."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (citation omitted); *Short*, 2024 WL 3424729, at *4 ("[B]y itself . . . prior injury is insufficient to confer standing for injunctive relief.").

Here, Plaintiff seeks a declaratory injunction restraining the New Jersey Attorney General from enforcing the NJLAD "in a manner which interferes with parental rights by not permitting full disclosure to parents of their minor child's desire to socially transition and/or to interfere with the right of parents to withhold consent to . . . social transitioning."  (ECF No. 44-4 ¶ 5.)  Plaintiff also seeks to preliminarily restrain the NJDOE "from promulgating and promoting any and all rules and/or guidance which interferes with parental rights by not permitting full disclosure to parents of their minor child's desire to socially transition and/or to interfere with the right of parents to withhold consent."  (*Id.* ¶ 6.)

Defendants argue that Plaintiff lacks standing to pursue these requests for injunctive relief "based on a purported right to be informed about Jane's social transition" because he "already knows that Jane elected to socially transition at school."  (ECF No. 46 at 33; ECF No. 45 at 42.) Because Plaintiff already knows this information, the requested injunctions "would not redress any ongoing injury to Plaintiff" and Plaintiff therefore lacks standing.  (ECF No. 45 at 43.)

The Court disagrees.  For purposes of establishing Article III standing, Plaintiff has sufficiently alleged an "actual and imminent" threat of harm that is fairly traceable to Defendants that would be redressable by the requested injunctive relief.  *See Free Speech Coal.*, 825 F.3d 149, 165-66.  First, Plaintiff has alleged that Jane's school accepted her preferred gender identity without Plaintiff's knowledge or consent, which he claims interfered with his "right to determine . . . how best to raise, nurture, and educate" Jane.  (ECF No. 40 ¶ 65.)  Second, in addition to this alleged "[p]ast wrong[]," Plaintiff has established that the school's continued enforcement of Board Policy 5756 is both "real and immediate," not "conjectural" or "hypothetical."  *Lyons*, 461 U.S. at 95-96.  The Board Defendants have indicated that they will continue to comply with the Policy.  (ECF No. 1-5 at 2-3 (stating that consistent with "applicable federal and state laws and the Department of [E]ducation guidance," "[s]hould [Jane] request to be called by a name or pronoun other than that which she was assigned at birth, the District will honor that request.").)  Therefore, an injunction requiring the Board Defendants to affirmatively notify Plaintiff and obtain his consent before referring to Jane by her preferred name and pronouns—and restraining the State Defendants from enforcing any contrary laws or policies— would directly redress Plaintiff's alleged ongoing harm.

The Board Defendants rely on the United States Supreme Court's decision in *Lyons* for the proposition that litigants lack Article III standing to pursue injunctive relief based solely on past injury.  (ECF No. 46 at 31-32 (citing *Lyons*, 461 U.S. at 95-105).)  In *Lyons*, the plaintiff alleged that police officers wrongfully put him in a chokehold during a traffic stop, and that the city's police officers "regularly and routinely" applied such chokeholds in an unconstitutional manner. 461 U.S. at 98.  The plaintiff "sought a preliminary and permanent injunction against the City [of Los Angeles] barring the use of" such chokeholds.  *Id.*  The Court found that the plaintiff lacked

standing to pursue this injunctive relief because the defendants' past misconduct did "nothing to establish a real and immediate threat that [the plaintiff] would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id.* at 105. To seek this injunctive relief, the plaintiff would have had to "make the incredible assertion either, (1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter, . . . or, (2) that the City ordered or authorized police officers to act in such manner." *Id.* at 105-06.

The threat of redressable harm in *Lyons* was significantly more attenuated than the alleged harm in this matter. Here, Plaintiff has alleged a past injury when the school referred to Jane by her preferred name and pronouns without Plaintiff's knowledge or consent. He has also established that upon Jane's return to school, the Board Defendants will continue to comply with the Policy in the same way they did previously. (*See* ECF No. 1-5 at 2-3.) And Plaintiff has established that he intends for Jane to return to Delaware Valley Regional High School, as opposed to transferring to a school with a different policy. (*See* ECF No. 40 ¶ 57 (Plaintiff "has no other viable alternative other than to send Jane to DVRHS.").) Plaintiff's allegations of future injury do not depend on a "speculative chain of possibilities" that "require[s] guesswork as to how independent decisionmakers will exercise their judgment." *John and Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 630 (4th Cir. 2023) (quoting *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 413-14 (2013)). Nor is Plaintiff merely a bystander who disagrees with the Policy. *See, e.g.*, *Short*, 2024 WL 3424729, at *5 (finding that parents challenging the same guidance at issue in this matter lacked standing because they did not allege that any of their children "are transgender or questioning their gender, that they have or are imminently going to

engage in conversations with school officials about their gender, or that [their] children will not otherwise share their gender identities or related questions or feelings with [the parents]"); *Doe v. Pine-Richland Sch. Dist.*, Civ. No. 24-00051, 2024 WL 2058437, at *2-3 (W.D. Pa. May 7, 2024) (denying a motion for a preliminary injunction for lack of standing because the plaintiff did not allege that their children were transgender or interacted with the school district in any way regarding their gender, and presented a "mere concern that a school may apply its transgender policy to their child").

Accordingly, Plaintiff has alleged a substantial risk that he will be subject to conduct that he claims is unconstitutional, which is sufficient to establish Article III standing. *Cf. John and Jane Parents 1*, 78 F.4th at 626-31 (finding that parents challenging a policy that allowed a school to "develop gender support plans for students . . . without the knowledge or consent of the students' parents" lacked Article III standing because they could not show a "substantial risk of future harm" where they merely disagreed with the policy and did "not allege[] that they suspect their children might be considering gender transition or have a heightened risk of doing so"). Whether Plaintiff is likely to succeed in showing that the Defendants' conduct is unconstitutional is a separate question for the Court to address. *See The Pitt News*, 215 F.3d at 367 (finding that the plaintiff had standing to assert First Amendment violations even though the plaintiff was unlikely to succeed on the merits of its First Amendment claims). The Court is satisfied that Plaintiff has established a live case or controversy with respect to his requested injunctive relief.

### B.    Mootness

Like standing, "Article III mootness derives from the case-or-controversy requirement." *Lutter*, 86 F.4th at 129-130. "[U]nlike standing, mootness depends on the state of things after the lawsuit commenced." *Id.* (citation omitted). "The doctrine of mootness is centrally concerned

with the court's ability to grant effective relief: [i]f developments occur during the course of adjudication that eliminate a plaintiff's personal stake in the outcome of the suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot." *Am. Littoral Soc'y v. U.S. Env't Prot. Agency Region*, 199 F. Supp. 2d 217, 245 (D.N.J. 2002) (citations and quotations omitted).  Moreover, "just as the party seeking to establish standing bears the burden of proof, the party seeking to demonstrate the loss of standing during the pendency of the litigation bears the burdens of production and persuasion." *Lutter*, 86 F.4th at 130 (citation omitted).

Additionally, "mootness is not merely the post-suit absence of standing." *Id.* at 130.  For instance, voluntary cessation of a defendant's conduct does not moot a case unless it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 700 (2022); *Lutter*, 86 F.4th at 130.  The defendant bears a "heavy" burden of establishing that "there is no reasonable expectation that the wrong will be repeated," and 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Id.* at 130-31 (citations omitted).

Here, Defendants argue that Plaintiff's claims have been rendered moot because Jane's pastoral counselor testified that as of August 11, 2024, Jane expressed to the counselor that she no longer wished to transition.  (ECF No. 81 at 2.)  Specifically, the counselor testified that in "prior conversations," Jane advised that she "no longer wants to be a part of what had transpired before," and that "she wants to move on."  (ECF No. 82 at 19, 63:1-25.)  When asked whether her "understanding is that [Jane] no longer wishes to use male pronouns or a male name at school," the counselor replied, "right."  (*Id.*)

Based on the current record, the Court finds that Defendants have not met their heavy burden of demonstrating that Plaintiff's claims for injunctive relief are moot.  Plaintiff's alleged

injury-in-fact is that in the fall of 2023, Jane asked to be referred to by a male name and pronouns, and the school honored that request without affirmatively notifying Plaintiff pursuant to Board Policy 5756.  (ECF No. 40 ¶¶ 35-50.)  The Policy remains in effect and Defendants' position is that the school will continue to comply with the Policy, regardless of whether Jane's preferences align or conflict with Plaintiff's preferences.  (*See id.* ¶¶ 47, 50.)  Therefore, it is not "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *West Virginia*, 597 U.S. at 700.  And Plaintiff could still pursue the monetary relief he seeks for the alleged past harm.  (*See* ECF No. 40 ¶¶ 9, 83 (seeking "an award of monetary damages" for past injuries including "emotional distress" and "economic damages").)  *Lutter*, 86 F.4th at 134 ("The availability of damages or other monetary relief almost always avoids mootness." (quoting 13C Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 3533.3 (3d ed. 2019))).

Additionally, other courts in similar cases have found that similar factual developments did not render the plaintiffs' claims moot.  For example, in *Willey v. Sweetwater County School District No. 1 Board of Trustees*, the defendant school district honored a student's request to be "treated as a male and be referred to by male pronouns" without informing the student's parents pursuant to the district's policy.  680 F. Supp. 3d 1250, 1264-65 (D. Wy. 2023).  Later, however, the child "changed course and requested to be called by the [s]tudent's given name and female pronouns."  *Id.* at 1265. On a motion for a preliminary injunction, the United States District Court for the District of Wyoming found that the plaintiffs' claims were not moot because the policy was still in place, and there was "no reason to think [the] [d]efendants would not pivot back to their original position . . . should the [s]tudent change the [s]tudent's mind."  *Id.* at 1270-71.  The plaintiffs' claims for injunctive and declaratory relief became moot only after the student "transferred to another high school out of state" and it was indisputable that she was "no longer

19

subject to the District's policies," and the plaintiffs "[were] no longer subject to those policies as [the student]'s guardians." *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd of Trs.*, 2023 WL 9597101, at *3-4 (D. Wy. Dec. 18, 2023); *see also Regino v. Staley*, 2023 WL 2432920, at *1 (E.D. Cal. Mar. 9, 2023) (ruling, without a mootness analysis, on the likelihood of success on the merits of a motion for a preliminary injunction challenging a school district's transgender student policy even though the plaintiff's child no longer "express[ed] feelings of gender dysphoria and now identifies as a girl again").

Because Plaintiff intends for Jane to return to the same school, where the school will continue to refer to Jane by her preferred name and pronouns in accordance with the Policy, Jane's current preferences as articulated by her pastoral counselor have not "eliminate[d] [Plaintiff]'s personal stake in the outcome of the suit" or prevented this Court "from being able to grant the requested relief."[8] *Cf. Short*, 2024 WL 3424729, at *7-8 (finding that a parent who transferred her children to another school that did not have the challenged transgender student policy was unable to establish a risk of future harm); *Parents Defending Educ. v. Linn Mar Comm. Sch. Dist.*, 83 F.4th 658, 664-66 (8th Cir. 2023) (finding that an appeal challenging the denial of injunctive relief against a school's transgender student policy was moot because intervening legislation required school districts to report students' gender transition requests to parents and guardians, and therefore provided the plaintiffs "with all of the relief requested"); *Littlejohn v. Sch. Bd. of Leon Cnty. Florida*, 647 F. Supp. 3d 1271, 1275-76 (N. D. Fla. Dec. 22, 2022) (finding that claims for injunctive relief against a school district's policy that denied parents involvement in students' gender support plans were rendered moot after the policy was amended).

---

[8]     *Am. Littoral Soc.*, 199 F. Supp. 2d at 245.

### C.    Likelihood of Success on the Merits

#### 1.    *Count Two – Substantive Due Process*

The Court will first determine whether Plaintiff is likely to succeed on the merits of his substantive due process claim under Count Two.[9]  (ECF No. 40 ¶¶ 78-83.)

To establish a claim under 42 U.S.C. § 1983, Plaintiff must show that he has been deprived of a federal constitutional right under color of state law.  *See Anspach ex rel. Anspach v. City of Phila., Dept. of Pub. Health*, 503 F.3d 256, 261 (3d Cir. 2007).  Here, Plaintiff asserts a liberty interest stemming from the substantive Due Process Clause of the Fourteenth Amendment of the United States Constitution.  (ECF No. 40 ¶ 4.)  The Fourteenth Amendment forbids states from depriving "any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause enumerates both substantive and procedural rights.  *See Steele v. Cicchi*, 855 F.3d 494, 501 (3d Cir. 2017).  Plaintiff asserts only substantive due process violations.  (*See* ECF No. 40 ¶¶ 78-83.)  To show a violation, Plaintiff must "demonstrate that he has 'been deprived of a particular interest that is protected by . . . substantive due process.'"  *Holland v. Rosen*, 895 F.3d 272, 292 (3d Cir. 2018) (quoting *Steele*, 855 F.3d at 501).

The substantive component of the Due Process Clause protects both those rights guaranteed by the first eight amendments, and fundamental rights that are not mentioned in the Constitution

---

[9]    Count one seeks declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.  (ECF No. 40 ¶¶ 62-77.)  The Declaratory Judgment Act does not provide an independent cause of action.  *See, e.g.*, *Malhan v. Sec'y U.S. Dep't of State*, 938 F.3d 453, 457 n.3 (3d Cir. 2019) ("[T]he Declaratory Judgment Act is procedural only, and presupposes the existence of a judicially remediable right.  It creates a remedy, not rights." (internal quotation marks and citations omitted)); *Everest Indem. Ins. Co. v. All Risks LTD*, Civ. No. 16-3582, 2023 WL 4295778, at *4 n.8 (D.N.J. Jun. 30, 2023) ("Declaratory judgment is a remedy, not an independent cause of action." (collecting cases)).  The Court will therefore first address the merits of Plaintiff's independent causes of action to determine whether they provide a basis to grant the preliminary injunctive relief that Plaintiff seeks.

but are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231, 237 (2022) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)).  Asserting a substantive due process right "requires 'a careful description of the asserted fundamental liberty interest.'" *Holland*, 895 F.3d at 292 (citations omitted).  "[V]ague generalities . . . will not suffice." *Id.*

In addition, both "the Supreme Court and the [United States Court of Appeals for the Third Circuit] have repeatedly warned that we cannot read these phrases too broadly to expand the concept of substantive due process." *Id.* at 293.  "A court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution." *Id.* (quotations and citation omitted).  Because a court's expansion of the concept of due process "place[s] the matter outside the arena of public debate and legislative action," the "doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever [they] are asked to break new ground in this field." *Doe by and through Doe v. Boyertown Area Sch. Dist.*, 276 F. Supp. 3d 324, 383 (E.D. Pa. 2017), *aff'd*, 897 F.3d 518 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 2636 (2019) (citations omitted).

Here, in his Amended Complaint, Plaintiff asserts the same constitutional liberty interest that he advanced in his original Complaint—his right as a parent "to direct the upbringing of his child."  (ECF No. 40 ¶ 4; ECF No. 1 ¶ 2.)

It is well-established that the "liberty" interest protected by the Fourteenth Amendment's substantive due process clause includes the "interest of parents in the care, custody, and control of their children." *See Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (citing, among others, *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-535 (1925); and *Wisconsin v. Yoder*, 406 U.S. 205, 232-233 (1972)).  But Plaintiff has not provided the Court

with any historical or legal precedent or authority demonstrating that the Fourteenth Amendment's protections extend to the circumstances of this case and that the scope of Plaintiff's claimed substantive due process right is deeply rooted in our Nation's "history and tradition" and "concept of ordered liberty."[10]

As the Court discussed at length in its previous Opinion in this matter, the Supreme Court decisions recognizing and defining the scope of parental rights, particularly in the school setting, do not support the type of unqualified right that Plaintiff asserts in this matter. (*See* ECF No. 37 at 11-14.)  For example, in *Meyer*, the Supreme Court held that parents have a right "to engage [a teacher] . . . to instruct their children" in a language other than English, but also recognized that the "power of the state to compel attendance at some school and to make reasonable regulations for all schools . . . is not questioned.".  262 U.S. at 400-02.  In *Pierce*, the Court found that a law requiring parents to send children to public schools violated the parents' right "to direct the

---

[10]    In support of his argument, Plaintiff cites *Loving v. Virginia*, 388 U.S. 1, 12 (1967), a 1753 English statute and more recent state laws restricting the marriage of minors, to argue that "the history and traditions of the Nation have always provided that the substantive due process right of minors to marry must yield to parental consent."  (ECF No. 44-1 at 28-29.)  However, none of these authorities concern parental rights in a school setting.  The Board Defendants cite sources such as William Blackstone's Commentaries and the colony of Massachusetts's Law of 1647, which became the basis for public education laws in most of the New England colonies, for the proposition that parental rights in a school setting were not absolute throughout the Nation's history.  (ECF No. 46 at 21-23.)  Blackstone acknowledged that parents have a duty to provide their children with an education but that the laws at that time were "defective . . . by not constraining the parent to bestow a proper education upon his children."  (*Id.* at 21-22 (citing 2 William Blackstone, *Blackstone's Commentaries: with Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and of the Commonwealth of Virginia*, 450-51 (St. George Tucker ed., 1803)).)  And as the Board Defendants point out, historian George Martin described the Law of 1647 as showing that the "obligation to furnish . . . education rests primarily upon the parent," but that the "State has a right to enforce this obligation" and "may fix a standard which shall determine the kind of education, and the minimum amount."  (*Id.* at 22-23 (citing Ellwood P. Cubberley, *Public Education in the United States* 18-19 (Riverside Textbooks in Educ. ed., 1919)).)  These authorities suggest that parental rights in a school setting are not absolute.

upbringing and education" of their children, but also cautioned that "[n]o question is raised concerning the power of the state reasonably to regulate all schools . . . and that nothing be taught which is manifestly inimical to the public welfare."  268 U.S. at 534-35.  And in *Yoder*, the Court found that a law prohibiting Amish parents from withdrawing children from school after a certain age violated both the First Amendment and the parents' substantive due process rights but simultaneously recognized the power of the state "to impose reasonable regulations for the control and duration of basic education," which must be balanced "when it impinges on fundamental rights."  406 U.S. at 213-14, 234.  In each of these cases, despite recognizing the right of parents to direct the upbringing of their children, the Supreme Court made clear that this right is not absolute in a school setting, and that schools may impose reasonable regulations.[11]

To find that a policy directing a school district to respect an individual student's preferred name and pronouns infringes on Plaintiff's constitutional due process rights, this Court would have to significantly expand the scope of parental rights articulated in *Meyer* and *Pierce*, which would contradict the Supreme Court's warning that courts are to "exercise the utmost care" when asked to break new ground in the field of substantive due process.  *See Glucksberg*, 521 U.S. at 720; *see also Willey*, 680 F. Supp. 3d at 1276 (holding that given "the lack of supporting caselaw . . . and the high bar for expanding existing fundamental rights," the plaintiff parents were unlikely to establish that "the Constitution imposes an affirmative obligation on the [school district] to actively disclose" to parents that a student requested to be called by a different name).  Instead, this Court

---

[11]    *See also Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (stressing the "limited scope" of *Meyer* and *Pierce*, which lend "no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society," but rather "held simply that while a State may posit (educational) standards, it may not pre-empt the educational process by requiring children to attend public schools" (quoting *Yoder*, 406 U.S. at 239 (White, J., concurring))).

is guided by the Supreme Court's and Third Circuit's admonitions not to interpret the Fourteenth's Amendment's "liberty" interest "too broadly to expand the concept of substantive due process . . . with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution,"[12] and "plac[ing] the matter outside the arena of public debate and legislative action."[13]  In his second motion for a preliminary injunction, Plaintiff has not identified any precedent addressing fundamental parental rights in a school setting that would alter this conclusion.

Indeed, the Third Circuit has recognized that "despite the Supreme Court's 'near-absolutist pronouncements' concerning the right to familial privacy, the right is necessarily qualified in a school setting where 'the state's power is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults.'"  *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 182 (3d Cir. 2005) (quoting *Gruenke v. Seip*, 225 F.3d 290, 304 (3d Cir. 2000)).  When evaluating the right of parents to control a child's upbringing and education, the Third Circuit has found dispositive that in each of the Supreme Court cases recognizing the right of parents to direct the upbringing of their children, "the state was either requiring or prohibiting some activity."  *See Anspach*, 503 F.3d at 263-64.

In *Anspach*, a public health center that provided a minor with emergency contraceptive pills without her parents' knowledge or consent was found not to have violated the parents' substantive due process rights.  *Id.* at 264-65.  The Third Circuit reasoned that the state in *Anspach* was not constraining or compelling any action by the parents, in contrast to the laws at issue in the Supreme Court cases such as *Meyer*, *Pierce*, and *Yoder*.

---

[12]    *Holland*, 895 F.3d at 293 (citations omitted).

[13]    *Glucksberg*, 521 U.S. at 720.

Here, by contrast, Plaintiff has not offered any evidence that the school district engaged in the type of proactive, coercive interference with the parent-child relationship that the Third Circuit has found to violate parents' constitutional rights in analogous circumstances. Plaintiff again relies on the Third Circuit's holding in *Gruenke*. (ECF No. 44-1 at 34-35.) There, a high school swim coach pressured a student to take a pregnancy test without her parents' knowledge or consent. 225 F.3d at 295-97. The plaintiffs asserted several violations of constitutional rights, including that the coach's actions "violated [the mother's] constitutional right to manage the upbringing of her child" and "obstruct[ed] the parental right to choose the proper method of resolution" of her daughter's pregnancy. *Id.* at 306. Given the coach's "continued intrusion into what was a private family matter . . . contrary to [the student's] express wishes that he mind his own business," the Third Circuit found that the plaintiffs had established an "unconstitutional interference with familial relations." *Id.* at 305-07.

Five years later, in *C.N. v. Ridgewood Board of Education*, the Third Circuit contrasted the *Gruenke* defendant's behavior with a school survey that questioned students from seventh through twelfth grade without parental consent about sensitive topics, such as sexual activity. 430 F.3d at 184. The Third Circuit held that the survey did not violate the parents' right to control their children's upbringing because the survey, unlike the coach's actions in *Gruenke*, did not "strike at the heart of parental decision-making authority on matters of the greatest importance." *Id.* The Court reasoned that a "parent whose middle or high school age child is exposed to sensitive topics or information in a survey remains free to discuss these matters and to place them in a family's moral or religious context, or to supplement the information . . . [but] School Defendants in no way indoctrinated the students in any particular outlook on these sensitive topics." *Id.* at 185. Thus, the Court concluded that the survey's interference with parental-decision making authority

did not amount to a constitutional violation.  *Id.*

The Third Circuit in *Anspach* similarly found that its holding in *Gruenke* "does not extend to circumstances where there is no manipulative, coercive, or restraining conduct by the State." 503 F.3d at 266.  In *Anspach*, the Court emphasized that the coach in *Gruenke* acted "contrary to the student's express wishes that he mind his own business," and "against her express wishes, the coach . . . attempt[ed] to have her admit to being pregnant, . . . paid for a pregnancy test and told her, through other members on the team, that unless she took the pregnancy test, he would take her off the relay team."  *Id.* at 266.  The Third Circuit contrasted the coach's behavior with that of the health clinic, which neither coerced the minor into taking emergency contraceptives, nor discouraged her from discussing the issue with her parents.  *Id.* at 266-67.  The minor was "only given the pills because she asked for them," and no one at the center coerced her into taking the pills or discouraged her from discussing the issue with her parents.  *Id.* at 264-65.

The *Anspach* decision also distinguished *Arnold v. Board of Education of Escambia County, Alabama*, a case in the United States Court of Appeals for the Eleventh Circuit where school officials "not only pressured [minor students] to refrain from discussing [a] pregnancy and abortion with their parents, but also imposed their own will on the decision of the children regarding whether to abort the pregnancy in various ways, including by providing them with the money for the procedure and hiring a driver to take them to the appointment."  *Id.* at 265 (citing *Arnold v. Bd. of Educ. of Escambia, County, Ala.*, 880 F.2d 305, 308-09 (11th Cir. 1989), *overruled on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 113 (1993)).  In *Arnold*, the Eleventh Circuit determined that "a parent's constitutional right to direct the upbringing of a minor is violated when the minor is *coerced* to refrain from discussing with the parent an intimate decision . . . which touches fundamental values and religious beliefs parents

wish to instill in their children." 880 F.2d at 312 (emphasis added).  The Third Circuit in *Anspach* emphasized that although the school officials in *Arnold* and *Gruenke* violated parental liberty rights, "neither *Arnold* nor *Gruenke* provide for a [parent's] constitutional right to notice." *Anspach*, 503 F.3d at 270.

Here, Plaintiff has not established that the Board Defendants engaged in the type of proactive intrusion into private family matters that the Third Circuit found dispositive in *Gruenke*. The record indicates that Jane initiated the request to socially transition, and that the Board Defendants did not coerce Jane into making the request or prevent or discourage Jane from discussing her request with Plaintiff.  Plaintiff does not allege otherwise in the Complaint or the sworn declarations.  The present record lacks particularized facts suggesting that the Board Defendants prompted Jane to initiate her request.  (*See* ECF No. 40 ¶ 35 ("Jane attended a SAFE meeting and expressed to defendant Miranda that she would like to undergo a social transition from female to male in school.").)  To the contrary, the record demonstrates that the Board Defendants acted only at Jane's affirmative request.  (*Id.* ¶ 47 ("The District advised that it would continue to have Jane called by a male name until such time as Jane indicated otherwise.").)

In addition, nothing in the recent summary judgment decision in *Tatel v. Mt. Lebanon School District*, Civ. No. 22-837, 2024 WL 4362459 (W.D. Pa. Sept. 30, 2024), submitted by Plaintiff in further support of his Motion, changes this Court's previous conclusion that *Tatel* is distinguishable.  (*See* ECF No. 85 at 1; ECF No. 37 at 20-21.)  The *Tatel* decision addressed "the extent of constitutional rights of parents of young children in a public elementary school to notice and the ability to opt their young children out of noncurricular instruction on transgender topics." 2024 WL 4362459, at *1.  In finding that the teacher had violated parents' fundamental rights to direct the upbringing of their children, the United States District Court for the Western District of

Pennsylvania relied heavily on the children's young age, noting that "the age of the children being instructed is an important factor in evaluating parental constitutional rights." *Id.* at *30 (citing *Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89 (3d Cir. 2009)) ("While secondary school students are mature enough and are likely to understand that a school does not endorse or support speech that it merely permits on a nondiscriminatory basis, kindergartners and first graders are different."). The court also found it dispositive that the teacher had "caused actual confusion" among first graders by "unilaterally deciding, without notice to the [p]arents, to read books and discuss with her young students that a 'he is now a she' and that parents may be wrong about their child's identity." *Id.* at *32.

Jane, by contrast, is a high school student. And, as discussed, there is nothing before the Court to suggest that the Board Defendants coerced Jane into socially transitioning, or that they prevented or discouraged Jane from discussing the issue with Plaintiff. (ECF No. 40 ¶ 35 ("Jane attended a SAFE meeting and expressed to defendant Miranda that she would like to undergo a social transition from female to male in school."); ECF No. 46-2 ¶¶ 11-22 (Miranda's declaration that when she asked Jane why she was upset, "Jane expressed that she identified as a transgender male," "expressed a desire to be referred to using a masculine name and pronouns," and "did not want school staff to report her social transition to her father").) In fact, the record suggests that Jane discussed issues related to gender and her preferred name and pronouns with her pastoral counselor as early as November 2022, a year before she started high school. (ECF No. 82 at 72-74.) And although the school referred to Jane by her given female name when communicating with Plaintiff, the school advised Plaintiff about Jane's request upon receiving an inquiry from Plaintiff. (*See* ECF No. 46-2 ¶¶ 25-27 (stating that when Plaintiff approached Miranda and the school about Jane's gender identity, they "advised him of the situation concerning her social

transition"); ECF No. 1-4 at 2-3 (memorializing Plaintiff's meeting with district staff who "advised that [Miranda] facilitated [Jane's] name and pronoun change upon [Jane's] request").)  Nothing in the current record contradicts McKinney's statement that Board Policy 5756 does not permit "staff members [to] lie to parents or guardians if they inquire about their child's gender identity or expression."  (ECF No. 46-1 ¶ 7.)  *See also Willey*, 680 F. Supp. 3d at 1275-77 (rejecting the plaintiff parents' argument that "the Constitution imposes an affirmative obligation on the District to actively disclose information regarding a student . . . in the *absence* of a parent's inquiry or request," even where the school used the students' legal name and pronouns in the parents' presence while referring to the students by their preferred name and pronouns at school).

Because the record indicates that Jane made her own request to socially transition and that her request not be disclosed to Plaintiff—as opposed to being at the direction of the Board Defendants—this Court is not persuaded that the Board Defendants have engaged in actions comparable to those in *Gruenke* and *Tatel*, where school officials "exploit[ed their] authority," "insist[ed] on a course of action," or "unilaterally decid[ed]" to "introduc[e] a child to sensitive topics before a parent might have done so herself."  *Anspach*, 503 F.3d at 270 (citing *Gruenke*, 225 F.3d at 307); *Tatel*, 2024 WL 4362459, at *32 (citing *C.N.*, 430 F.3d at 183).

The Court's ruling aligns with those of other district courts addressing similar transgender student policies that distinguish between school officials who passively recognized students by their preferred gender identities, and officials who proactively interfered with the parent-child relationship.  (*See* ECF No. 37 at 18-22 (*comparing Littlejohn v. Sch. Bd. of Leon Cnty. Fla.*, 647 F. Supp. 3d 1271, 1273-74, 1282 n.6 (N.D. Fla. 2022) (holding that the school had not infringed on the parents' substantive due process rights in part because the student had approached the school on his own volition and asked the school to use his preferred name and pronouns, as opposed to

being "singled out" or "forced to adopt a support plan against [the student's] will"); *Willey*, 680 F. Supp. 3d at 1275-77 (finding it unlikely that the Constitution imposes an affirmative obligation on schools to actively disclose a student's request to change their name and pronouns to parents); and *Regino v. Staley*, 2023 WL 4464845, at *4 (E.D. Cal. Jul. 11, 2023) (holding that a school's regulation directing staff to refer to students by their preferred name and pronouns did not violate parents' substantive due process rights because the regulations at issue were "not proactive, but reactive; District staff are not directed to force students to adopt transgender identities or keep their identities secret from their parents"); *with Tatel v. Mt. Lebanon Sch. Dist.*, 637 F. Supp. 3d 295, 325-26 (W.D. Pa. 2022) (finding that plaintiff parents had stated a plausible substantive due process claim where a public school teacher discussed gender dysphoria and transgender transitioning with first-graders, suggested to the children that "parents make mistakes about gender," instructed the children "not to discuss this topic with their parents," and "targeted one student for repeated approaches about his becoming like her transgender child").

Finally, Plaintiff has also not met his burden at this stage in showing that Board Policy 5756 and the Board Defendants have interfered with Plaintiff's constitutional right to make medical decisions for Jane. (ECF No. 44-1 at 6.) Although gender dysphoria has been "recognized by the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ('DSM') as clinically significant distress or impairment related to gender incongruence,'" neither Jane's primary care provider nor her pastoral counselor have diagnosed Jane with gender confusion or dysphoria, nor have they referred Jane to a specialist for such a diagnosis. *Willey*, 680 F. Supp. 3d at 1273-74. (ECF No. 82 at 12, 33:17-23; 34, 52:4-14.) And although Jane's pastoral counselor believes that Jane does suffer from "gender confusion," the counselor defines "gender confusion" not as a medical condition, but as when somebody does "not understand[]" his or her desire to be

treated as a different gender.  (*Id.* at 16, 52:9-25.)  Jane's pastoral counselor has not (and indeed, is not authorized to) formally diagnose Jane with any mental health condition related to gender identity.  (*Id.* at 12, 33:17-23; 34, 50:23-52:14.)

Nor does the record indicate that Jane's primary healthcare provider made an independent medical assessment that Jane needed to be kept out of school to avoid any harm caused by her use of a masculine name and pronouns.  Instead, the provider testified that she informed the school that Jane's anxiety "significantly increased with social transitioning in the school setting" in response to Plaintiff's report that Jane "missed a lot of school and they needed the doctor's note to say that she was having difficulty with mental health and needed to be provided home instruction." (*See id.* at 39, 70:5-15; 33-37, 46:5-62:12; ECF No. 49-3 at 2.)  The provider's notes that the provider submitted to the school between December 2023 to April 2024 were based on information she received from Plaintiff, as well as one visit with Jane in February when Jane told her that she "is much less anxious when she is not in the school building itself."  (ECF No. 82 at 41, 77:14-20.) Jane's provider, however, does not recall Jane ever informing her that she was more anxious at school than at home specifically due to social transitioning.  (*Id.* at 40, 73:16-75:3.)  In fact, she has not made any diagnosis or professional judgment about whether Jane is mature enough to socially transition.  (*Id.* at 32, 43:5-15.)

Absent evidence that Jane is suffering or diagnosed with a mental health condition related to gender identity, or evidence that the school actively encouraged Jane to socially transition as opposed to "passively recognizing" her wishes, the Court finds that Plaintiff has not demonstrated a likelihood of success on his constitutional claim regarding his right to direct Jane's medical care. *See Willey*, 680 F. Supp. 3d at 1275; *Foote v. Town of Ludlow*, 2022 WL 18356421, at *5 (D. Mass. Dec. 14, 2022) ("Plaintiffs have not alleged Defendant's actions were undertaken as a part

of a treatment plan for gender dysphoria or explained how referring to a person by their preferred name and pronoun, which requires no special training or skill, has clinical significance when there is no treatment plan in place.").

Because Plaintiff has not established an infringement of a fundamental right, Defendants need only satisfy a rational basis review. *Glucksberg*, 521 U.S. at 728. And as the Court has previously discussed, even if the Court were to find that the Policy burdened a fundamental right, the Third Circuit has already held in *Doe by and through Doe v. Boyertown Area School District*, under a more stringent strict scrutiny analysis, that a school district "had a compelling state interest in protecting transgender students from discrimination.'" 897 F.3d at 529-30. There, the Third Circuit considered whether a school district's policy permitting transgender students to use restrooms and locker rooms consistent with their gender identity—permission for which "was granted on a case-by-case basis"—violated the privacy rights of other students. *Id.* at 524. The Third Circuit recognized that "transgender students face extraordinary social, psychological, and medical risks," and that "when transgender students are addressed with gender appropriate pronouns . . . those students 'reflect the same, healthy psychological profile as their peers.'" *Id.* at 523, 528. The court also held that the policy "fosters an environment of inclusivity, acceptance, and tolerance," which "serve an important educational function for both transgender and cisgender students." *Id.* at 528-29. Accordingly, the policy not only advanced the "compelling state interest in protecting transgender students from discrimination," but also "benefit[ted] all students by promoting acceptance." *Id.* at 529.

Here, too, for purposes of this preliminary injunction, Defendants are likely to successfully show that their stated goals of protecting transgender students from discrimination at school and of fostering a diverse learning environment are compelling state interests, and that the Policy is

"specifically and narrowly framed" to accomplish those purposes. *Id.* at 530 (citing *Grutter*, 539 U.S. 306, 333 (2003)). (ECF No. 45 at 37-39.) The Court agrees with Defendants that "there is no less restrictive alternative" that would achieve the State's goal "of ensuring safe and supporting learning environment" for transgender students. (*Id.* at 40-41.)

Plaintiff asks the Court to find that Plaintiff has a substantive due process right to be notified and provide consent before the school district may refer to Jane by her own preferred name and pronouns. The issue before the Court is "not whether it is a good idea for school districts to notify parents of a minor's gender identity and receive consent before using alternative names and pronouns, but whether the United States Constitution mandates such parental authority [and consent]." *Regino*, 2023 WL 4464845, at *4. Based on the current record and lack of legal authority recognizing any such right, and because such a finding would "place the matter outside the arena of public debate and legislative action," the Court is not convinced that the relief Plaintiff seeks falls within the scope of the familial liberty interest protected under the United States Constitution. *Glucksberg*, 521 U.S. at 720 (citation omitted). Accordingly, Plaintiff has not demonstrated a likelihood of success on the merits with respect to Count Two.

### 2.    *Count Three – NJCRA*

Count Three alleges a violation of "the right to parent a minor child who is receiving a thorough and efficient education." (ECF No. 40 ¶¶ 84-85.) The New Jersey State Constitution sets forth that the New Jersey "Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." N.J. Const. art. VIII, § 4, para. 1.

Like in his original pleading, Plaintiff asserts in conclusory fashion that Board Policy 5756 makes it "impossible for Jane to receive a public education unless [Plaintiff] yield[s] his

constitutional and statutory parental rights." (ECF No. 40 ¶ 53; ECF No. 4 at 11.) But Plaintiff does not advance a specific argument in his moving papers about his likelihood of success on the merits of Count Three. Nor has Plaintiff cited any case law showing that this clause in the New Jersey Constitution applies under these circumstances. Plaintiff bears the burden of demonstrating a reasonable probability of eventual success on the merits. *See Del. River Port Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 920 (3d Cir. 1974). Therefore, Plaintiff has not met his burden with respect to Count Three.

### 3.    *Count Four – Supremacy Clause*

Count Four asserts a claim under § 1983 alleging that Board Policy 5756 violates the Department of Education Organization Act of 1979, 20 U.S.C. § 3401, and is therefore unconstitutional under the Supremacy Clause of Art. VI, cl. 2 of the United States Constitution. (ECF No. 40 ¶¶ 86-102.)

Section 3401(3) provides that "parents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role." This provision is one of ten congressional findings enumerated in the legislation that created the United States Department of Education in 1979.[14] Plaintiff argues that § 3401 is "the supreme law of the land" and that Board Policy 5756 and the NJLAD violate § 3401(3) to the extent that these laws "preclude parental knowledge and consent of social transitioning of their minor children." (ECF No. 44-1 at 16-21.) Plaintiff further contends that the American Rescue Plan Act of 2021, which appropriated billions of dollars to states "to support

---

[14]    Department of Education Organization Act, Pub. L. No. 96-88, 93 Stat. 668 (1979); *see Cottrell v. U.S. Dep't of Educ.*, 430 F. Supp. 3d 1287, 1290 (N.D. Fla. 2019) ("The Department of Education ('DOE') is an executive-branch agency that Congress created in 1979 through the Department of Education Organization Act . . . codified at 20 U.S.C. §§ 3401-3508.").

their education programs," cited § 3401 as its statutory authority, and that school districts that accepted federal funds under the American Rescue Plan Act therefore "implicitly accepted Congress's finding" in § 3401(3).  (*Id.*)  Despite conceding that § 3401(3) does not provide any enforcement mechanism, Plaintiff argues that the Supremacy Clause confers a right of action to pursue an injunction to assure "the supremacy of federal law."  (*Id.* at 20-21 (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015)).

"[I]f an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted."  *Armstrong*, 575 U.S. at 326 (citing *Ex Parte Young*, 209 U.S. 123, 155-56 (1908)).  But a federal statute has preemptive effect only where the federal law "imposes restrictions or confers rights on private actors," and the state law "confers rights or imposes restrictions that conflict with the federal law."  *See Kansas v. Garcia*, 589 U.S. 191, 202 (2022); *Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, F.4th 176, 181 (3d Cir. 2021).

Here, Plaintiff has not cited, nor has the Court located, any authority to support the proposition that § 3401(3) confers any enforceable right to individuals.  Nor do the "traditional tools of statutory construction" show that Congress has "unambiguously conferred" individual rights in § 3401(3).  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) (finding that the nondisclosure provisions of educational records in the Family Educational Rights and Privacy Act of 1974 (FERPA) did not create an enforceable right because they lacked "the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights").  The plain language of Section 3401(3) appears to express only "general statements of federal policy" and does not unambiguously confer any protections to a class of beneficiaries.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 22-23 (1981); *Alexander v. Sandoval*, 532 U.S. 275, 288-

89 (2001) ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'").  Because § 3401(3) does not appear to confer any individual rights to private parties, it cannot preempt state regulations sufficient to justify injunctive relief.  *Armstrong*, 575 U.S. at 326.

Absent such authority, Plaintiff has not met his burden of demonstrating a likelihood of success on the merits with respect to Count Four.  *See also E. Shoshone Tribe v. N. Arapaho Tribe*, 926 F. Supp. 1024, 1032 (D. Wyo. 1996) (finding reliance on "novel, untested" theory "does not provide any assurance of eventually prevailing on the merits"); *Ruppert v. Washington*, 366 F. Supp. 683, 685 (D.D.C. 1973) (denying preliminary injunction where the "issues [we]re novel" and "the likelihood of success on the merits appear[ed] very slight").

### D.    Irreparable Harm

Plaintiff argues that because his "fundamental constitutional rights have and continue to be violated," he has been irreparably harmed "since money damages can never replace a constitutional right."  (ECF No. 49 at 18.)  But because Plaintiff has not shown a reasonable likelihood of success on the merits, Plaintiff has not established a likelihood that he will be irreparably harmed if the Board Defendants continue to recognize Jane by her preferred name and pronouns.  Because a failure to show a likelihood of success on the merits "must necessarily result in the denial of a preliminary injunction," the Court need not address the remaining factors.  *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012) (citations omitted); *Friedland v. Zickefoose*, 538 F. App'x 122, 124 (3d Cir. 2013).

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunction (ECF No. 44) is

**DENIED**.  An appropriate Order follows.

Dated: November 27, 2024

**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**